1  **PORTER | SCOTT**
2  A PROFESSIONAL CORPORATION
   Martin N. Jensen, (SBN 232231)
3  mjensen@porterscott.com
4  Jeffrey A. Nordlander, (SBN 308929)
5  jnordlander@porterscott.com
   350 University Avenue, Suite 200
6  Sacramento, California 95825
7  Tel: 916.929.1481
   Fax: 916.927.3706
8
9  Attorneys for Defendants

10         **UNITED STATES DISTRICT COURT**
11  **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**
12

13  HIGHMARK DIGITAL, INC., a          CASE NO. 2:18-cv-06105-SJO-AS
    California corporation,
14                                     **DECLARATION OF DAVID
15                                     WINTER IN SUPPORT OF
              Plaintiff,               DEFENDANTS' OPPOSITION TO
    v.                                 HIGHMARK DIGITAL, INC.'S
16                                     MOTION FOR SUMMARY
17  CASABLANCA DESIGN CENTERS,         JUDGMENT**
    INC., a California corporation; FOUR
18  SEASONS WINDOWS, INC., a
    California corporation; INTERIOR   **Date:     February 18, 2020**
19  DOOR & CLOSET COMPANY, an          **Time:     10:00 a.m.**
20  unincorporated California company; **Judge:    S. James Otero**
    ONE DAY DOORS AND CLOSETS,         **Location: Courtroom 10C**
21  INC., a California corporation; DAVID
22  WINTER, an individual; and ONE     **Hon. S. James Otero**
    DAY ENTERPRISES, LLC, a            **Magistrate Judge Alka Sagar**
23  Delaware company,
24                                     **Trial: 6/9/20**
25            Defendants.
26
27  _____/
28  {02129297.DOCX}                    1

DECLARATION OF DAVID WINTER IN SUPPORT OF DEFENDANTS'
OPPOSITION TO HIGHMARK DIGITAL, INC.'S MOTION FOR SUMMARY
JUDGMENT

PORTER | SCOTT
350 University Avenue, Suite 200
Sacramento, CA  95825
TEL: 916.929.1481
FAX: 916.927.3706

I, David Winter, declare:

1.     Except for those matters stated on information and belief, the facts set forth herein are true of my own personal knowledge and if called as a witness, I could and would properly testify hereto.

2.     I co-founded HighMark Digital, Inc. ("HighMark") with my father-in-law, Mike McElroy.  In 2011, I was the Vice of President of HighMark.

3.     Four Seasons Windows, Inc. ("Four Seasons") were parties to a Master Agreement.

4.     After Four Seasons and/or Dairl and Glenn Johnson stopped using One-Cut™ in or around November 2011, I did not request that Four Seasons return all materials containing confidential information or destroy all such materials and certify that such destruction occurred.  I do not believe that anyone else associated with HighMark made such a request.

5.     Attached hereto as **Exhibit "A"** is a true and correct copy of e-mail correspondence sent by Richard Matulia to the Board of Directors of Plaintiff HighMark Digital, Inc. ("Plaintiff") in which I believe Richard Matulia disparages me.

6.     Attached hereto as **Exhibit "B"** is a true and correct copy of my July 16, 2015, resignation letter to Richard Matulia, Plaintiff's Chief Executive Officer.

PORTER | SCOTT
350 University Avenue, Suite 200
Sacramento, CA  95825
TEL: 916.929.1481
FAX: 916.927.3706

{02129297.DOCX}

2

DECLARATION OF DAVID WINTER IN SUPPORT OF DEFENDANTS'
OPPOSITION TO HIGHMARK DIGITAL, INC.'S MOTION FOR SUMMARY
JUDGMENT

7.     Attached hereto as **Exhibit "C"** is a true and correct copy of my July 9, 2015, correspondence to Glenn Johnson making it clear that I would not bring over any dealers or assets from HighMark or do anything to the detriment of HighMark.

8.     Attached hereto as **Exhibit "D"** is a true and correct copy of records provided to me by Wells Fargo regarding my personal bank account in July of 2015, putting me on notice of changes being made to the account.

9.     Attached hereto as **Exhibit "E"** is a true and correct copy of records provided to me via email by Facebook regarding my personal account in July of 2015, putting me on notice of changes being made to the account.

10.     I believe that my personal Wells Fargo bank account and personal Facebook accounts were accessed by HighMark shortly after my resignation in July of 2015. The changes to my personal Wells Fargo Bank Account included the changing of my and my wife's personal password and the removal of my and my wife's name and contact information.  I was not informed by HighMark that changes were going to be made to my Wells Fargo bank account and my personal Facebook account prior to when such changes were made. I did not consent to HighMark making changes to my personal Wells Fargo bank account and my personal Facebook page.

11.     I believe that my personal Facebook page was accessed and the account

{02129297.DOCX}

DECLARATION OF DAVID WINTER IN SUPPORT OF DEFENDANTS' OPPOSITION TO HIGHMARK DIGITAL, INC.'S MOTION FOR SUMMARY JUDGMENT

PORTER | SCOTT
350 University Avenue, Suite 200
Sacramento, CA  95825
TEL: 916.929.1481
FAX: 916.927.3706

settings were changed. The changes included the changing of my personal password and the removal of my personal email account. I believe that these changes were made by HighMark.

12.     I brought a claim before the California labor commissioner for unpaid wages and unreimbursed expenses against HighMark in 2016. I was successful in my claims before the labor commissioner. I secured a judgment against Highmark in the amount of $221,875.53.  Attached hereto as **Exhibit "F"** is a true and correct copy of the filed judgment in Placer County dated July 18, 2016 and the Order, Decision or Award of the Labor Commissioner.

13.     In August of 2015 I began employment for Casablanca Design Centers, Inc. and ended my employment with that company in December of 2016. In January of 2017 I began employment for One Day Enterprises, LLC and remain an employee of that company as of the date of this declaration.

14.     In or around November 2019, I instructed an employee of One-Day Enterprises, LLC to contact Holz-Her GmbH ("Holz-Her") and request that they provide a sample HOP file for cutting a door.  A true and correct copy of the sample HOP file Holz-Her provided is attached hereto as **Exhibit "G."**

15.     While I was affiliated with HighMark, I believe that CadCode and HighMark did not execute a confidentiality or trade secret agreement regarding

{02129297.DOCX}                                                  4

DECLARATION OF DAVID WINTER IN SUPPORT OF DEFENDANTS'
OPPOSITION TO HIGHMARK DIGITAL, INC.'S MOTION FOR SUMMARY
JUDGMENT

PORTER | SCOTT
350 University Avenue, Suite 200
Sacramento, CA  95825
TEL: 916.929.1481
FAX: 916.927.3706

Plaintiff's use of the CadCode Software to generate HOP files.

16.     One Day Enterprises, LLC operates from its door manufacturing facility in Rocklin, California, and has done so since the opening of the Rocklin, California facility in January 2017.

17.     Manufacturing interior doors using electronic measuring devices and computer numerical control ("CNC") machines is a widely-known process.  Jeld-Wen, Inc. ("Jeld-Wen"), a world-wide manufacturer of windows and doors and largest global door and window manufacturer, launched its interior door replacement program in or around 2009.  Attached hereto as **Exhibit "H"** is a true and correct copy of a November 23, 2009, announcement of the Jeld-Wen interior door program, which is publicly available at: https://windowanddoor.com/news-item/companies/jeld-wen-launches-interior-door-replacement-program.

18.     Jeld-Wen produced brochures describing the use of electronic measuring devices and CNC machines to manufacture doors.  Attached hereto as **Exhibit "I"** is a Jeld-Wen marketing brochure demonstrating the use of Jeld-Wen's electronic measuring the – the "Door Digitizer" – and a Komo CNC machine to manufacture interior doors.

19.     HighMark once had a partnership with Jeld-Wen under which Jeld-Wen produced doors for HighMark.  HighMark would send raw measurement data

{02129297.DOCX}

5

DECLARATION OF DAVID WINTER IN SUPPORT OF DEFENDANTS'
OPPOSITION TO HIGHMARK DIGITAL, INC.'S MOTION FOR SUMMARY
JUDGMENT

PORTER | SCOTT
350 University Avenue, Suite 200
Sacramento, CA  95825
TEL: 916.929.1481
FAX: 916.927.3706

from HighMark's measurement device to Jeld-Wen for processing by Jeld-Wen's proprietary conversion code and the CAM software used by Jeld-Wen.  Jeld-Wen manufactured the doors on their CNC machines and returned them to HighMark or HighMark's customers.

20.     John Ambruz and Paul Bernards, members of the HighMark Board of Directors, were previously employed by Jeld-Wen and were involved in negotiations between HighMark and Jeld-Wen and were intimately aware of Jeld-Wen's system for processing doors, including the use of a measuring device and proprietary conversion code.

21.     Michael McElroy sold his interior door replacement company, Interior Door and Replacement Company ("IDRC"), in 2015.  IDRC uses electronic measuring devices and CNC machines to manufacture replacement interior doors and continues to operate from its facility in Santa Clara, California.  IDRC is a direct competitor of HighMark.

22.     CadCode had the ability to translate XML generated by the MetaWorks Software into machine-specific code readable by CNC machines produced by different manufacturers.  HighMark cut doors on CNC machines manufactured by several companies, including Komo, Biese, Rierge, and other manufacturers.

23.     When the Master Agreement was drafted, CAM software capable of

{02129297.DOCX}

PORTER | SCOTT
350 University Avenue, Suite 200
Sacramento, CA  95825
TEL: 916.929.1481
FAX: 916.927.3706

6

DECLARATION OF DAVID WINTER IN SUPPORT OF DEFENDANTS' OPPOSITION TO HIGHMARK DIGITAL, INC.'S MOTION FOR SUMMARY JUDGMENT

translating XML into machine-specific cutting instructions, was intended to be installed locally onto HighMark licensees' CNC machines or local computer at the customer's location.     Licensees uploaded door frame measurement data to HighMark and downloaded converted XML files generated by the MetaWorks Software, not machine-specific cutting instructions, which were at that time were generated locally by software installed on the customer's CNC machine or local computer.

24.     Dairl and Glenn Johnson did not express an interest in partnering or otherwise going into business with HighMark prior to my resignation in July 2015. My understanding is that they were interested in working with me personally.


I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was signed on January 3, 2020, in Sacramento, California.

David Winter

{02129297.DOCX}                                              7

DECLARATION OF DAVID WINTER IN SUPPORT OF DEFENDANTS'
OPPOSITION TO HIGHMARK DIGITAL, INC.'S MOTION FOR SUMMARY
JUDGMENT

PORTER | SCOTT
350 University Avenue, Suite 200
Sacramento, CA  95825
TEL: 916.929.1481
FAX: 916.927.3706

# EXHIBIT A



Richard Matulia <richard@highmarkdigital.com>

## Propose We Cancel/Postpone Today's BOD Call

8 messages

**Richard Matulia** <richard@highmarkdigital.com>        Thu, May 28, 2015 at 12:57 PM
To: John Ambruz <jfambruz@gmail.com>, Jonathan Morgan <jmorgan@mmainvestments com>, Paul Bernards <pbernards@bell.net>, david townsend <dhtownsend20@gmail.com>

Gentlemen,

With all due respect, I do not wish to continue to go through the motions. Shame on me for not insisting sooner, but it is not acceptable to me to continue to report the same things.

Are we getting progress? Yes

Is it worthwhile progress? Not really.

I didn't sign up for mediocre, so I won't pretend that I accept it. To say that I'm proud of hitting exceeding last months results is BS. We all know that we need results of 2,500+ doors, etc. Praising the progress of 1,200 or 1,500 is pathetic.

I'm overly passionate about the success of this business, so here's what I'm proposing as a draft/surface level...

Ceasing to do business development (i.e. dealers) and having the goal of increasing sales by 1,000+ doors means you need a really good sales/marketing plan or professional. A recent experiment indicates we don't have the plan or personnel to accomplish this. My experiment, which I have no expertise or skills, provided shocking results. I forced 2 promos with virtually no thought and to be implemented in 1 day and gone in a week.



CONFIDENTIAL

EXHIBIT A
8

HMDI.0006704

Jumping back into business development appears to be a critical necessity, however, we have likely spent $100k between November and March with ZERO results. We can't just jump back into signing up people just for the sake of signing them up. Results & Criteria must be achieved.

I cannot allow the organization to continue to run as "Damage Control Unlimited" - as you all know the previous failures of OC, Home Depot, Lawsuits, and spending countless man-hours over the last 90 days to collect $4,500 over less than 50 doors from Boston.

If you want drastic change & improvement (which I do), we have to make some drastic decisions.

Bagg - decision made, just awaiting contractor's license. Status check estimates that we are still 2 weeks away from approval.

Dave: the results warrant corrective action. Title change and responsibilities must be addressed and clearly embraced by all. There is currently not clear.
- Full time marketing: Franchises hate him - however this is 1 of the company's most critical priorities
- Dealer development: everyone knows this story
- New Laser or dealing with TPR:  nothing Joe can't handle

So what exactly is the right position/responsibility?  Are we stuck? I'm very open to suggestions, but they must come with quantifiable, value-added results.

For the right things to happen, we need the right people, not anchors. I know there are assumed risks with change, but we cannot afford to stay the same.

I propose we cancel today's call and regroup for a strategic call early next week. I can be available for questions if you wish to contact me directly. Unless anyone disagrees, I will cancel/postpone. Dave has excused himself anyways due to travel/meeting Dan in Chicago to take over his marketing.

For the sake of reporting, I've attached the most current sales by location results.

I apologize if I've said anything out of line, but I don't think I provide the right value by staying complacent.

**90 Plan - May Results Through 5-27.pdf**
413K

**John Ambruz** <jfambruz@gmail.com>                                    Thu, May 28, 2015 at 1:02 PM
To: Richard Matulia <richard@highmarkdigital.com>
Cc: dave townsend <dhtownsend20@gmail.com>, Paul Bernards <pbernards@bell.net>, Jonathan Morgan <jmorgan@mmainvestments.com>

Agreed on all fronts.

John Ambruz
(914) 319-5586 (cell)

[Quoted text hidden]

**Jonathan Morgan** <jmorgan@mmainvestments.com>                                    Thu, May 28, 2015 at 2:14 PM
To: Richard Matulia <richard@highmarkdigital.com>, John Ambruz <jfambruz@gmail.com>, Paul Bernards <pbernards@bell.net>, david townsend <dhtownsend20@gmail.com>

Hi Richard,

No, I don't think you've said anything out of line. We need to know what you really think. You live it every day.

CONFIDENTIAL

EXHIBIT A
9

HMDI.0006705

I think the marketing/promo point you make comes back to the discussion following the first board meeting I attended · marketing isn't enough; you need to have the right strategy.  If Dave has been sabotaging the marketing managers strategy, that needs to be taken care of.

As far as business development goes, I think you're right, but I'm not convinced signing up more dealers is the way to go.  They generally don't have enough skin in the game to really commit.

I will be in meetings all around the UK next week, so I probably won't be able to call in, but please go ahead without me.  I will email any further thoughts I have and encourage everyone else to do the same.

I think we all agree that drastic action is necessary and you're the guy the board has chosen to do the job.  The only question is how can we help you to execute.


Jonathan



*Jonathan Morgan*

*Executive Vice-President*


**Morgan Meighen & Associates Limited**

10 Toronto Street

Toronto, ON M5C 2B7

Main Phone: 416·366·2931 Ext. 233

Toll Free:  1·866·443·6097

www.mmainvestments.com

[Quoted text hidden]

Spam
Phish/Fraud
Not spam
Forget previous vote


**dave townsend** <dhtownsend20@gmail.com>                                      Thu, May 28, 2015 at 2:54 PM
To: Richard Matulia <richard@highmarkdigital.com>

CONFIDENTIAL

EXHIBIT A
10

HMDI.0006706

11/5/2019                        Highmark Digital, Inc Mail 4902se We Cancel/Postpone Today's BOD Call

Richard,

You have my full support. I'm a hard nosed factory guy, I get tired of the BS and over complication the "sales professionals" create. I got what your saying, push your agenda, as it is exactly what I would do. (take no prisoners)

Thanks

Dave

**From:** Richard Matulia [mailto:richard@highmarkdigital com]
**Sent:** May 28, 2015 12:57 PM
**To:** John Ambruz; Jonathan Morgan; Paul Bernards; david townsend
**Subject:** Propose We Cancel/Postpone Today's BOD Call

Gentlemen,

[Quoted text hidden]

Paul Bernards <pbernards@bell.net>                              Thu, May 28, 2015 at 3:11 PM
To: Jonathan Morgan <jmorgan@mmainvestments.com>
Cc: Richard Matulia <richard@highmarkdigital.com>, John Ambruz <jfambruz@gmail.com>, david townsend <dhtownsend20@gmail.com>

We need a call Monday. 4pm edt. Just the five of us as available. Richard will present his go forward recommendation and we will agree on mandate.

Richard please send a calendar invite and dial in.

[Quoted text hidden]

> [Quoted text hidden]
> [Quoted text hidden]

> <image001.png>

Jumping back into business development appears to be a critical necessity, however, we have likely spent $100k between November and March with ZERO results. We can't just jump back into signing up people just for the sake of signing them up. Results & Criteria must be achieved.

I cannot allow the organization to continue to run as "Damage Control Unlimited" - as you all know the previous failures of OC, Home Depot, Lawsuits. and spending countless man-hours over the last 90 days to collect $4,500 over less than 50 doors from Boston.

If you want drastic change & improvement (which I do), we have to make some drastic decisions.

CONFIDENTIAL                                        EXHIBIT A
                                                                    11              HMDI.0006707

Bagg - decision made, just awaiting contractor's license. Status check estimates that we are still 2 weeks away from approval.

Dave: the results warrant corrective action. Title change and responsibilities must be addressed and clearly embraced by all. There is currently not clear.

- Full time marketing: Franchises hate him - however this is 1 of the company's most critical priorities

- Dealer development: everyone knows this story

- New Laser or dealing with TPR: nothing Joe can't handle

So what exactly is the right position/responsibility? Are we stuck? I'm very open to suggestions, but they must come with quantifiable, value-added results.

For the right things to happen, we need the right people, not anchors. I know there are assumed risks with change, but we cannot afford to stay the same.

I propose we cancel today's call and regroup for a strategic call early next week. I can be available for questions if you wish to contact me directly. Unless anyone disagrees, I will cancel/postpone. Dave has excused himself anyways due to travel/meeting Dan in Chicago to take over his marketing.

For the sake of reporting, I've attached the most current sales by location results.

I apologize if I've said anything out of line, but I don't think I provide the right value by staying complacent.

[Quoted text hidden]



CONFIDENTIAL

EXHIBIT A
12          HMDI.0006708

# EXHIBIT B

HighMark Digital, Inc
CEO Richard Matulia
1751 Aviation Blvd., Suite B
Lincoln, Ca 95648

July 16, 2015

Dear Mr. Matulia,

As of Thursday, July 16, 2015, I am resigning from my employment with HighMark Digital, Inc, ("Highmark") and subsequently from all positions and roles within HighMark, as well as with any and all of its parent, subsidiary or affiliate companies. I will stay on for one additional day, Friday, July 17, 2015, to assist with any transitional work that Highmark might need.

Upon my resignation and termination of my employment, Highmark owes me $167,692.32 in unpaid salary, accrued vacation and loans, pursuant to the following breakdown:

- Unpaid salary – $137,735.42
- Accrued vacation – $20,827.90
- Short-term loans when I helped the company cover payroll – $9,129.00

In addition, Highmark owes me my final paycheck for the most recent pay periods.

I expect to pick up my final paycheck including the items above on my last day, July 17, 2015.

By means of this resignation letter, I also relinquish any and all board positions that I currently hold with Highmark, as well as any duties or obligations that are associated with those board positions.

Upon my resignation, it is my understanding that I will no longer have any duties or responsibilities with respect to Highmark. I will also have no past, present, or future obligations to Highmark. Furthermore, upon my resignation, it is my understanding and expectation that Highmark will take full responsibility for all of the duties, functions, commitments and obligations associated with my employment or other relationship with Highmark.

As soon as practical after receiving this resignation letter, I request that Highmark remove my name from all documentation and registration pertaining to Highmark's business, including documentation and registration with government entities, banks or financial institutions, or any other entities. This includes, but is not limited to, documentation and registration with the Contractors State License Board, any bank accounts that Highmark or its parents, subsidiaries, or affiliates have with U.S. Bank, any of Highmark's merchant accounts, any documentation and registration with any other state or federal agencies (including, but not limited to, the California Secretary of State,

DEF_000180
EXHIBIT B
13

the California State Board of Equalization, etc.), and any other documentation, whether public or private, that lists me as an director, officer or employee of Highmark.

In addition, this letter shall serve as my notice that I no longer consent to being a personal guaranty for Highmark (or any of its parents, subsidiaries, or affiliates) on any credit card accounts or other lines of credit, and this letter serves as revocation of any agreements where I agreed to be a personal guarantee for any accounts used by Highmark (or any of its parents, subsidiaries, or affiliates). These accounts include, but are not limited to, any Wells Fargo credit card accounts for Grand Mark Solutions, Highmark Digital, or HomeStory, any lines of credit for HighMark Digital, any credit card accounts with Home Depot, any credit card accounts with Shell, and any other credit cards or lines of credit for Grand Mark Solutions, Highmark Digital, HomeStory, or any of Highmark's parents, subsidiaries, or affiliates.

It is my understanding that this resignation letter comports with all provisions and requirements of any employment agreements, any stock purchase agreements, and other agreements, bylaws, or procedures that may exist.

Please let me know if you have any questions and I wish you the best.

Thank you,

Dave Winter

# EXHIBIT C

**Attachments:**                One Day Proposal.docx

**From:** Dave Winter <davemwinter@yahoo.com>
**Sent:** Thursday, July 9, 2015 8:37 AM
**To:** gjohnson@interiordoorco.com
**Cc:** Dave Winter <davemwinter@yahoo.com>
**Subject:** Re: One Day Doors & Closets

Glenn,

Th=nk you for the phone call a few moments ago. I am excited to move forward =ased on our conversations and points we discussed (outlined below) and I a=preciate your proposal and offer of a signing bonus upon committing t=is week.

- The production assets=of Casablanca will be transferred over to One Day Doors and Closets (OD) i= approximately one year and OD will assume all third party debt on the equ=pment at that time.
- I will=be the CEO and therefore be responsible for the overall organization. Dair= will lead the production/manufacturing side, Adam with marketing both to =ell dealerships and doors and closets through dealerships, and you selling=and sales training. I will of course help wherever I can in the above and =lso with the operations structure, technology and other areas.

  <=i id="yui_3_16_0_1_1436366276011_10875">I cannot bring over any dealers =r assets from my existing company or do anything to the detriment of that =ompany. This is an area that we should stay clear of for the protection of=all and ensure that we are ethical in all areas. This doesn't mean that if=a HomeStory dealer doesn't approach us we couldn't take advantage of the o=portunity.

- To clarif=, the salary increase will occur when the total (from Casablanca and deale=s) number of doors hits 2,000 in a month.
- Within the next week, a basic employment agreement an= partnership agreements will be written to include details. I can get this=done.
- My employment and in=olvement will need to remain confidential until we both agree that it is a=vantageous to make it publicly known.
- These discussions shall always remain confidential. =/li>

I am ver= excited about this business plan and the opportunity to bring our knowled=e, experience and strengths together. Not that it guarantees success, but = am quite confident in our future. I will give notice to my existing emplo=er within the next few weeks so I would anticipate getting started with yo= approximately August 3.

Thanks again and I'm looking forward to joining your team and ge=ting started soon. Please call me for any reasons.

Regards,

Dave Winter

1

Exhibit No. 23

D. Winter
3/20/19

Elizabeth W____, ___
CCRR, RPR, CSR No. 12155

EXHIBIT C
15

On Thursday, July 2, 2015 9:26 PM, "gjohnson=interiordoorco.com" <gjohnson@interiordoorco.com>
wrote:
=

Dave,
We are pleased to provide you with the attached=LOI to kick off our new business venture.  Let's talk
in the morning=    We're ready.

Respectfully,

Glenn Jo=nson
Interior Door & Closet Company
Interior Doors | Closets | S=utters
310.779.5514 cell www.InteriorDoorCo.com

>

EXHIBIT C
16

# EXHIBIT D



**From:** Wells Fargo Online <alerts@notify.wellsfargo.com>
**Subject: Your Wells Fargo contact information has been updated**
**Date:** July 17, 2015 at 10:00:27 AM PDT
**To:** davemwinter@yahoo.com

wellsfargo.com



## We have updated your contact information

- Phone Number
- Email Address
- Mailing Address
- Home/Permanent Address

For details about what changed, sign on to Messages and Alerts.
To view the updates, or make additional updates, sign on to update your contact information.

If you did not make this request online, by phone, or at a Wells Fargo store, please call us immediately at 1-800-869-3557 (for personal banking) or 1-800-225-5935 (for small business banking). We are available 24 hours a day, 7 days a week.

**wellsfargo.com** | Fraud Information Center

Note: You may also receive this alert if you are a "Guest User" with view-only access on another customer's account. The Administrator on those accounts may have recently updated your email address. Please contact the Administrator for assistance.

Please do not reply to this email.

a00f5963-b67f-49a0-9241-87474a5d6bed

Regards,

Dave Winter
CEO, One Day Enterprises, LLC.

dave@onedayhq.com
916-244-2417

www.OneDayDoorsAndClosets.com



**From:** Wells Fargo Online <alerts@notify.wellsfargo.com>
**Subject: Wells Fargo Username Change Confirmation**
**Date:** July 17, 2015 at 10:48:12 AM PDT
**To:** davemwinter@yahoo.com

wellsfargo.com



## Your username has been changed

Your Wells Fargo username has been changed. Please use your new username the next time you sign on.

To make additional changes to your profile, sign on and go to Account Services.

If you did not make this username change, please call Wells Fargo immediately at 1-866-867-5568. We are available 24 hours a day, 7 days a week. Please do not reply to this email.

For all other Online Banking related inquiries, please call Wells Fargo Online Customer Service at 1-800-956-

4442.

**wellsfargo.com** | Fraud Information Center

b5d0f0dd-6b11-497a-b327-59f15052a295

Regards,

Dave Winter
CEO, One Day Enterprises, LLC.

dave@onedayhq.com
916-244-2417

www.OneDayDoorsAndClosets.com

DEF_000199
EXHIBIT D
20

# EXHIBIT E



**From:** "Facebook" <password+y4fy4jt9@facebookmail.com>
**Subject: Somebody requested a new password for your Facebook account**
**Date:** July 17, 2015 at 9:34:10 AM PDT
**To:** Dave Winter <davemwinter@yahoo.com>
**Reply-To:** noreply <noreply@facebookmail.com>



Regards,

Dave Winter
CEO, One Day Enterprises, LLC.

dave@onedayhq.com
916-244-2417

www.OneDayDoorsAndClosets.com



From: "Facebook" <security@facebookmail.com>
**Subject: Facebook password reset**
**Date:** July 17, 2015 at 9:36:17 AM PDT
**To:** Dave Winter <davemwinter@yahoo.com>
**Reply-To:** noreply <noreply@facebookmail.com>

**facebook**

Hi Dave,

Your Facebook password was reset using the email address dave@highmarkdigital.com on Friday, July 17, 2015 at 9:36am (PDT).

Operating system:     **Windows**
Browser:              **Firefox**
IP address:           **2602:304:b355:9a80:a00f:524:7467:7c9d**
Estimated location:   **Richardson, TX, US**

**If you did this,** you can safely disregard this email.

**If you didn't do this,** please secure your account.

Thanks,
The Facebook Security Team

This message was sent to davewinter@yahoo.com at your request.
Facebook, Inc., Attention: Department 415, PO Box 10005, Palo Alto, CA 94303

Regards,

Dave Winter
CEO, One Day Enterprises, LLC.

dave@onedayhq.com
916-244-2417

www.OneDayDoorsAndClosets.com



**From:** "Facebook" <security@facebookmail.com>
**Subject: Facebook primary email changed to dave@highmarkdigital.com**
**Date:** July 17, 2015 at 12:31:22 PM PDT
**To:** Dave Winter <davemwinter@yahoo.com>
**Reply-To:** noreply <noreply@facebookmail.com>

**facebook**

Hi Dave,

Your primary email address or phone number was changed from **davemwinter@yahoo.com** to **dave@highmarkdigital.com** on Friday, July 17, 2015 at 12:31pm (PDT).

**If you did this, you can safely disregard this email.**

**If you didn't do this, please** secure your account.

Thanks,
The Facebook Security Team

This message was sent to **davemwinter@yahoo.com** at your request.
Facebook, Inc., Attention: Department 415, PO Box 10005, Palo Alto, CA 94303.

EXHIBIT E
25



Regards,

Dave Winter
CEO, One Day Enterprises, LLC.

dave@onedayhq.com
916-244-2417

www.OneDayDoorsAndClosets.com

DEF_000187

EXHIBIT E
26



**From:** "Facebook" <security@facebookmail.com>
**Subject: davemwinter@yahoo.com removed from your Facebook account**
**Date:** July 17, 2015 at 12:31:37 PM PDT
**To:** Dave Winter <davemwinter@yahoo.com>
**Reply-To:** noreply <noreply@facebookmail.com>

**facebook**

Hi Dave,

The email address **davemwinter@yahoo.com** was removed from your Facebook account on Friday, July 17, 2015 at 12:31pm (PDT).

**If you did this,** you can safely disregard this email.

**If you didn't do this,** please secure your account.

Thanks,
The Facebook Security Team

This message was sent to **davemwinter@yahoo.com** at your request.
Facebook, Inc., Attention: Department 415, PO Box 10005, Palo Alto, CA 94303



Regards,

Dave Winter
CEO, One Day Enterprises, LLC.

dave@onedayhq.com
916-244-2417

www.OneDayDoorsAndClosets.com

DEF_000189
EXHIBIT E
28



**From:** "Facebook" <security@facebookmail.com>
**Subject: Someone may have accessed your account**
**Date:** July 17, 2015 at 3:35:31 PM PDT
**To:** Dave Winter <davemwinter@yahoo.com>
**Reply-To:** noreply <noreply@facebookmail.com>

## facebook

Hi Dave,

It looks like someone may have accessed your Facebook account. To secure your account, you'll need to answer a few questions and change your password the next time you go to Facebook.

For your protection, no one can see you on Facebook until you secure your account.

Thanks,
The Facebook Security Team

**Secure Your Account Now**

This message was sent to highmarkdigital@gmail.com at your request.
Facebook, Inc., Attention: Department 415, PO Box 10005, Palo Alto, CA 94303

DEF_000190
EXHIBIT E
29



Regards,

Dave Winter
CEO, One Day Enterprises, LLC.

dave@onedayhq.com
916-244-2417

www.OneDayDoorsAndClosets.com

DEF_000191
EXHIBIT E
30



**From:** "Facebook" <security@facebookmail.com>
**Subject:** (650) 814-8754 added to your Facebook account
**Date:** July 17, 2015 at 3:39:18 PM PDT
**To:** Dave Winter <davemwinter@yahoo.com>
**Reply-To:** noreply <noreply@facebookmail.com>

**facebook**

Hi Dave,

The phone number **(650) 814-8754** was added to your Facebook account on Friday, July 17, 2015 at 3:39pm (PDT).

**If you did this,** you can safely disregard this email.

**If you didn't do this,** please secure your account.

Thanks,
The Facebook Security Team

This message was sent to davemwinter@yahoo.com at your request.
Facebook, Inc. Attention: Department 415. PO Box 10005, Palo Alto, CA 94303



Regards,

Dave Winter
CEO, One Day Enterprises, LLC

dave@onedayhq.com
916-244-2417

www.OneDayDoorsAndClosets.com



**From:** "Facebook" <security@facebookmail.com>
**Subject: Login Approvals has been turned on**
**Date:** July 17, 2015 at 3:39:31 PM PDT
**To:** Dave Winter <davemwinter@yahoo.com>
**Reply-To:** noreply <noreply@facebookmail.com>

**facebook**

Hi Dave,

Login Approvals is now activated. A security code is required when logging in from an unknown browser.

- You can always log in from a known browser.
- Set up app passwords to log into apps that can't ask you for your security code.

If you want to turn off Login Approvals, go to your Security Settings.

Thanks,
The Facebook Security Team

This message was sent to davemwinter@yahoo.com at your request.
Facebook, Inc., Attention: Department 415, PO Box 10005, Palo Alto, CA 94303

# EXHIBIT F

**LABOR COMMISSIONER, STATE OF CALIFORNIA**
Department of Industrial Relations
Division of Labor Standards Enforcement
2031 Howe Avenue, Suite 100
Sacramento, CA 95825
Tel: (916) 263-2841   Fax: (916) 263-2853

(For Court use only)

**FILED**
Superior Court of California
County of Placer

**JUL 18 2016**

Jake Chatters
Executive Officer & Clerk
By: M. Anderson, Deputy

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF __Placer__

JUDICIAL DISTRICT

PLAINTIFF:

David Winter

DEFENDANT: HIGHMARK DIGITAL, INC., a California corporation, GRAND MARK
SOLUTIONS, INC., a California corporation, each jointly and severally
liable

Court number

**SCV0038183**

| STATE CASE NUMBER | REQUEST THAT CLERK ENTER JUDGMENT AND JUDGMENT ON FINAL |
| --- | --- |
| **08 - 76615 CM** | ORDER, DECISION OR AWARD OF THE LABOR COMMISSIONER |

### REQUEST THAT CLERK ENTER JUDGMENT

The Order, Decision or Award of the Labor Commissioner has become final and the clerk is requested to enter judgment immediately in conformity with the accompanying certified copy.

LABOR COMMISSIONER, STATE OF CALIFORNIA      BY _____

DATED:   July 13, 2016                                    Kerry Lewis                    DEPUTY

### JUDGMENT

A certified copy of a final Order, Decision or Award of the Labor Commissioner has been filed with this court. Judgment therefore is entered as follows: **Plaintiff recover from Defendant.**

(1)  $ ___182,825.97___  for wages and expenses pursuant to Labor Code Section(s) 98.1 and/or 2802;

(2)  $ ___0.00___  for liquidated damages pursuant to Labor Code Section 1194.2;

(3)  $ ___16,178.86___  interest pursuant to Labor Code Section(s) 98.1(c), 1194.2 and/or 2802(b);

(4)  $ ___19,082.40___  for additional wages accrued pursuant to Labor Code Section 203 as a penalty

(5)  $ ___0.00___  for penalties pursuant to Labor Code Section 203.1.

(6)  $ ___1,500.00___  other (specify):  **for penalties pursuant to Labor Code Sections 226(f) and 1198.5(k).**

(7)  $ ___219,587.23___  **Total Amount of Plaintiff's Award**

(8)  $ ___1,853.30___  for post hearing interest pursuant to Labor Code Section(s) 98.1(c), 1194.2 and/or 2802(b)

(9)  $ ___435.00___  for filing fee, pursuant to Labor Code Section 101, et. seq.

(10) $ ___221,875.53___  **Total Amount of Judgment**

I certify this to be a true copy of the judgment entered on **JUL 18 2016** , in Judgment book _____ at page _____ or microfilm, pursuant to CCP 668.5

Clerk, by _____ Deputy Clerk

DLSE 545(2001) (Rev. 1/12)          REQUEST THAT CLERK ENTER JUDGMENT                    L.C. 98

| **LABOR COMMISSIONER, STATE OF CALIFORNIA**<br>Department of Industrial Relations<br>Division of Labor Standards Enforcement<br>2031 Howe Avenue, Suite 100<br>Sacramento, CA 95825<br>Tel: (916) 263-2841   Fax: (916) 263-2853 | For Court Use Only: |
|---|---|
| Plaintiff   David Winter | |
| | Court Number |
| Defendant:   HIGHMARK DIGITAL, INC., a California corporation, GRAND MARK SOLUTIONS, INC., a California corporation, each jointly and severally liable | |

| State Case Number<br>**08 - 76615 CM** | **ORDER, DECISION OR AWARD OF THE LABOR COMMISSIONER** |
|---|---|

1. The above-entitled matter came on for hearing before the Labor Commissioner of the State of California as follows:

   **DATE: May 27, 2016**          ☐ **CONTINUED TO:**

   **CITY: 2031 Howe Avenue, Suite 100, Sacramento, CA 95825**

2. IT IS ORDERED THAT:   **Plaintiff recover from Defendant.**

   | $ | | |
   |---|---|---|
   | $ | 90,488.47 | for wages  **(with lawful deductions)** |
   | $ | 0.00 | for liquidated damages pursuant to Labor Code Section 1194.2 |
   | $ | 92,337.50 | Reimbursable business expenses |
   | $ | 16,178.86 | for interest pursuant to Labor Code Section(s) 98.1(c), 1194.2 and/or 2802(b), |
   | $ | 19,082.40 | for additional wages accrued pursuant to Labor Code Section 203 as a penalty *and that same shall not be subject to payroll or other deductions.* |
   | $ | 0.00 | for penalties pursuant to Labor Code Section 203.1 which *shall not be subject to payroll or other deductions.* |
   | $ | 1,500.00 | other (specify):  for penalties pursuant to Labor Code Sections 226(f) and 1198.5(k). |
   | $ | **219,587.23** | **TOTAL AMOUNT OF AWARD** |

3. The herein Order, Decision or Award is based upon the Findings of Fact, Legal Analysis and Conclusions attached hereto and incorporated herein by reference.

4. The parties herein are notified and advised that this Order, Decision or Award of the Labor Commissioner shall become final and enforceable as a judgment in a court of law unless either or both parties exercise their right to appeal to the appropriate court* within ten (10) days of service of this document.  Service of this document can be accomplished either by first class mail or by personal delivery and is effective upon mailing or at the time of personal delivery.  If service on the parties is made by mail, the ten (10) day appeal period shall be extended by five (5) days.  For parties served outside of California, the period of extension is longer (See Code of Civil Procedure Section 1013).  In case of appeal, the necessary filing fee must be paid by the appellant and appellant must, immediately upon filing an appeal with the appropriate court, serve a copy of the appeal request upon the Labor Commissioner.  If an appeal is filed by a corporation, a non-lawyer agent of the corporation may file the Notice of Appeal with the appropriate court, but the corporation must be represented in any subsequent trial by an attorney, licensed to practice in the State of California.  Labor Code Section 98.2(c) provides that if the party seeking review by filing an appeal to the court is unsuccessful in such appeal, the court shall determine the costs and reasonable attorney's fees incurred by the other party to the appeal and assess such amount as a cost upon the party filing the appeal.  An employee is successful if the court awards an amount greater than zero.

**PLEASE TAKE NOTICE:** Labor Code Section 98.2(b) requires that as a condition to filing an appeal of an Order, Decision or Award of the Labor Commissioner, the employer shall first post a bond or undertaking with the court in the amount of the ODA; and the employer shall provide written notice to the other parties and the Labor Commissioner of the posting of the undertaking.  Labor Code Section 98.2(b) also requires the undertaking contain other specific conditions for distribution under the bond.  While this claim is before the Labor Commissioner, you are required to notify the Labor Commissioner *in writing* of any changes in your business or personal address within 10 days after any change occurs.

* Appropriate Court:
  Placer County Superior Court
  PO Box 619072
  Roseville, CA 95661-9072

**DATED: June 6, 2016**

**LABOR COMMISSIONER, STATE OF CALIFORNIA**

BY: _____

Kerry Lewis                    HEARING OFFICER

DLSE 535 (Rev. 1/12)                    ORDER, DECISION OR AWARD OF THE LABOR COMMISSIONER                    LC 98

**EXHIBIT F**
**35**

| LABOR COMMISSIONER, STATE CALIFORNIA | For Cou  e Only: |
| --- | --- |
| Department of Industrial Relations<br>Division of Labor Standards Enforcement<br>2031 Howe Avenue, Suite 100<br>Sacramento, CA 95825<br>Tel: (916) 263-2841  Fax: (916) 263-2853 | |
| Plaintiff:   David Winter | |
| | Court Number |
| Defendant:   RICHARD MATULIA, an individual | |

| State Case Number<br>**08 - 76615 A CM** | **ORDER, DECISION OR AWARD OF THE LABOR COMMISSIONER** |
| --- | --- |

1. The above-entitled matter came on for hearing before the Labor Commissioner of the State of California as follows:

**DATE: May 27, 2016**          ☐ **CONTINUED TO:**

**CITY: 2031 Howe Avenue, Suite 100, Sacramento, CA 95825**

2. IT IS ORDERED THAT:  **Plaintiff take nothing by virtue of his/her complaint.**

| $ | 0.00 | for wages  **(with lawful deductions)** |
| --- | --- | --- |
| $ | 0.00 | for liquidated damages pursuant to Labor Code Section 1194.2 |
| $ | 0.00 | Reimbursable business expenses |
| $ | 0.00 | for interest pursuant to Labor Code Section(s) 98.1(c), 1194.2 and/or 2802(b), |
| $ | 0.00 | for additional wages accrued pursuant to Labor Code Section 203 as a penalty<br>*and that same shall not be subject to payroll or other deductions.* |
| $ | 0.00 | for penalties pursuant to Labor Code Section 203.1 which *shall not be subject to payroll or other deductions.* |
| $ | 0.00 | other (specify): for penalties pursuant to Labor Code Sections 226(f) and 1198.5(k). |
| $ | **0.00** | **TOTAL AMOUNT OF AWARD** |

3. The herein Order, Decision or Award is based upon the Findings of Fact, Legal Analysis and Conclusions attached hereto and incorporated herein by reference.

4. The parties herein are notified and advised that this Order, Decision or Award of the Labor Commissioner shall become final and enforceable as a judgment in a court of law unless either or both parties exercise their right to appeal to the appropriate court* within ten (10) days of service of this document.  Service of this document can be accomplished either by first class mail or by personal delivery and is effective upon mailing or at the time of personal delivery.  If service on the parties is made by mail, the ten (10) day appeal period shall be extended by five (5) days.  For parties served outside of California, the period of extension is longer (See Code of Civil Procedure Section 1013).  In case of appeal, the necessary filing fee must be paid by the appellant and appellant must, immediately upon filing an appeal with the appropriate court, serve a copy of the appeal request upon the Labor Commissioner.  If an appeal is filed by a corporation, a non-lawyer agent of the corporation may file the Notice of Appeal with the appropriate court, but the corporation must be represented in any subsequent trial by an attorney, licensed to practice in the State of California.  Labor Code Section 98.2(c) provides that if the party seeking review by filing an appeal to the court is unsuccessful in such appeal, the court shall determine the costs and reasonable attorney's fees incurred by the other party to the appeal and assess such amount as a cost upon the party filing the appeal.  An employee is successful if the court awards an amount greater than zero.

**PLEASE TAKE NOTICE:** Labor Code Section 98.2(b) requires that as a condition to filing an appeal of an Order, Decision or Award of the Labor Commissioner, the employer shall first post a bond or undertaking with the court in the amount of the ODA; and the employer shall provide written notice to the other parties and the Labor Commissioner of the posting of the undertaking.  Labor Code Section 98.2(b) also requires the undertaking contain other specific conditions for distribution under the bond  While this claim is before the Labor Commissioner, you are required to notify the Labor Commissioner *in writing* of any changes in your business or personal address within 10 days after any change occurs.

* Appropriate Court:
  Placer County Superior Court
  PO Box 619072
  Roseville, CA 95661-9072

**DATED: June 6, 2016**

**LABOR COMMISSIONER, STATE OF CALIFORNIA**

BY: _____
     Kerry Lewis                          HEARING OFFICER

DLSE 535 (Rev  1/12)          ORDER, DECISION OR AWARD OF THE LABOR COMMISSIONER          LC 98

**EXHIBIT F**
**36**

BEFORE THE LABOR COMMISSIONER

OF THE STATE OF CALIFORNIA

DAVID WINTER )
         )
      Plaintiff, )   CASE NO. 08-76615 CM
         )
vs. )
         )   ORDER, DECISION OR AWARD
HIGHMARK DIGITAL, INC., a California )  OF THE LABOR COMMISSIONER
corporation; GRAND MARK SOLUTIONS, )
INC, a California corporation; RICHARD )
MATULIA, an individual, each jointly and )
severally liable )
      Defendants. )
                )

## BACKGROUND

Plaintiff filed an initial claim with the Labor Commissioner's office on November 9, 2015. The Complaint alleges that Plaintiff is owed:

1. Wages earned from January 1, 2010 to July 16, 2015 in the amount of $168,687.88;

2. Vacation wages for 64 hours earned from January 1, 2010 to July 16, 2015 at the rate of $79.51 per hour, claiming $5,088.64;

3. Reimbursable business expenses incurred from January 1, 2010 to November 2, 2015, claiming $75,621.03, plus reasonable attorney fees pursuant to Labor Code section 2802(c);

4. Penalties pursuant to Labor Code section 203.1 for 13 days at the rate of $636.08 per day, claiming $8,269.04;

5. Penalties pursuant to Labor Code section 203 for 30 days at the rate of $636.08 per day;

6. Penalties pursuant to Labor Code section 226(f) in the amount of $750.00; and

7. Penalties pursuant to Labor Code section 1198.5 in the amount of $750.00.

Page 1

EXHIBIT F

37

1   A hearing was conducted in Sacramento, California, on May 27, 2016, before the

2   undersigned hearing officer designated by the Labor Commissioner to hear this matter.

3   Plaintiff appeared and was represented by Timothy Nelson, Esq. Tammy Mendonca and

4   Philomena Stipp were subpoenaed by Plaintiff to appear as witnesses.

5   Highmark Digital, Inc., a California corporation ("Highmark"), Grand Mark

6   Solutions, Inc., a California corporation ("Grand Mark"), and Richard Matulia, an

7   individual, were represented by Dennis Murphy, Esq. All three named Defendants are

8   referred to herein collectively as "Defendants."

9   Due consideration having been given to the testimony, documentary evidence, and

10  arguments presented, the Labor Commissioner hereby adopts the following Order,

11  Decision or Award.

12                           <u>FINDINGS OF FACT</u>

13  Defendant Highmark employed Plaintiff pursuant to the terms of a written

14  employment agreement in Placer County, California, from 2007 until July 16, 2015.

15  Plaintiff was one of the founders of the company with his father-in-law. Plaintiff's

16  father-in-law, Mike McElroy, was the President and Plaintiff was the Vice President. In

17  August 2011, Plaintiff and McElroy entered into a written agreement ("Agreement")

18  whereby Plaintiff was promoted to President and CEO. Pursuant to the Agreement,

19  Plaintiff's starting salary was $125,060.00, with a five percent increase at the start of each

20  calendar year. The Agreement called for an increase to $150,000.00 if Plaintiff "sold" ten

21  dealerships, or franchises. Plaintiff's records indicate that there were ten franchises sold by

22  the end of 2012, so his claim is based on a salary of $150,000.00 starting in January of 2013

23  and increasing by five percent each year thereafter: $157,500.00 in 2014, and $165,375.00 in

24  2015. Additionally, the Agreement provided that Plaintiff would be reimbursed for

25  "reasonable out-of-pocket expenses incurred with respect to [his] execution of the

26  Company's business, including reasonable travel and entertainment expenses."

27      ///

1      Defendants argued that the Agreement was invalid because it was "secret" and the

2 Board of Directors (the "Board") was unaware of its existence. Plaintiff was a member of

3 the Board throughout the course of his employment. Meeting minutes from the September

4 19, 2014 Board meeting reflect that "the Company has an existing employment contract

5 with David Winter as President of Highmark Digital, Inc." and "the Company undertakes

6 to update its employment agreement with David Winter upon mutually agreeable terms

7 no later than the next board meeting of the Company."

8      In September of 2014, Plaintiff and Defendants agreed that Plaintiff's compensation

9 would be modified in an effort to save Defendants money. Plaintiff agreed to have a

10 portion of his salary paid toward equity in Highmark. The details of the amounts that

11 were allotted to wages versus equity were set forth in an email between Plaintiff, Paul

12 Bernards (Board member), Richard Shi (CFO) and John Ambruz (Board member) on

13 September 18, 2014. Plaintiff attached a copy of the Agreement to the email. In that email,

14 Plaintiff's actual monthly salary was set forth as $13,083.00, increasing to $13,781.00 in

15 January 2015. These monthly salaries are the equivalent of $157,000.00 and $165,375.00 per

16 year, respectively. The monthly salary was then broken down into the portion that would

17 be paid on his paycheck and the amount that would be allotted to equity in the company.

18 This calculation was sent to Bernards, Shi, and Ambruz and none of the three registered an

19 objection to Plaintiff's salary being reflected at these amounts. When the paycheck portion

20 of Plaintiff's wages was due to increase pursuant to the table set forth in the September 18,

21 2014 email, Plaintiff forwarded it to Tammy Mendonca (bookkeeper), Richard Shi, and

22 Richard Matulia (CEO) to ensure that the amount he received on his paycheck

23 corresponded with the agreed-upon allocations. Mendonca testified that she confirmed the

24 increase with Shi and Plaintiff was paid accordingly. Mendonca further testified that she

25 adjusted the equity amounts allotted to Plaintiff pursuant to the September 18, 2014 email.

26      Plaintiff was not provided with any record of stock options. Matulia testified that

27 Plaintiff had stock options on the company's books, but no documentation was submitted

1  in support of this assertion and Plaintiff was given no information regarding how or when
2  he could exercise his options if, in fact, he has any stock options on the books.

3    Plaintiff asserted that he was underpaid in the total amount of $90,488.47 for the
4  period from November 9, 2011 through July 16, 2015.

5    Plaintiff was originally the CFO of the company when it incorporated in 2007. As the
6  CFO, Plaintiff was tasked with opening the corporate bank account and establishing the
7  company's credit cards. Plaintiff opened two Wells Fargo credit cards and a line of credit
8  on behalf of Highmark. Plaintiff was a personal guarantor on all of the accounts. Plaintiff
9  testified that he used the two credit cards for business expenses and those credit card
10 statements were sent to Highmark for payment each month. Additionally, Plaintiff
11 testified that had a personal credit card ("USAA card") which he utilized only for business
12 purposes. Plaintiff brought the USAA card's monthly statements to Highmark for
13 payment as well. Plaintiff occasionally submitted receipts for the items he purchased, but
14 Mendonca testified that it was often difficult to ascertain whether the charges on any of the
15 credit cards were for business or personal expenses. Nonetheless, Highmark made partial
16 payments on the cards each month without questioning the charges.

17   After Plaintiff resigned on June 16, 2015, the statements for the credit cards and credit
18 line stopped being delivered to Highmark for reasons that neither Plaintiff nor Defendants
19 could explain. When Mendonca attempted to get the statements sent to Highmark in order
20 to pay them, Wells Fargo refused to provide them because they were in Plaintiff's name.
21 Mendonca testified that she was instructed by Mat li

EXHIBIT F

40

1   paid Wells Fargo a total of $39,946.63. Additionally, Plaintiff paid off the USAA card in the

2   total amount of $26,548.40.

3       Defendants argued that there was no way for them to determine which of the charges

4   were personal and which were legitimate business expenses. As such, the Board gave a

5   directive that none of the balances were to be paid without sufficient proof that they were

6   business-related. Mendonca conducted an audit of the various credit cards and, using

7   criteria established by the Board and Matulia, made an assessment of which charges

8   appeared to be personal in nature. A few of the items that Mendonca asserted were

9   personal were: a charge at Jessica McClintock clothing store for $1,100.00; a down payment

10   for a vehicle purchased from Future Ford; and charges for repairing Plaintiff's personal

11   vehicle. Plaintiff testified that the Jessica McClintock charge was for a shrink wrap

12   machine and pancake scale that the clothing store was selling at a good value due to store

13   closure. Matulia testified that the company does possess these items in its warehouse.

14   Plaintiff further testified that when his personal truck broke down while being used for

15   business purposes, he received approval from Paul Bertrands to purchase a new truck and

16   the company would pay the down payment, rather than repair the other truck at greater

17   expense. Finally, Plaintiff testified that his newly purchased truck was damaged while

18   towing a machine on behalf of the company. Matulia was present when the truck was

19   damaged and he approved Plaintiff charging the repairs to the company.

20       Defendants' audit of the credit card transactions reveals $17,818.75 charges which

21   were arguably personal, including those specifically refuted by Plaintiff as personal

22   expenses, above. Plaintiff argued that all the charges were business expenses. However,

23   Plaintiff asserted that the fact that he negotiated the balances down on all the Wells Fargo

24   accounts as well as his USAA card, reducing Defendants' potential debt from over

25   $88,000.00 to approximately $66,500.00 saved the companies more than $21,500.00. As

26   such, even if those charges were arguably personal, which Plaintiff adamantly denies,

27

EXHIBIT F
41

1  Plaintiff is not requesting reimbursement for them because that amount was written off by
2  the bank.

3      On three different occasions in 2013 and early 2014, Plaintiff made deposits in
4  Defendants' bank accounts to cover payroll, expecting that the amounts would be repaid
5  shortly thereafter. The 2013 "loan" was repaid approximately one month later. However,
6  there were two deposits made by Plaintiff in March and April of 2014 in the amounts of
7  $6,200.00 and $2,929.00, respectively, for which Plaintiff was not reimbursed. These
8  amounts are not disputed by Defendants. Defendants unilaterally decided to reclassify the
9  $6,200.00 "loan" as capital stock so that it would not be reflected in its accounts payable
10  ledger as an outstanding debt. There was no evidence regarding the April 2014 deposit
11  and Defendants did not assert that it had been reclassified or otherwise repaid. Plaintiff
12  argued that Defendants did not have the right to reclassify any portion of the monies he
13  was owed without his consent.

14      Plaintiff's 2010 employment agreement provided for 120 hours of paid vacation per
15  calendar year. Plaintiff alleges that he is owed 64 hours of vacation that he did not take
16  between August of 2010 and the end of his employment. Plaintiff did not provide a basis
17  for his assertions, other than to say that he had 24 unused hours in 2013 and 40 unused
18  hours in 2014. Plaintiff did not claim any unused hours in 2015 because he had taken all of
19  the hours he had accrued for that year. However, Defendants' records reflect that Plaintiff
20  had actually used 100 hours in 2015, while only entitled to 60 hours of accrual. Plaintiff did
21  not account for this negative balance in his claim for unused vacation hours. Additionally,
22  Plaintiff did not provide any breakdown of the hours he took off throughout the years.
23  Plaintiff argued that Defendants should have tracked his vacation hours more effectively
24  throughout the years. Defendants argued that Plaintiff was the highest ranking individual
25  in the company and any such tracking procedures should have been implemented by him.

26      Plaintiff resigned without notice on July 16, 2015. He was mailed his final paycheck
27  via certified mail on July 18, 2015, but he did not pick it up from the post office until July

EXHIBIT F
42

1  24, 2015. The gross amount of the paycheck for the semi-monthly pay period was
2  $4,528.89. Plaintiff argues that the paycheck did not contain all earned prorated wages
3  because his salary rate as of his resignation was $165,375.00, which is the equivalent of
4  $6,890.00 per semi-monthly pay period. Additionally, when Plaintiff deposited the check
5  into his account, it was returned by the bank for insufficient funds.

6       Defendants asserted that the bank account on which Plaintiff's check was written had
7  been frozen or closed because it was determined that there had been fraudulent activity on
8  the account between the time that the check was written and Plaintiff's depositing it. The
9  activity in question was the result of Plaintiff's actions in attempting to make a large
10 payment on his USAA card from an account to which he was not supposed to have access.
11 When it became apparent that Defendants' accounts were "under attack," immediate
12 action was taken to reverse the attempted credit card payments and protect the accounts
13 from future unauthorized activity. On July 28, 2015, Plaintiff informed Matulia that the
14 check had been returned by his bank and the wages were replaced immediately.

15      On December 15, 2015, Plaintiff's attorney sent a letter to Highmark and its attorney
16 requesting a copy of Plaintiff's personnel file and payroll records. The initial request did
17 not identify who the attorneys were representing, but Plaintiff's identity was provided by
18 the end of December. Plaintiff's attorney ultimately received the requested information on
19 February 22, 2016. Defendants asserted that it took time to compile the personnel file
20 because nothing had been maintained over the years due to Plaintiff's poor management
21 of the company. It was unclear why Defendants did not provide payroll records within the
22 21-day time frame set forth in Labor Code section 226.

23      Plaintiff's attorney submitted a declaration regarding fees Plaintiff has incurred in
24 furtherance of his claims. The declaration asserts that the Plaintiff has incurred a total of
25 $33,433.00 in attorneys' fees to date. The declaration further asserts that the efforts put
26 forth in preparation for the hearing, as well as the time spent at the hearing, were
27

1  primarily focused on the expenses portion of Plaintiff's claim, for an estimate of 50 percent

2  of the attorney's time. Defendants did not object to this estimate.

3      Plaintiff argued that Richard Matulia has individual liability for his claims pursuant

4  to Labor Code section 558.1. Plaintiff asserted that Matulia had personal knowledge of the

5  expenses Plaintiff incurred and Defendants' refusal to reimburse those expenses, as well as

6  Defendants' failure to honor the August 2011 contract and the equity agreement allocating

7  a portion of Plaintiff's salary to stock options for a period of one year. Matulia argued that

8  he was only the CEO of Highmark and Grand Mark acting in his capacity as an employee

9  and, therefore, should not have personal liability for Plaintiff's employment claims.

10      Defendants further argued that Plaintiff's Complaint extends to periods outside the

11  statute of limitations for the various claims. Additionally, Defendants asserted that,

12  although the claim was originally filed on November 9, 2015, Grand Mark and Matulia

13  were not added as named defendants until the formal Complaint was signed on February

14  22, 2016, so the statute of limitations periods should begin on that date for those two

15  Defendants. As part of the Labor Commissioner's process, a Notice of Claim was mailed to

16  Highmark at its address of record, which is also the address of record for Grand Mark.

17  Highmark and Grand Mark were both payors of Plaintiff's wages, have the same CEO,

18  and have been represented by the same attorney since the inception of the case. Matulia

19  received the original Notice of Claim and attended the conference in December 2015 with

20  his attorney. Matulia knew that Plaintiff's claims would have been against both Highmark

21  and Grand Mark, as the two appear to be interchangeable in most respects with regard to

22  payment of wages and use of credit cards to pay business expenses. Plaintiff's paychecks

23  appear to have been paid by Highmark, but the W-2 Forms were issued from Grand Mark.

24  Credit card charges on Highmark cards reflect that they were funds transfers to pay off

25  Grand Mark debts.

26      ///

27

<u>LEGAL ANALYSIS</u>

**Individual Liability**

At the outset, it is necessary to determine whether Richard Matulia is individually liable for any of Plaintiff's claims. Plaintiff argued that Matulia should be held liable for his wage and expenses claims pursuant to Labor Code section 558.1, which provides, in relevant part:

> Any employer or other person acting on behalf of an employer, who violates, or causes to be violated, any provision regulating minimum wages or hours and days of work in any order of the Industrial Welfare Commission, or violates, or causes to be violated, Sections 203, 226, ... or 2802, may be held liable as the employer for such violation.
>
> (b) For purposes of this section, the term "other person acting on behalf of an employer" is limited to a natural person who is an owner, director, officer, or managing agent of the employer, and the term "managing agent" has the same meaning as in subdivision (b) of Section 3294 of the Civil Code.

Labor Code section 558.1 was implemented on January 1, 2016. Because the statute imposes liability on persons who did not previously have liability, it cannot be applied retroactively. Plaintiff's alleged wages and expenses were incurred prior to 2016. As such, Labor Code section 558.1 cannot be the basis for finding individual liability.

Prior to Labor Code section 558.1, the issue of whether individual corporate agents have liability for wages when acting within the scope of their agency was decided in *Martinez v. Combs* (2010) 49 Cal.4th 35. The California Supreme Court in *Martinez* held that individual corporate agents cannot be found liable as "employers" owing wages unless the facts show that they were acting outside the scope of their agency. There were no such facts present in this matter. Plaintiff provided no testimony or other evidence that Matulia was in any way acting outside the scope of his agency. Accordingly, Matulia is not found individually liable for wages, expenses, or penalties awarded herein.

**Statute of Limitations**

The California Code of Civil Procedure establishes time limits for filing various types of claims. The statute of limitations for filing a claim based on a statutory right, such as

1   expenses, is three years from the date the right to reimbursement occurred. (Code of Civ.

2   Pro. §338.) An action upon any contract, obligation or liability founded upon an

3   instrument in writing has a four-year statute of limitations. (Code of Civ. Pro. §337.)

4          Plaintiff's Complaint alleges wages and expenses from January of 2010. Defendants

5   argued that a portion of this period is outside the statute of limitations because Plaintiff's

6   claim was filed on November 9, 2015. Because the wages alleged by Plaintiff were owed

7   pursuant to a written agreement, his claim for wages may only encompass the period from

8   November 9, 2011 until July 16, 2015. While reimbursement of expenses is a statutory right

9   pursuant to Labor Code section 2802, Plaintiff's written agreement provided for

10  reimbursement of his expenses, extending the statute of limitations to four years. Plaintiff

11  incurred the expenses alleged when he paid off Defendants' credit cards in 2015 and 2016.

12  Prior to paying off Defendants' credit card debts, the expenses were incurred by

13  Defendants, not Plaintiff. As such, all of Plaintiff's claims for reimbursement of expenses

14  fall within the applicable statute of limitations.

15         Defendants further argued that the statute of limitations for Grand Mark should be

16  measured based on Plaintiff's addition of the new Defendant to his Complaint on

17  February 22, 2016[1]. Plaintiff filed his initial claim with the Labor Commissioner on

18  November 9, 2015. It is from this date that the statute of limitations is calculated. (See

19  *Cuadra v. Millan* (1998) 17 Cal.4th 855.)

20         As part of the Labor Commissioner's process, a Notice of Claim was mailed to

21  Highmark at its address of record on November 23, 2015, which is also the address of

22  record for Grand Mark. Highmark and Grand Mark were both payors of Plaintiff's wages,

23  have the same CEO, and have been represented by the same attorney since the inception of

24  the case.

25

26  _____

[1] Defendants' argument regarding the statute of limitations pertained to the addition of both Grand Mark
27  and Matulia. Because Matulia has been found to have no individual liability, he has not been included in this
    statute of limitations analysis, as it is moot.

Page 10

1   Although hearings held pursuant to Labor Code section 98 are not subject to the
2   Federal Rules of Civil Procedure, a brief discussion of the federal courts' use of amended
3   pleadings is instructive. Federal Rule 15(c)(2) provides that an amendment relates back to
4   the date of the original complaint when the claim asserted in the amended complaint
5   "arose out of the conduct, transaction, or occurrence set forth" in the original complaint."
6   Rule 15(c)(3) adds two additional requirements when the amendment changes or adds a
7   new defendant. First, within the period for service of the summons and complaint, the
8   party to be brought in by amendment must have received such notice of the institution of
9   the action that the party will not be prejudiced in maintaining a defense on the merits.
10  (FRCP 15(c)(3)(A).) Second, the new party must know or should have known that, but for
11  a mistake concerning the identity of the proper party, the action would have been brought
12  against that party. (FRCP 15(c)(3)(B).)

13  Matulia received the original Notice of Claim and attended the conference in
14  December 2015 with his attorney. Matulia knew that Plaintiff's claims would have been
15  against both Highmark and Grand Mark, as the two appear to be interchangeable in most
16  respects with regard to payment of wages and use of credit cards to pay business
17  expenses. Plaintiff's paychecks appear to have been paid by Highmark, but the W-2 Forms
18  were issued from Grand Mark. Credit card charges on Highmark cards reflect that they
19  were funds transfers to pay off Grand Mark debts. Whatever the reason that Plaintiff did
20  not initially name Grand Mark as an employer, there is no doubt that the entity was aware
21  of Plaintiff's claims and that it had potential liability.

22  As such, even utilizing the Federal Rules of Civil Procedure, which are more
23  restrictive than California procedure, it would be proper to permit Plaintiff's amendment
24  adding Grand Mark to carry the same statute of limitations as the original claim filed in
25  November 2015. California courts follow a far more liberal scheme of relation back,
26  commonly referred to as "Doe defendant practice," with respect to amended complaints
27  that add new defendants. (See *Austin v. Mass. Bonding & Ins. Co.* (1961) 56 Cal.2d 596.) That

EXHIBIT F
47

1   is, the original complaint may contain unnamed defendants who are subsequently

2   identified in amended complaints. Under California's Doe defendant practice, an amended

3   complaint substituting an actual defendant for a fictitious one relates back to the date of

4   the original complaint, thereby defeating the bar of the statute of limitations, provided it

5   seeks recovery on the "same general set of facts" as alleged in the original complaint. (See

6   *Austin, id.*, and Cal. Code of Civ. Pro. §474.) Plaintiff's claims against Grand Mark are

7   identical to those that he raised in his initial claim against Highmark. The facts and

8   allegations did not change at all. Matulia was well aware of Plaintiff's allegations and,

9   although California civil practice does not even require that the newly added defendant

10  have any knowledge of the existence of a claim against it, Grand Mark had full knowledge

11  of the allegations.

12      The policy behind statutes of limitations is to put defendants on notice of the need

13  to gather and preserve evidence in time to prepare a fair defense on the merits. (See

14  *Garrison v. Bd. of Dirs. of the United Water Conservation Dist.* (1995) 36 Cal.App.4th 1670;

15  *Pasadena Hosp. Ass'n v. Superior Court* (1988) 204 Cal. App. 3d 1032; *Lamont v. Wolfe* (1983)

16  142 Cal. App. 3d 375.) There were no additional documents, witnesses, or defenses

17  required as a result of Plaintiff's addition of Grand Mark to the claim. As such, the statute

18  of limitations applicable to all Defendants is the same.

19  **Salary Wages**

20      In California, a contract is defined by statute as "an agreement to do or not to do a

21  certain thing." (Civil Code §1549.) Four essential elements of a contract are (1) parties

22  capable of contracting; (2) (mutual) consent; (3) a lawful object, and (4) a sufficient cause or

23  consideration (Civil Code §1550.)

24      In order for a binding contract to arise, there must be mutual assent between the

25  parties (Civil Code §1565) such that each must intend to enter into the contract under the

26  same terms and conditions (Civil Code §1580).

27

Page 12

EXHIBIT F
48

Plaintiff and the former President of Highmark entered into a valid written contract. The contract set forth the terms of Plaintiff's employment as the President of the company. Defendants' argument that the contract was not valid because it was "secret" is not supported by the facts provided by Plaintiff. The September 2014 Board minutes reference an employment contract, yet Defendants did not argue that there was any other contract to which the Board would have been referring. Additionally, Plaintiff attached a copy of the Agreement to his September 2014 email to two Board members and the CFO, in which he set forth his acceptance of an offer to modify his compensation structure for an allocation of a portion of his salary to equity shares. The salary amount reflected in the email is the monthly equivalent of the salary set forth in his written Agreement. This email was then forwarded to Mendonca, Robert Shi, and Matulia in October 2014. Mendonca testified that she confirmed the increase with Shi and Plaintiff was paid accordingly.

Defendants did not compensate Plaintiff in accordance with the terms of his Agreement. Additionally, Defendants failed to provide any documentation that a portion of Plaintiff's salary had, in fact, been allocated to equity shares. If Plaintiff has shares in the company, he has seen no evidence of it and has no way of knowing how to exercise those options, their value, or that they even exist.

From November 2011 to July 2015, Plaintiff was underpaid in the amount of $90,488.47. Defendants are hereby ordered to pay Plaintiff's underpaid wages in the amount of $90,488.47.

**Vacation Wages**

Labor Code section 227.3 provides in relevant part:
> Unless otherwise provided by a collective bargaining agreement, whenever a contract of employment or employer policy provides for paid vacations, and an employee is terminated without having taken off his vested vacation time, all vested vacation shall be paid to him as wages at his final rate in accordance with such contract of employment or employer policy respecting eligibility or time served; provided, however, that an employment contract or employment policy shall not provide for forfeiture of vested vacation time upon termination...

Page 13

1   Plaintiff, as the party asserting the affirmative, has the burden of proof including the

2   initial burden of going forward and the burden of persuasion by a preponderance of the

3   evidence. Plaintiff has not met his burden with regard to his claim for unpaid vacation.

4   Plaintiff's employment agreement provided for three weeks, or 120 hours, of vacation pay

5   per year. Plaintiff did not provide any basis for his claim that he did not use 64 hours of

6   vacation during the years 2013 and 2014. Plaintiff did not account for the fact that he had

7   used far more than he accrued in 2015 and did not provide any testimony or

8   documentation regarding how many hours he used in the prior years. Plaintiff was the

9   President and CEO of the company during the majority of the period of his claim. It is

10  disingenuous for Plaintiff to argue that Defendants should have tracked his vacation hours

11  and their failure to have a more effective procedure to do so should entitle him to recover

12  on a claim for which he has set forth no factual basis. Accordingly, Plaintiff shall take

13  nothing pursuant to his claim for unpaid vacation wages.

14  **Expenses**

15  Labor Code section 2802(a) provides: "An employer shall indemnify his or her

16  employee for all necessary expenditures or losses incurred by the employee in direct

17  consequence of the discharge of his or her duties..."  Plaintiff utilized Defendants'

18  corporate credit cards to make purchases on Defendants' behalf. Additionally, Plaintiff

19  had a personal credit card which he testified was used exclusively for business expenses.

20  These cards were paid by Defendants without question during his employment. After

21  Plaintiff's resignation, Defendants stopped paying all the credit cards, leaving enormous

22  balances entirely unpaid. Because those cards and the line of credit were in Plaintiff's

23  name, the creditors held him liable and went after Plaintiff's personal finances to recover

24  the debt. Plaintiff was able to reduce the debt, which belonged to Defendants, from

25  $88,000.00 to approximately $66,500.00, which saved the companies more than $21,500.00.

26  As such, even if $17,818.75 of the charges were arguably personal in nature, which Plaintiff

27  credibly and reasonably refuted as personal expenses, Plaintiff's claim does not include

EXHIBIT F
50

1    reimbursement for those allegedly personal charges. Even taking the full balance of the

2    credit cards and line of credit and discounting it for the amount that Defendants allege to

3    be personal charges, the balance is still more than Plaintiff is actually claiming he is owed.

4        Additionally, Plaintiff made two deposits into Defendants' account to cover payroll

5    in 2014, which were never reimbursed to him, for a total of $9,129.00. Defendants took the

6    $6,200.00 deposit off its books and reclassified it as capital stock without Plaintiff's

7    approval. However, this is not evidence that Defendant reimbursed such expenses.

8        Defendants are hereby ordered to pay Plaintiff $75,629.00 as reimbursement for

9    business expenses.

10       Labor Code section 2802(b) provides: For purposes of this section, the term

11   "necessary expenditures or losses" shall include all reasonable costs, including, but not

12   limited to, attorney's fees incurred by the employee enforcing the rights granted by this

13   section." Plaintiff's attorney submitted a declaration attesting to the fact that Plaintiff has

14   incurred attorney's fees in the amount of $33,433.00 as a result of his claims against

15   Defendants. Plaintiff's attorney asserted that preparation of Plaintiff's expenses claim was

16   the primary focus of his legal efforts in the case. As such, it is reasonable to find that 50

17   percent of the fees incurred were attributable to time spent pursuing Plaintiff's expenses

18   claim. Accordingly, Defendants are ordered to pay $16,716.50 in attorney's fees.

19   **Interest**

20       Labor Code sections 98.1(c) and 2802(b) provide that all awards granted pursuant to

21   this hearing shall accrue interest on all due and unpaid wages and expenses from the date

22   that said amounts became due until the monies are paid.  Therefore, Plaintiff is entitled to

23   $16,178.86 in interest accrued to date on the unpaid balance.

24   **Penalties – Labor Code Section 203**

25       Labor Code section 202 requires that if an employee quits without providing at least

26   72 hours' notice, all earned wages are due within 72 hours of his resignation.  Labor Code

27   section 203 provides that if an employer willfully fails to pay any earned wages of an

EXHIBIT F
51

1   employee in accordance with Labor Code section 202, the wages of such employee shall

2   continue as a penalty from the due date thereof at the same rate until paid, up to 30 days.

3   The term "willful" as used in the statute has been defined by case law as an intentional

4   failure to perform an act that is required under the law.  There is no requirement of evil

5   purpose or intent to defraud.  (*Davis v. Morris* (1940) 37 Cal.App.2d 269.) Defendants

6   intended to pay Plaintiff the amounts that they paid. Defendants were aware of Plaintiff's

7   contract setting forth a different amount, yet failed to pay it. Plaintiff's final paycheck was

8   not issued in the correct amount pursuant to his contract. Defendants did not even provide

9   an explanation for the amount that he was paid in his final paycheck, which equates to

10   $100,000.00 per year. This amount is not even equivalent to the salary portion of the

11   equity/salary agreement that had previously been in effect prior to July 2015.

12        Because Defendants failed to set forth a good faith dispute to Plaintiff's wage claim,

13   they are ordered to pay the maximum of 30 days' wages in the amount of $636.08 per day,

14   for a total of $19,082.40.

15   **Penalties — Labor Code Section 203.1**

16        Labor Code section 203.1 provides that if an employer issues a check for wages which

17   is refused payment because the employer does not have an account with the bank or has

18   insufficient funds in the account, and the employee has presented the check for payment

19   within thirty days of receipt, those wages shall continue as a penalty from the due date

20   thereof at the same rate until paid, up to a maximum of 30 days. Plaintiff's final paycheck

21   was mailed to him via certified mail on July 18, 2015. Plaintiff did not pick it up from the

22   post office until July 24, 2015. The check was subsequently returned by his bank.

23        Labor Code section 203.1 provides that, "this penalty shall not apply if the employer

24   can establish to the satisfaction of the Labor Commissioner or an appropriate court of law

25   that the violation of this section was unintentional." Defendants argued that the reason the

26   check was not negotiable was not due to negligence or intentional wrongdoing on the part

27   of the company. Rather, in an effort to ensure that the bank accounts were secure after

EXHIBIT F

52

Plaintiff attempted to make a large unauthorized payment to his personal credit card,
Defendants took immediate action by freezing or closing their accounts. This activity took
place in the interim period between the issuance of Plaintiff's paycheck and his attempt to
deposit it in his bank. The wages were promptly replaced when Plaintiff notified
Defendants that the check had been returned.

Defendants have sufficiently demonstrated that penalties pursuant to Labor Code
section 203.1 should not apply. Plaintiff shall take nothing pursuant to his claim for
penalties.

**Labor Code Section 226—Payroll Records**

Labor Code section 226(a) provides the following:

Every employer shall, semimonthly or at the time of each payment of wages,
furnish each of his or her employees, either as a detachable part of the check,
draft, or voucher paying the employee's wages, or separately when wages
are paid by personal check or cash, an accurate itemized statement in writing
showing

(1)     gross wages earned;

(2)     total hours worked by the employee, except for any employee whose
compensation is solely based on a salary and who is exempt from payment
of overtime under subdivision (a) of section 515 or any applicable order of
the Industrial Welfare Commission;

(3)     the number of piece rate units earned and any applicable piece rate if
the employee is paid on a piece-rate basis;

(4)     all deductions, provided that all deductions made on written orders of
the employee may be aggregated and shown as one item;

(5)     net wages earned;

(6)     the inclusive dates of the period for which the employee is paid;

(7)     the name of the employee and…the last four digits of his or her social
security number or an employee identification number other than a social
security number may be shown on the itemized statement;

(8)     the name and address of the legal entity that is the employer; and

(9)     all applicable hourly rates in effect during the pay period and the
corresponding number of hours worked at each hourly rate by the employee.

/ / /

/ / /

EXHIBIT F
53

The deductions made from payments of wages shall be recorded in ink or other indelible form, properly dated, showing the month, day, and year, and a copy of the statement or a record of the deductions shall be kept on file by the employer for at least three years at the place of employment or at a central location within the State of California.

Labor Code section 226(f) entitles the current or former employee to recover from the employer a penalty of $750.00 if the employer fails to permit the employee to inspect or copy the records referenced in section (a), within 21 calendar days of the date of his written or oral request.

At the end of December, 2015, Plaintiff's attorney served Defendants and Defendants' attorney with a letter requesting a copy of Plaintiff's payroll records. Defendants failed to provide Plaintiff with those records within 21 days. Accordingly, Defendants shall pay Plaintiff a penalty of $750.00 pursuant to Labor Code section 226(f).

**Labor Code Section 1198.5—Personnel File**

Labor Code section 1198.5(k) entitles a current or former employee to recover from the employer a penalty of $750.00 if the employer fails to permit the employee to inspect or copy personnel records within 30 calendar days of his written request.

At the end of December, 2015, Plaintiff's attorney served Defendants and Defendants' attorney with a letter requesting a copy of Plaintiff's personnel file. Defendants failed to provide Plaintiff with those records within 30 days. Accordingly, Defendants shall pay Plaintiff a penalty of $750.00 pursuant to Labor Code section 226(f).

<u>CONCLUSION</u>

**Richard Matulia, an individual**

Richard Matulia, an individual, is found to have no individual liability and, as such, Plaintiff shall take nothing pursuant to his claims against Matulia.

/ / /

EXHIBIT F

54

**Highmark Digital, Inc. and Grand Mark Solutions, Inc.**

For all of the reasons set forth above, IT IS HEREBY ORDERED that Defendants Highmark Digital, Inc., a California corporation, and Grand Mark Solutions, Inc., a California corporation, shall pay Plaintiff a total of $219,587.23, as follows:

1. $90,488.47 for wages earned and unpaid;

2. $75,629.00 for business expenses pursuant to Labor Code section 2802;

3. $16,716.50 for attorney's fees pursuant to Labor Code section 2802(c);

4. $16,178.86 in interest pursuant to Labor Code sections 98.1(c) and 2802(b);

5. $19,082.40 in waiting time penalties pursuant to Labor Code section 203;

6. $750.00 in penalties pursuant to Labor Code section 226(f); and

7. $750.00 in penalties pursuant to Labor Code section 1198.5(k).

Dated:    June 6, 2016                                    _____
                                                         Kerry Lewis, Hearing Officer

STATE OF CALIFORNIA
DEPARTMENT OF INDUSTRIAL RELATIONS
DIVISION OF LABOR STANDARDS ENFORCEMENT

### CERTIFICATION OF SERVICE BY MAIL
### (C.C.P. 1013A) OR CERTIFIED MAIL

I, _____Kerry Lewis_____, do hereby certify that I am a resident of or employed in the County
of _____Sacramento_____, over 18 years of age, not a party to the within action, and that I am
employed at and my business address is:

**LABOR COMMISSIONER, STATE OF CALIFORNIA**
**2031 Howe Avenue, Suite 100**
**Sacramento, CA 95825**
**Tel: (916) 263-2841   Fax: (916) 263-2853**

I am readily familiar with the business practice of my place of business for collection and processing
of correspondence for mailing with the United States Postal Service.  Correspondence so collected
and processed is deposited with the United States Postal Service that same day in the ordinary course
of business.

On _____June 13, 2016_____ at my place of business, a copy of the following document(s):

**_____Order, Decision or Award_____**

was(were) placed for deposit in the United States Postal Service in a sealed envelope, by
first class mail_____ , with postage fully prepaid, addressed to:

NOTICE TO·   Highmark Digital, Inc.
**Paul Bernards, Agent for Service**
1751 Aviation Boulevard, Suite 200
Lincoln, CA  95648

and that envelope was placed for collection and mailing on that date following ordinary
business practices.

*I certify under penalty of perjury that the foregoing is true and correct.*

Executed on: _____June 13, 2016_____ at _____Sacramento_____, California

STATE CASE NUMBER:  08-76615 CM          *Kerry Lewis*
_____
Kerry Lewis

DLSE 544/DEF. #2  (3/06)          CERTIFICATION OF MAILING          L.C. 98

EXHIBIT F
56

STATE OF CALIFORNIA
DEPARTMENT OF INDUSTRIAL RELATIONS
DIVISION OF LABOR STANDARDS ENFORCEMENT

**CERTIFICATION OF SERVICE BY MAIL
(C.C.P. 1013A) OR CERTIFIED MAIL**

I, _____Kerry Lewis_____, do hereby certify that I am a resident of or employed in the County of _____Sacramento_____, over 18 years of age, not a party to the within action, and that I am employed at and my business address is:

**LABOR COMMISSIONER, STATE OF CALIFORNIA
2031 Howe Avenue, Suite 100
Sacramento, CA 95825
Tel: (916) 263-2841   Fax: (916) 263-2853**

I am readily familiar with the business practice of my place of business for collection and processing of correspondence for mailing with the United States Postal Service.  Correspondence so collected and processed is deposited with the United States Postal Service that same day in the ordinary course of business.

On _____June 13, 2016_____ at my place of business, a copy of the following document(s):

**_____Order, Decision or Award_____**

was(were) placed for deposit in the United States Postal Service in a sealed envelope, by first class mail_____, with postage fully prepaid, addressed to:

NOTICE TO   **David Winter
2241 Wild Plains Circle
Rocklin CA  95765**

and that envelope was placed for collection and mailing on that date following ordinary business practices.

*I certify under penalty of perjury that the foregoing is true and correct.*

Executed on: _____June 13, 2016_____ at _____Sacramento_____, California

STATE CASE NUMBER:  08-76615  CM

*Kerry Lewis*
_____
Kerry Lewis

DLSE 544/PLT. (3/06)          CERTIFICATION OF MAILING          L.C. 98

STATE OF CALIFORNIA
DEPARTMENT OF INDUSTRIAL RELATIONS
DIVISION OF LABOR STANDARDS ENFORCEMENT

**CERTIFICATION OF SERVICE BY MAIL**
**(C.C.P. 1013A) OR CERTIFIED MAIL**

I, _____Kerry Lewis_____, do hereby certify that I am a resident of or employed in the County of _____Sacramento_____, over 18 years of age, not a party to the within action, and that I am employed at and my business address is:

**LABOR COMMISSIONER, STATE OF CALIFORNIA**
**2031 Howe Avenue, Suite 100**
**Sacramento, CA 95825**
**Tel: (916) 263-2841   Fax: (916) 263-2853**

I am readily familiar with the business practice of my place of business for collection and processing of correspondence for mailing with the United States Postal Service.  Correspondence so collected and processed is deposited with the United States Postal Service that same day in the ordinary course of business.

On _____June 13, 2016_____ at my place of business, a copy of the following document(s):

**Order, Decision or Award**

was(were) placed for deposit in the United States Postal Service in a sealed envelope, by first class mail_____, with postage fully prepaid, addressed to:

NOTICE TO:   Grand Mark Solutions, Inc.
**Paul Bernards, Agent for Service**
1751 Aviation Boulevard, Suite 200
Lincoln, CA  95648

and that envelope was placed for collection and mailing on that date following ordinary business practices.

*I certify under penalty of perjury that the foregoing is true and correct.*

Executed on: _____June 13, 2016_____ at _____Sacramento_____, California

STATE CASE NUMBER:  08-76615  CM

*Kerry Lewis*
_____
Kerry Lewis

DLSE 544/DEF. #1  (3/06)          CERTIFICATION OF MAILING                         L.C. 98

# EXHIBIT G

```
                                  DOOR_SAMPLE.hop
;MAKROTYP=0
;INSTVERSION=6.4.9.0
;EXEVERSION=6.6.2.213[Hops.exe]
;BILD=DOOR_SAMPLE.wmf
;INFO=
;WZGV=7123K_616
;WZGVCONFIG=
;MASCHINE=HOLZHER
;NCNAME=DOOR_SAMPLE
;KOMMENTAR=
;DX=0
;DY=0
;DZ=0
;DIALOGDLL=Dialoge.Dll
;DIALOGPROC=StandardFormAnzeigen
;DIALOGKIND=0
;AUTOSCRIPTSTART=1
;BUTTONBILD=
;DIMENSION_UNIT=0
VARS
    DX := 80in;*VAR*Dimension X
    DY := 38in;*VAR*Dimension Y
    DZ := 1.5in;*VAR*Dimension Z
START
Fertigteil (DX,DY,DZ,0,0,0,0,0,'',0,0,0)
CALL HH_Park ( VAL PARK:=3,X:=0,Y:=0)
Ebene0()
;-
;DRILLING A HOLE
;-
WZB (501,_VE,_V,_VA,_SD,_ANF,'1')
Bohrung (10in,1.5in,3mm,-0.05in,20,0,0,0,1,0,0,0)
Bohrung (8.5in,0.75in,3mm,-0.05in,20,0,0,0,1,0,0,0)
Bohrung (11.5in,0.75in,3mm,-0.05in,20,0,0,0,1,0,0,0)
Bohrung (10in,1.5in,3mm,-0.05in,20,0,0,0,1,0,0,0)
;-
;RECTANGLE POCKET
;-
WZF (10,_VE,_V,_VA,_SD,_ANF,'1')
CALL _RechteckTasche_V5 ( VAL
X_MITTE:=10in,Y_MITTE:=1in,TASCHENLAENGE:=5in,TASCHENBREITE:=3in,RADIUS:=0.25in,WINK
EL:=0,TIEFE:=-0.25in,ZUSTELLUNG:=0,AB:=2,ABF:=_ANF,INTERPOL:=1,UMKEHREN:=0,ESXY:=0,E
SMD:=0,LASER:=0)
;-
;CIRCULAR POCKET
;-
WZF (10,_VE,_V,_VA,_SD,_ANF,'1')
;CIRCULAR POCKET
```

Page 1

EXHIBIT G
59

DOOR_SAMPLE.hop

```
CALL _Kreistasche_V5 ( VAL
X_MITTE:=15in,Y_MITTE:=DY/2,RADIUS:=1in,TIEFE:=-0.5in,ZUSTELLUNG:=0.25in,AB:=2,ABF:=
_ANF,INTERPOL:=1,UMKEHREN:=1,ESXY:=0,ESMD:=0,LASER:=0)
;CIRCULAR BORE - CUTOUT
CALL _Kreisbahn_V5 ( VAL
X_MITTE:=DX/2,Y_MITTE:=DY-2.5in,TIEFE:=-0.05in,ZUTIEFE:=0.25in,RADIUS:=1.5in,RADIUSK
ORREKTUR:=1,AB:=1,AUFMASS:=0,BEARB_UMKEHREN:=0,WINKEL:=180,ANF:=_ANF,ABF:=_ANF,RAMPE
:=1,INTERPOL:=0,ESXY:=0,ESMD:=1,LASER:=0)
;-
;SIDE MILLING
;-
;BOTTOM
;-
Ebene1()
WZF (25,_VE,_V,_VA,_SD,_ANF,'1')
;GROOVE DOWN CENTER OF SIDE
SP (0,DZ/2,0in,0,-1,_ANF,0,0,0,1,0,0,0,_AT_MAXDEPTH,0,0,0,0,0,0,0,0,0)
G01 (DX,DZ/2,0,0,1,2)
EP (1,_ANF,0)
;-
;RIGHT
;-
Ebene4()
WZF (25,_VE,_V,_VA,_SD,_ANF,'1')
;RECTANGLE POCKET
CALL _RechteckTasche_V5 ( VAL
X_MITTE:=DY/2,Y_MITTE:=DZ/2,TASCHENLAENGE:=DY-4in,TASCHENBREITE:=DZ-0.5in,RADIUS:=0,
WINKEL:=0,TIEFE:=-1in,ZUSTELLUNG:=0.25in,AB:=2,ABF:=_ANF,INTERPOL:=1,UMKEHREN:=0,ESX
Y:=1,ESMD:=0,LASER:=0)
;-
;TOP
;-
Ebene3()
WZF (26,_VE,_V,_VA,_SD,_ANF,'1')
CALL _Kreistasche_V5 ( VAL
X_MITTE:=DX/2,Y_MITTE:=DZ/2,RADIUS:=0.5in,TIEFE:=-1.5in,ZUSTELLUNG:=0.25in,AB:=2,ABF
:=_ANF,INTERPOL:=0,UMKEHREN:=1,ESXY:=1,ESMD:=0,LASER:=0)
;-
;LEFT
;-
Ebene2()
WZF (25,_VE,_V,_VA,_SD,_ANF,'1')
;RECTANGLE POCKET
CALL _RechteckTasche_V5 ( VAL
X_MITTE:=DY/2,Y_MITTE:=DZ/2,TASCHENLAENGE:=DY-4in,TASCHENBREITE:=DZ-0.5in,RADIUS:=0,
WINKEL:=0,TIEFE:=-1in,ZUSTELLUNG:=0.25in,AB:=2,ABF:=_ANF,INTERPOL:=1,UMKEHREN:=0,ESX
Y:=1,ESMD:=0,LASER:=0)
Ebene0()
```

EXHIBIT G
60

# EXHIBIT H

Custom Search

# WINDOW+ DOOR

| Strategies & Practices | Design & Performance | Markets & Trends | News | Products | Online Exclusive | Submissions |

## Jeld-Wen Launches Interior Door Replacement Program

November 23, 2009
*Companies*

Jeld-Wen Inc. is launching The Perfect Fit program for measuring, manufacturing and installing interior doors. The manufacturer started a pilot program through 25 Home Depot stores in Oregon beginning this month, and plans a national roll-out next year, it reports.

"Unlike other projects, door replacement benefits every room of the home and can give homeowners a fresh look that adds great value for much less than other improvements," says John Monfore, Jeld-Wen product marketing manager. "No longer is it a labor-intensive or time-consuming project. Thanks to our patented digital technology, The Perfect Fit makes it almost turnkey."

Working through the Home Depot locations, customers first identify the door openings they need to replace and select the styles and options they want. A Jeld-Wen Perfect Fit consultant then schedules an in-home meeting to confirm the order and take measurements using a laser scanning device, company officials explain. That data allows a door to be made to fit existing openings, even when they are out-of-square, and installed quickly and easily, it is reported.

Costs for The Perfect Fit door replacement vary widely depending on door style, material, hardware and finishing options selected. Customers pay a basic $199 fee which covers an in-home consultation and the measurement of each door (up to 15 doors), in addition to the total cost of the door style and options selected. The company offers a variety of products and options to fit nearly any budget, and the cost and time efficiencies can result in substantial savings.

"Taking the guesswork out of the process is simply more efficient, resulting in less time spent and fewer costly errors," says Monfore. "Any way you look at it, that's going to equate to greater savings."

The Perfect Fit system is applicable for nearly any interior door replacement including closet doors, passage doors, French doors, bifold doors, fire doors and more. Customers can choose from many Jeld-Wen doors, including flush, molded, clear pine and custom carved options. Homeowners can also choose from a variety of hardware and trim options and can order their doors pre-painted or in custom colors. "The Perfect Fit gives homeowners a way to achieve a custom look without the custom price tag," Monfore reports. "And that's definitely a great fit for what nearly all homeowners are looking for today."

**Share this article:** in 𝕏 f ✉



**Most Clicked**

Roto North America Promotes and Hires New Team Members

WomenInc. Recognizes Two Quanex Board Members

Roto Introduces Restrictor

Marilech Windows Files Chapter 7 Bankruptcy

Copyright © 2020 National Glass Association. All Rights Reserved. Powered by Digital Loom. Privacy Policy. Cookies Policy

This web site uses cookies

This web site uses cookies to improve user experience. A cookie file is stored in your web browser and allows the web site to recognize you and make your next visit easier and the web site more useful to you. By using our web site, you consent to all cookies in accordance with our Cookies Policy.

I agree    Cookies Policy

EXHIBIT H
61

1/1

# EXHIBIT I

**JELD·WEN**
WINDOWS & DOORS

DECORATE with DOORS ™

INTERIOR DOORS



DRAMATICALLY IMPROVE THE LOOK OF EVERY ROOM
IN YOUR HOME WITH NEW CUSTOM-FIT INTERIOR DOORS

QUICK
EASY
HASSLE-FREE

The Decorate With Doors Team accurately measures and custom-fits
new doors to their existing frames - Quick, Easy and Hassle-Free

RELIABILITY *for* real life®

JW

EXHIBIT I
62





# 3-D PINPOINT ACCURACY



### Replacing Interior Doors Has Never Been Easier

JELD-WEN has developed an efficient and reliable system of measuring, manufacturing and installing custom-made interior doors.

Using a state-of-the-art measuring device, 3-D measurements of your existing door frames are taken and sent electronically to our manufacturing plants, where the doors are built to fit your opening perfectly. Then the doors are simply installed without being invasive to your home.

Just choose your doors and the options you want…and the rest will be done for you.

## IT'S AS EASY AS 1, 2, 3

**1**

### Select Your Doors & Accessories

Choose your doors and accessories: An In Home Consultant will walk you through our offering to help you make the best choice.

**2**

### High-Tech Measurements

An In Home Consultant digitally measures each unique opening, and based on these measurements, your interior doors will be custom made.

**3**

### Professional Installation

A professional team will install your beautiful new doors, hardware, trim and accessories for a Hassle-Free dramatic improvement to your home.

*"It really is this easy."*



EXHIBIT I
63

**1**

# SELECT YOUR NEW DOORS

**Molded Doors**   Molded doors available in 15 door designs with Solid ProCore® or hollow core.

     

**ProCore**
THE QUIET DOOR®
Option available.

Impression Mirror not available with ProCore.

Craftsman III   Rockport   Bristol   Continental   Provincial   Impression Mirror*

---

**Authentic Wood Doors**   Adds the warmth and charm that only an authentic wood door can.

       

Pine 6-Panel   Knotty Alder 2-Panel V-Groove   Hemlock 1-Panel   Oak 3-Panel   Cherry Pantry Door   Primed Louver/Louver   Pine 10-Lite

---

**Custom Carved Doors**   Over 100 customizable door designs that also offer beautiful raised moulding.

      

*Personalized carvings are not painted or decorated by JELD-WEN.

3-Panel C3140   5-Panel C5000 w/raised moulding   2-Panel C2020   3-Panel C3070   5-Panel C5010   *Personalized Door

---

**Flush Doors**   Hardwood veneer & primed, thin MDF doors available with Solid ProCore® or hollow core.

   

**ProCore**
THE QUIET DOOR®
Option available.

## SEE ALL OF OUR DOORS AT

### jeld-wen.com


Oak   Tropical Hardwood   Birch   Primed Hardboard White

---

Actual colors may vary from samples displayed.

**RELIABILITY** *for real life*®

EXHIBIT I
64

3

 

**1** **DECORATE YOUR DOOR**

## Hardware & Accessories (Most Popular Shown)




Reserve Arch Lever


Tobin Lever


Reserve Square Lever


Carnaby Knob


Madrina Lever


Reserve Decorative Lever


Cove Knob


Laurel Knob


Tustin Lever


Ashfield Lever


Katara Lever


Dorian Lever

## Trim Choices   Available In Primed or Clear Pine, 2-1/4", 2-1/2" and 3-1/4".

Ask your consultant for other options available in your area.


Primed  2-1/4" Pine


Clear  2-1/2" Pine




Clear  3-1/4" Pine

## 9 Standard Colors

| Brilliant White | French Vanilla | Desert Sand | Dark Chocolate | Black | Medium Chocolate | Driftwood | Weathered Stone | Light Gray |
|---|---|---|---|---|---|---|---|---|

### Custom Color Match Available

We'll prepaint your favorite custom color at our factory to match your interior design theme.

*NOTE:  Variances in photography and printing may cause finish colors shown in this catalog to vary from actual finish.*



EXHIBIT

## 2    HIGH-TECH ACCURATE MEASUREMENTS

### Door Digitizer

The Door Digitizer is a state-of the art measuring device which allows the capture of 3-D measurements for the contour of each door opening (inside the jamb) — to create a truly unique and custom made door.

### 3-D Pinpoint Accuracy

The typical interior passage door has 13 points to measure. This includes:

» 9 points along the contour of the existing frame are measured.

» 2-4 hinge points depending on height of door frame and 1-3 strikes depending on function of door.

### Precision Manufacturing of Your Perfectly Fit Custom Door

These measurements are then sent electronically to our manufacturing plants, where the doors are custom made to perfectly fit the opening.

All preparation — routing, sanding and painting of the new door is done at the JELD-WEN plant, not in your home. Your door order is manufactured, precision trimmed and available with factory applied prepaint color or clear coat.

This insures the Quick, Easy and Hassle-Free installation of your beautiful and reliable custom made doors.



Taking 3-D measurements for the contour of each door opening.




CNC Router cuts the door's contours and mortises the hinges and bores




Routing, sanding and painting of the new door is done at the JELD-WEN plant



Factory finish can be applied in 9 standard colors or any custom color of your choice

# 3 PROFESSIONAL INSTALLATION





**DECORATE** with **DOORS**

**Hassle Free Installation** A professional team will install your beautiful new doors, hardware, trim and accessories for a **Hassle-Free** dramatic improvement to your home. Your home is left clean and doors are ready to use with no additional work needed.



Your existing doors are removed



New doors and hardware are installed



After final inspection, your home is left clean and doors are ready to use with no additional work needed

**before**



**after**



EXHIBIT I
67

## ORDER YOUR NEW DOORS TODAY



Contact your local dealer at:

EXHIBIT
68

 

The JELD-WEN website is your ultimate resource for learning about our reliable windows and doors. It has all the product information and design advice you need. Visit us at **jeld-wen.com** today.

# OUR RELIABILITY PROMISE

JELD-WEN products create lasting value for your home. We are so confident that you will be pleased with our Interior Doors, that each one carries our industry-leading warranty. Here are just some of the highlights of our warranty...

## THE INTERIOR & EXTERIOR DOOR SLAB AND SYSTEM LIMITED WARRANTY INCLUDES:

» Limited 5-year coverage on interior door slabs for defects in material and workmanship

» Limited 1-year coverage on door frames for defects in material and workmanship

**Important Legal Information**
**This Limited Warranty document sets forth our maximum liability for our products. We shall not be liable for special, indirect, consequential, or incidental damages. Your sole and exclusive remedy with respect to any and all losses or damages resulting from any cause whatsoever shall be as specified above. We make no other warranty or guarantee, either express or implied, including implied warranties of merchantability and fitness for a particular purpose to the original purchaser or to any subsequent user of the product, except as expressly contained herein. In the event state or provincial law precludes exclusion or limitation of implied warranties, the duration of any such warranties shall be no longer than, and the time and manner of presenting any claim thereon shall be the same as, that provided in the express warranty stated herein. This Limited Warranty document gives you specific legal rights, and you may have other rights that vary from state/province to state/province.**

NOTE: The above information is a summary of key provisions of the **JELD-WEN Interior Door Slab and System Limited Warranty** effective July 1, 2010,  For a complete copy of the current warranty, see your sales associate or refer to **www.jeld-wen.com**.





All JELD-WEN door designs in this brochure feature ODL doorglass

©2011 JELD-WEN, inc.; Door designs and this publication are owned by JELD-WEN, inc. and are protected under the U.S. Copyright Act and other intellectual property laws. All trademarks, service marks, logos and the like (whether registered or unregistered) are owned or controlled by JELD-WEN, inc. or others. Unauthorized use or duplication is prohibited. JELD-WEN reserves the right to change product specifications without notice. Please check our website, **jeld-wen.com**, for current information.

**10-660 1/12** (SB 9/12 3M)

**RELIABILITY** *for* real life®



EXHIBIT I
69

**CASE NAME:** *Highmark Digital, Inc. v. Casablanca Design Centers, Inc. et al.*

**CASE NO.:**   USDC Central District, Western Division Case No. 2:18-cv-06105-SJO-AS

<hr>

## PROOF OF SERVICE

At the time of service, I was over 18 years of age and not a party to this action.  My business address is 350 University Avenue, Suite 200, Sacramento, California 95825.

On January 28, 2020, I served the following document:

# DECLARATION OF DAVID WINTER IN SUPPORT OF DEFENDANTS' OPPOSITION TO HIGHMARK DIGITAL, INC.'S MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| XX | **BY MAIL:** I placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this business' practice for collecting and processing correspondence for mailing.  On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid. |
| | **BY PERSONAL SERVICE:** I caused such document to be personally delivered to the person(s) addressed below.  (1) For a party represented by an attorney, delivery was made to the attorney or at the attorney's office by leaving the documents, in an envelope or package clearly labeled to identify the attorney being served, with a receptionist or an individual in charge of the office, between the hours of nine in the morning and five in the evening.  (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not younger than 18 years of age between the hours of eight in the morning and six in the evening. |
| | **BY OVERNIGHT DELIVERY:**  I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the person(s) listed below. I placed the envelope or package for collection and overnight delivery at my office or a regularly utilized drop box of the overnight delivery carrier. |
| | **BY FAX TRANSMISSION:** Based on an agreement of the parties to accept service by fax transmission, I faxed the documents to the persons at the fax numbers listed below.  No error was reported by the fax machine that I used.  A copy of the record of the fax transmission, which I printed out, is attached |
| XX | **BY ELECTRONIC SERVICE**: Based on a court order or an agreement of the parties to accept service by electronic transmission, I caused the documents to be sent to the persons at the electronic notification address listed below.  **(COURTESY COPY PER AGREEMENT OF COUNSEL)** |

/ / /

/ / /

/ / /

/ / /

/ / /

PORTER | SCOTT<br>350 University Avenue, Suite 200<br>Sacramento, CA  95825<br>TEL: 916.929.1481<br>FAX: 916.927.3706

{02141227.DOCX}

1

PROOF OF SERVICE

Addressed as follows:

**COUNSEL FOR PLAINTIFF:**
Michael Friedland
Thomas P. Krzeminski
Cassie Gourash
Benjamin Ho
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, 14th Floor
Irvine, CA 92614
Michael.friedland@knobbe.com; 2tpk@knobbe.com;
Cassie.Gourash@knobbe.com; Benjamin.Ho@knobbe.com

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed at Sacramento, California on January 28, 2020.

Desiree Ganzon

PORTER | SCOTT
350 University Avenue, Suite 200
Sacramento, CA 95825
TEL: 916.929.1481
FAX: 916.927.3706

{02141227.DOCX}

2

**PROOF OF SERVICE**