1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Michael Friedland (State Bar No. 157,217)
michael.friedland@knobbe.com
Thomas P. Krzeminski (State Bar No. 213,714)
2tpk@knobbe.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, 14th Floor
Irvine, CA 92614
Phone: (949) 760-0404
Facsimile: (949) 760-9502

Attorneys for Plaintiff,
HIGHMARK DIGITAL, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| HIGHMARK DIGITAL, INC., a California corporation,<br><br>      Plaintiff,<br><br>  v.<br><br>CASABLANCA DESIGN CENTERS, INC., a California corporation; FOUR SEASONS WINDOWS, INC., a California corporation; INTERIOR DOOR & CLOSET COMPANY, an unincorporated California company; ONE DAY DOORS AND CLOSETS, INC., a California corporation; DAVID WINTER, an individual; and ONE DAY ENTERPRISES, LLC, a Delaware company,<br><br>      Defendants. | CASE NO. 2:18-cv-06105-SJO-AS<br><br>**STATEMENT OF GENUINE DISPUTES IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT**<br><br>**Hon. S. James Otero**<br>**Magistrate Judge Alka Sagar**<br><br>**Date: February 18, 2020**<br>**Time: 10:00 a.m.**<br>**Judge: S. James Otero**<br>**Location: Courtroom 10C**<br><br>**Discovery Cutoff: 9/30/2019**<br>**Pre-Trial Conference: 6/1/2020**<br>**Trial Date: 6/9/2020** |

Plaintiff HighMark Digital, Inc. ("HighMark") submits this Statement of Genuine Disputes, pursuant to Local Rule 56-2, in opposition to Casablanca Design Centers, Inc., Four Seasons Windows, Inc., Interior Door & Closet Company, One Day Doors and Closets, Inc., and One Day Enterprises, LLC ("Defendants") (D.I. 146) Motion for Summary Judgment or Partial Summary Judgment.

The alleged facts that HighMark does not affirmatively dispute below should be deemed undisputed solely for the purposes of responding to Defendants' present motion. HighMark reserves the right to contest the truth of these facts later in these proceedings and for any purpose other than opposing Defendants' present Motion for Summary Judgment or Partial Summary Judgment.

## I. <u>STATEMENT OF GENUINE DISPUTES</u>

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
| 1 | Defendant Four Seasons Windows, Inc. ("Four Seasons") licensed door software (*i.e.*, One-Cut™) from Plaintiff under a December 2008 "Master Agreement." | **Undisputed.** |
| 2 | The initial term of the Master Agreement was December 12, 2008 to December 31, 2010. | **Undisputed.** |
| 3 | The Master Agreement could be renewed for additional two year terms. | **Undisputed.** |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|-----|------|-----------------------------------|
| 4 | Four Seasons and Plaintiff did not execute an agreement to renew the Master Agreement beyond December 31, 2010. | **Undisputed** that Four Seasons and HighMark did not execute a *written* renewal of the Master Agreement. Instead, the parties extended the agreement by mutual performance. |
| 5 | Four Seasons continued to use One-Cut™ until approximately November 2011. | **Undisputed** that Four Seasons continued to submit door measurement data for processing through HighMark's One-Cut™ system until at least mid-November 2011. |
| 6 | Casablanca entered into an agreement to license door software from Prodim in October 2011. | **Undisputed**. |
| 7 | Plaintiff knew Dairl and Glenn Johnson, of Casablanca, had transitioned to competing software from Prodim no later than early 2012. | **Disputed.** David Winter ("Winter") *assumed* that the Johnsons had transitioned to a competing software in 2011 or 2012. Krzeminski Decl., Ex. 12 at 250:18-252:3, 253:4-255:9. |
| 8 | Michael McElroy ("McElroy"), the President of Plaintiff at the time, was "mad" and "upset." | **Disputed.** HighMark disputes that McElroy was President of HighMark in 2011 or 2012. Krzeminski Decl., Ex. Ex. 28 (showing that Winter was President of HighMark as of January 2011). HighMark also disputes that McElroy was "mad" or "upset" for any reason |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
| | | other than the loss of the Johnson's business. |
| 9 | McElroy knew the Johnsons from prior to the founding of Plaintiff in January 2007 because the Johnsons had been franchisees of another door company owned by McElroy, IRDC Franchising, Inc. | **Undisputed**. |
| 10 | In "heavy negotiations," the Johnsons had bought out their franchise, which did not leave McElroy and the Johnsons "on good terms." | **Disputed-in-part**. HighMark does not dispute that McElroy testified the Johnsons bought out their franchise following "heavy negotiations." To the extent the Johnsons and McElroy were not "on good terms" when the Johnsons bought out their franchise in or around 2007, HighMark disputes that they remained not "on good terms," given that the Johnsons subsequently entered into another business relationship with McElroy when Four Seasons started licensing HighMark's One-Cut™ technology in 2008. Krzeminski Decl., Ex. 11 at 120:8-122:22. |
| 11 | The relationship between McElroy and the Johnsons was "fairly | **Disputed-in-part**. Highmark does not dispute that McElroy testified that "the |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|-----|------|-----------------------------------|
|  | fractured." | relationship between the Johnsons, Dave [Winter] and [McElroy] was fairly fractured" during the negotiations for the Johnsons to buy out their franchise in 2007. Krzeminski Decl., Ex. 11 at 118:19-121:1.  HighMark that the relationship was still "fairly fractured" in or after 2008, at which time the Johnsons entered into another business relationship with McElroy to license HighMark's One-Cut™ technology.  Krzeminski Decl., Ex. 11 at 120:8-122:22. |
| 12 | McElroy did not trust Dairl and Glenn Johnson and questioned the legitimacy of their business dealings. | **Disputed-in-part.**  HighMark does not dispute that McElroy testified that "there was some business dealings [of the Johnsons] that weren't always legitimate" and that he had "some trust issues" with the Johnsons. Krzeminski Decl., Ex. 11 at 163:11-164:9.  HighMark that this testimony refers to HighMark's business relationship with the Johnsons under the Master Agreement or McElroy's perception of the Johnsons in late 2011 or early 2012. |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
| 13 | McElroy felt that the Johnsons did not operate their business in an "honest" manner, whether that meant the way they paid their bills, treated customers, or how they resolved issues and problems. | **Disputed-in-part.** HighMark does not dispute that McElroy testified that the Johnsons did not "operate[] their business in with how [he] felt an honest [] company should operate" with respect to "how they paid their bills or how they treated customers or how they resolved issues and problems." Krzeminski Decl., Ex. 11 at 165:19-166:4. HighMark disputes that this testimony refers to HighMark's business relationship with the Johnsons under the Master Agreement or McElroy's perception of the Johnsons in late 2011 or early 2012. |
| 14 | When the Johnsons transitioned to Prodim software, McElroy was concerned about "infringement" and the Johnsons using information belonging to Plaintiff "that they weren't allowed to have." | **Disputed.** While McElroy stated there was concern regarding infringement, he later conceded that "there was no indication that" the Johnsons or their businesses were using information that belonged to HighMark. Krzeminski Decl., Ex. 11 at 126:17-127:2. Furthermore, David Winter indicated his and McElroy's concern was more related to the loss of business than anything else. Krzeminski Decl., Ex. 12 250:18-251:16. |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|-----|------|-----------------------------------|
| 15 | McElroy considered Prodim competitor that posed a threat to Plaintiffs business because Prodim offered competing software. | **Disputed-in-part.** HighMark does not dispute that McElroy viewed Prodim as a competitor. HighMark disputes that McElroy thought Prodim offered software that included all the functionality of HighMark's. Specifically, he expresses uncertainty as to what Prodim has done to develop their software. Krzeminski Decl., Ex. 11 at 129:8-129:16. |
| 16 | Prodim was downplaying the importance of Plaintiffs software by "advertising the fact that, you know, who needs HighMark when we can do it." | **Disputed-in-part.** HighMark does not dispute that Prodim downplayed the importance of HighMark's software in its advertising. HighMark disputes that Prodim had the ability to back up their claims and replicate the functionality and quality of HighMark software. |
| 17 | McElroy was concerned Prodim was using ideas and technology developed by Plaintiff to benefit Prodim's business. | **Disputed-in-part.** HighMark does not dispute that McElroy was concerned Prodim was attempting to compete with Highmark. HighMark disputes that McElroy had any concrete knowledge that Prodim had stolen or was maliciously using HighMark's technology. Specifically |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
|  |  | McElroy states he did not have "any specific information" as to Prodims actions. Krzeminski Decl., Ex. 11 at 135:5-135:20. |
| 18 | A former employee of Plaintiff, Richard Reardon, had abruptly left his employment with Plaintiff and went to work for Prodim; when McElroy learned of this, he was "upset" and "surprised." | **Undisputed**. |
| 19 | McElroy and Winter met and reviewed the terms of the Master Agreement after Four Seasons stopped using One-Cut™ | **Undisputed**. |
| 20 | McElroy did not know what the Johnsons were doing with information belonging to Plaintiff, if anything, but he was concerned and believed there to be "a need for protection." | **Disputed-in-part.** HighMark does not dispute that there was concern. HighMark disputes that McElroy's and Winter's concern was based on any concrete evidence. McElroy stated that "there was no indication that" the Johnsons or their businesses were using information that belonged to HighMark. Krzeminski Decl., Ex. 11 at 126:17-127:2. Furthermore, David Winter indicated |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
| | | that his and McElroy's concern was more related to losing business. Krzeminski Decl., Ex. 12 at 250:18-251:16. |
| 21 | McElroy and Winter considered litigation against Dairl and Glenn Johnson in or around the beginning of 2012. | **Disputed-in-part.** HighMark does not dispute that McElroy and Winter considered litigation against Dairl and Glenn Johnson. HighMark disputes that the litigation considered had anything do to with the causes of action asserted in HighMark's Second Amended Complaint. Instead, litigation was discussed as a potential means of maintaining the business relationship and was quickly dismissed because Winter and McElroy felt there were no grounds for litigation. Krzeminski Decl., Ex. 11 at 253:18-254:15. |
| 22 | Plaintiff filed its Complaint on July 13, 2018. | **Undisputed.** |
| 23 | The Master Agreement provided that Four Seasons should return or destroy the Licensed Applications, Documentation, or Confidential | **Disputed.** The language provides that Four Seasons should discontinue its use, return, or destroy the Licensed Applications, Extranet, Data, the |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
| | Information in its possession upon the termination of the Master Agreement. | HighMark Content, and the Documentation. Krzeminski Decl., Ex. 44 at Section 9.3, "Obligations on Termination." |
| 24 | The Confidentiality Agreement attached to the Master Agreement: as Exhibit E provides that upon Plaintiffs request, Four Seasons shall either return all written materials containing the confidential information or destroy such materials and certify to Plaintiff that such destruction has occurred. | **Undisputed.** |
| 25 | Plaintiff did not request that Four Seasons return all materials containing confidential information or destroy such materials and certify to Plaintiff that such destruction occurred. | **Undisputed** that in the absence of Plaintiff making such a voluntary request, Defendants were still obligated to abide by all surviving provisions of the Confidentiality Agreement. |
| 26 | Between 2012 and at least January 1, 2015, Plaintiff did not conduct further investigation into whether the Johnsons or Prodim had or was misusing technology | **Disputed-in-part.** HighMark does not dispute that it did not conduct such an investigation during that time. HighMark disputes that it suspected or had reason to suspect that the Johnsons |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
| | belonging or relating to Plaintiff. | or Prodim were misusing HighMark's technology between 2012 and January 1, 2015. |
| 27 | Under the Master Agreement, Four Seasons uploaded Proliner door frame measurement data to Plaintiff over the internet. | **Undisputed** that Plaintiff's solution includes a cloud-based element. |
| 28 | The Proliner is an electronic measuring device manufactured by Prodim that Four Seasons used to capture the dimensions of door frames in existing structures so that a custom fit replacement door could be cut. | **Undisputed.** |
| 29 | Plaintiff itself relied on the Proliner to measure door frames. | **Undisputed** that HighMark used the Prodim Proliner and other measuring devices for door measurements. |
| 30 | Plaintiff used software originally developed by a company called MetaWorks LLC to convert Proliner measurement data into an eXtensible markup language ("XML") output ("MetaWorks Software"). | **Undisputed** that HighMark contracted with MetaWorks LLC to assist in developing software HighMark owned as part of its platform. |
| 31 | Plaintiff used software supplied by | **Disputed-in-part.** HighMark does not |

-10-

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|-----|------|-----------------------------------|
|  | CadCode Systems ("CadCode") to translate XML output into files written in HOPS ("CadCode Software"). | dispute that CadCode assisted in the development of software used by Plaintiff to translate XML output into HOP files. HighMark disputes that the software was "supplied by" CadCode Systems. Instead, HighMark developed the software in conjunction with CadCode, and contracted with CadCode to develop a small portion of its larger One-Cut ecosystem. |
| 32 | A CadCode file library translated non CNC machine specific data (e.g., Plaintiff's XML) into files readable by CNC machines produced by different CNC manufacturers (e.g., HOP in the case of Holz-Her). | **Undisputed** that iterations of HighMark's source code for its One-Cut system incorporated CadCode-supplied file libraries. |
| 33 | A HOP file is the instruction to the CNC machine to cut the door. | **Undisputed.** |
| 34 | Holz-Her GmbH ("Holzer-Her") CNC machines are programmed to receive cutting instructions in HOP. | **Undisputed.** |
| 35 | Four Seasons downloaded the converted HOP files over the | **Undisputed.** |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
| | internet. | |
| 36 | Four Seasons inputted the converted HOP files into its HolzHer CNC machine and cut doors. | **Undisputed.** |
| 37 | Four Seasons paid a fee for each HOP file it downloaded, which Plaintiff increased in or around December 2010, prompting Dairl and Glenn Johnson to look into the availability of an alternative door software provider. | **Disputed-in-part.** HighMark disputes the inference that pricing was the sole factor prompting Dairl and Glenn Johnson to look for an alternative door software provider. |
| 38 | In or around October 2011, Casablanca entered into an agreement with Prodim to license Prodim software to convert Proliner measurement data into cutting instructions written in HOP. | **Disputed-in-part.** HighMark disputes that the software is Prodim's own software. |
| 39 | Prodim offered a non-expiring license to its software for a one-time fee. | **Disputed-in-part.** HighMark disputes that the software is Prodim's own software. |
| 40 | Prodim completed installation of its software in November 2011. | **Disputed-in-part.** HighMark disputes that the software is Prodim's own software. |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
| 41 | In 2013, Casablanca paid to upgrade the Prodim software it licenses. | **Disputed-in-part.** HighMark disputes that the software is Prodim's own software. |
| 42 | Casablanca has manufactured doors using Prodim software since November 2011. | **Disputed-in-part.** HighMark disputes that the software is Prodim's own software. |
| 43 | Prodim uses computer aided manufacturing software provided by the third-party company vectorcam to translate Proliner XML files into cutting instructions for Casablanca's Holz-Her CNC machine written in HOP. | **Disputed-in-part.** HighMark disputes that the Prodim CAM-software component was always provided by vectorcam. |
| 44 | Software installed on the Prodim Proliner generates an XML file containing door measurement data. | **Undisputed.** |
| 45 | Plaintiff did not install source code for the MetaWorks Software or the CadCode Software locally at the Torrance, California facility Four Seasons and then Casablanca conducted business from. | **Undisputed.** |
| 46 | Plaintiff stores source code in a cloud-based repository, which | **Undisputed** that any Defendant other than David Winter accessed the |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
| | neither Four Seasons nor Casablanca ever accessed or attempted to access. | repository directly. |
| 47 | Neither Four Seasons nor Casablanca has ever accessed or attempted to access source code for any component of One-Cut™. | **Disputed.** Defendants attempted to access One-Cut source code through soliciting David Winter to take it with him when he departed HighMark**.** Krzeminski Decl., Ex. 24. |
| 48 | Plaintiffs Chief Technology Officer admitted that he was aware of no facts suggesting that Defendants took source code from Plaintiff. | **Undisputed.** |
| 49 | Neither Casablanca nor Four Seasons ever accessed or attempted to access the XML output generated by the MetaWorks Software. | **Disputed-in-part.** HighMark lacks direct knowledge about whether Defendants may have first tried to reverse engineer any of its XML outputs generated by MetaWorks software. |
| 50 | The Johnsons do not have experience writing source code. | **Undisputed.** |
| 51 | Neither Casablanca nor Four Seasons has ever possessed any source code for the Prodim software, including vectorcam. | **Disputed-in-Part.** Undisputed that Defendants may have possessed Prodim source code lacking HighMark source code components. Disputed that Casablanca and Four Seasons never |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
| | | possessed any source code that may have been incorporated into Prodim software. In fact, Highmark suspects that the Prodim software used by Defendants may have incorporated HighMark's own source code. |
| 52 | Casablanca and Four Seasons did not contemplate, request or discuss that Prodim reverse engineered One-Cut™. | **Disputed.** Defendants complained that the Prodim software failed to operate as well as HighMark's software, and subsequently conspired with Prodim to reverse engineer parts of the One-Cut platform using HighMark's HOP files. Krzeminski Decl., Ex. 18. |
| 53 | Casablanca and Four Seasons did not disclose trade secret information of Plaintiff to Prodim. | **Disputed.** Defendants conspired with Prodim to reverse engineer parts of the One-Cut platform using HighMark's HOP files. Krzeminski Decl., Ex. 18. In doing so, they revealed HighMark's trade secret information to Prodim, in violation of the Master Agreement. Krzeminski Decl., Ex. 44. |
| 54 | Four Seasons did not disclose confidential information of Plaintiff to Prodim. | **Disputed.**  HighMark believes that its HOP files, which were designated confidential information under the Master Agreement, were sent to a |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
| | | Prodim representative for purposes of reverse engineering.  Krzeminski Decl., Ex. 18. |
| 55 | Neither Four Seasons nor Casablanca sent a HOP file generated by CadCode and/or Plaintiff to Prodim. | **Disputed.**  HighMark believes that its HOP files, which were designated confidential information under the Master Agreement, were sent to a Prodim representative for purposes of reverse engineering.  Krzeminski Decl., Ex. 18. |
| 56 | Plaintiffs Chief Technology Officer admitted that he "could not recreate all of the functionality of Cad Code" using a HOP file. | **Undisputed** that Joseph Fallon testified that he personally would not be able to recreate *all* functionality of HighMark source code via reverse engineering a HOP file. |
| 57 | Prodim had software to translate Proliner measurement data into HOPS file prior to Dairl Johnson licensing such software from Prodim in 2011. | **Disputed.** Highmark disputes that Prodim had existing software that translated measurement data all the way into a HOP file (or equivalent format) to allow for the cutting of replacement doors on HolzHer CNC machines in 2011.  In fact, Defendants later approached Prodim to develop such software precisely because it did not already have software that handled such |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
|  |  | a task.  Krzeminski Decl., Ex. 18. |
| 58 | In or around 2006, McElroy attended a trade show specifically to meet with Prodim and discuss automating the replacement door manufacturing process. | **Undisputed** that this was one purpose of attending the trade show. |
| 59 | Prodim already had basic door software, which it demonstrated for McElroy. | **Disputed-in-part.**  HighMark does not dispute that Prodim had software that could cut new doors.  HighMark disputes that Prodim already had software that allowed a user to cut replacement doors. Krzeminski Decl., Ex. 18. |
| 60 | When McElroy met with Prodim, Prodim was already using the Prodim Proliner to measure and cut countertops on CNC machines. | **Undisputed.** |
| 61 | Prior to meeting with Prodim, McElroy "didn't even know what a CNC machine was." | **Undisputed.** |
| 62 | Prodim recommended McElroy use Holz-Her machines to cut doors. | **Undisputed.** |
| 63 | McElroy opted to use Holz-Her CNC machines because they were cost effective and because of | **Undisputed.** |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
| | Holz-Her's preexisting relationship with Prodim. | |
| 64 | McElroy understood that Holz-Her and Prodim had sold machines. | **Undisputed.** |
| 65 | As of 2006, Holz-Her had been cutting doors on CNC machines for years. | **Disputed-in-part.** Highmark does not dispute that Prodim had software that could cut new doors in 2006. HighMark disputes that Prodim already had software that allowed a user to cut *replacement* doors. Rather, Prodim was later approached by Defendants to develop such software precisely because Prodim did not already have software capable of handling replacement door tasks. Krzeminski Decl., Ex. 18. |
| 66 | Prodim was measuring and cutting countertops on Holz-Her CNC machines in 2006. | **Undisputed.** |
| 67 | After the trade show, Prodim travelled to McElroy's door facility and cut a door using a Proliner, Prodim provided door software, and McElroy's Holz-Her CNC machine. | **Disputed-in-part.** HighMark does not dispute that a Prodim representative traveled to McElroy's facility and cut a new door. Highmark disputes the inference that Prodim already had software that allowed a user to cut |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
|  |  | replacement doors. Krzeminski Decl., Ex. 18. |
| 68 | McElroy considered purchasing Prodim developed software to convert Proliner measurement data into HOPS format, but decided not to because Prodim wanted to enter into a "per-door" licensing agreement, whereas McElroy wanted to own the software. | **Disputed-in-part.** HighMark does not dispute that a per-door licensing agreement was *one* factor that McElroy considered. However, HighMark disputes that the per-door licensing agreement was the *only* factor. Rather, McElroy stated that "[t]he software that Prodim was providing was not adequate to meet our needs." Krzeminski Decl., Ex. 11 at 44:9-15. |
| 69 | McElroy contracted with MetaWorks to develop the MetaWorks Software (which converted Proliner measurement data into XML), but multiple companies, including Prodim, had "expressed they had the ability to do what we were asking them to do." | **Undisputed** that multiple companies *claimed* to have the ability and functionality HighMark desired. |
| 70 | It was McElroy's understanding that Prodim and Holz-Her could put together an integrated software solution "fairly easily." | **Undisputed.** |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
| **71** | After Prodim installed its software, Casablanca personnel noted that the Prodim software functioned differently than One-Cut™. | **Disputed-in-part.**  HighMark does not dispute that Defendants noted differences between Prodim software and One-Cut™.  However, HighMark disputes the implication that the differences were welcomed.  Conversely, Prodim received complaints that its software did not function like One-Cut and thus was pressured to fix the Prodim software so that it conformed more closely to HighMark functionality. Krzeminski Decl., Ex. 64. |
| **72** | Holz-Her GmbH ("Holzer-Her") CNC machines are programmed to receive cutting instructions in HOPS format. | **Undisputed.** |
| **73** | A July 13, 2006 HOP Interface manual describes how to program HOP files for Holz-Her CNC machines. | **Undisputed.** |
| **74** | Holz-Her gives out sample HOP files to users of its CNC machines. | **Undisputed** that it is industry practice for certain machine manufacturers to show potential users what file inputs to their machines look like. |
| **75** | On woodworking and CNC | **Disputed.**  HighMark does not dispute |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
|  | machine forums, users discuss programming Holz-Her CNC machines and writing HOPS files and share information amongst themselves, including sample HOP files. | that users have discussed HolzHer CNC machines in online forum posts. However, HighMark disputes that the forum posts provided by Defendants in Vilfer's responsive report are from woodworking and CNC machine forums specifically. |
| 76 | Prodim was measuring and cutting countertops on Holz-Her CNC machines in 2006. | **Undisputed.** |
| 77 | As of 2006, Holz-Her had been cutting doors on its CNC machines for years. | **Undisputed.** |
| 78 | Plaintiff was not incorporated until January 2007. | **Undisputed.** |
| 79 | CadCode Software translates the Meta Works XML output into HOP format. | **Undisputed** that CadCode software solutions have this functionality available. |
| 80 | CadCode used a machine file library to translate non CNC machine specific data (e.g., Plaintiff's XML) into files readable by CNC machines produced by different CNC manufacturers. | **Undisputed** that some iterations of Plaintiff's source code for its One-Cut system incorporated CadCode-supplied file libraries. |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
| 81 | Plaintiff's Chief Technology Officer admitted that CadCode offers its software to other customers. | **Undisputed.** |
| 82 | According to Plaintiff's Chief Technology Officer, CadCode HOP files are "simple" compared to XML. | **Undisputed.** |
| 83 | McElroy testified that he does not see HOP files as something "proprietarywise." | **Disputed-in-part.** HighMark does not dispute that McElroy provided this testimony. However, McElroy also testified that HOP files could have been proprietary. Krzeminski Decl., Ex. 11 at 146:7-12. |
| 84 | Winter, the former President and Chief Executive Officer of Plaintiff, does not consider HOP files proprietary to Plaintiff. | **Disputed-in-part.** HighMark does not dispute that Winter testified that he does not consider HOP files to be proprietary. However, Winter also expressed his belief that source code is proprietary. Krzeminski Decl., Ex. 12 at 97:16-18; |
| 85 | Defendant One Day Enterprises, LLC generates HOP files to manufacture doors but does not consider them proprietary. | **Undisputed** that an entity without its own proprietary source code to generate HOP files would not consider their HOP files themselves proprietary. |
| 86 | Between 2008 and at least 2012, | **Undisputed** that CadCode did not |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
| | Plaintiff and CadCode did not execute a written confidentiality or other agreement restricting Plaintiffs use of the CadCode Software to generate HOP files. | restrict Plaintiff's use of the portions of CadCode's software that Plaintiff paid to use. |
| 87 | After Cad Code contacted Plaintiff regarding Plaintiffs use of the Cad Code Software, Plaintiffs Chief Technology Officer sent email correspondence stating m part: [A]fter reviewing our source code, your part is just a small code library that our system wraps and exposes. My software generates the XML that your little library consumes. Your library spits out a rather simple hop file that is about 200 lines long with about 15 CNC cutting features . . . Indeed, the construction of the input XML is way more complicated and 10x longer in length. We use your library because it is convenient. To do away with this convenience, I would have to sit down and | **Undisputed** that Plaintiff's Chief Technology Officer wrote this email, specifying that the small CadCode component of the HighMark source code library had less value and technical complexity than the home-grown portions of HighMark software. |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
| | change our logic to output the HOP directly instead of outputting the XML ... I would prefer to not have to do this, but it is not remotely difficult. | |
| 88 | Plaintiff's current Chief Executive Officer, Richard Matulia, responded that the e-mail was good but he did not want CadCode to "leverage [Plaintiff] on new pricing." | **Undisputed.** |
| 89 | Plaintiff's Chief Technology Officer wrote software that was the "equivalent" of the CadCode software and Plaintiff stopped paying to use the CadCode Software to generate HOP files. | **Disputed.**  Fallon testified that he did not create software that was equivalent to CadCode after David Winter departed. Krzeminski Decl., Ex. 65 at 22:1-6. |
| 90 | Defendant David Winter ("Winter") resigned from Plaintiff in or around July 2015. | **Undisputed.** |
| 91 | Winter did not provide Casablanca with any type of trade secret or confidential information relating to CadCode. | **Disputed.**  Winter was in possession of HighMark's property that contained confidential source code, and provided it to the Defendants. Huisjen Decl., Ex. 9 at 12:8-13:28 |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
| 92 | Plaintiffs Chief Technology Officer admits he has no evidence Winter ever looked at the "key" for accessing CadCode Software. | **Disputed-in-part**. Highmark does not dispute that Fallon testified that he had no personal knowledge that Winter ever looked at the "key".  However, Highmark disputes that Winter never possessed nor looked at any of Highmark's confidential information, including the "key."  Fallon testified that Winter possessed a file containing the "key" that would allow access to Highmark CadCode servers. Krzeminski Decl., Ex. 16 at 155:5-156:16. |
| 93 | Plaintiffs Chief Technology Officer admitted that that he does not have any evidence that Winter has Plaintiffs trade secret or confidential information m his possession. | **Disputed.** HighMark does not dispute that Fallon testified he had no personal knowledge that Winter disclosed trade secrets or confidential information in Winter's possession.  However, Highmark disputes that Winter never possessed any of HighMark's confidential information.  Krzeminski Decl., Ex. 16 at 155:5-156:16. |
| 94 | On December 2, 2016, Plaintiffs Chief Technology Officer sent email correspondence stating that door files were being generated | **Undisputed.** |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
| | because for a given door, Plaintiff regenerates HOP file 3-4 times. | |
| 95 | CadCode responded that Plaintiffs Chief Technology Officer's statements are "consistent with the logs, so I think that question has been answered." | **Undisputed** that CadCode's response here is based on the assumption that only HighMark possessed its own "key" ID |
| 96 | Plaintiff wrote to CadCode to ask if there had been "any cadcode conversions coming from more than 1 IP address in regards to our specific account." | **Undisputed.** |
| 97 | Cad Code responded that they "just verified that all of the authorization requests have come from the same computer ID." | **Undisputed** that CadCode's response here is based on the assumption that only HighMark possessed its "key" ID |
| 98 | On January 4, 2017, CadCode wrote to Plaintiff stating that: "For the record, we don't have any evidence that Dave and/or his current company are using the CadCode solution." | **Undisputed** that CadCode had no reason to suspect Defendants were using their solution if Defendants were using HighMark's "key" ID. |
| 99 | On March 16, 201 7, Plaintiff sent e-mail correspondence to Cad Code stating that Plaintiffs "server | **Undisputed.** |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
| | issues" have not been resolved and requesting that CadCode make the issue a high priority "so we can get back up and running." | |
| 100 | Casablanca generated HOP files March 13, 14, 15, 16, and 17, 2016. | **Undisputed.** |
| 101 | Since November 2011, Casablanca has generated HOP files via the Prodim provided vectorcam software. | **Undisputed** that Defendants have an agreement in place with Prodim to generate HOP files**.** |
| 102 | Vectorcam is installed locally at Casablanca and One Day Enterprises' Torrance and Rocklin, California facility, respectively; Defendants do not access any type of off-site server to generate HOP files. | **Undisputed.** |
| 103 | Each HOP file stored on Defendants' CNC machine from November 2011 to the present bears the name "vectorcam" in its text. | **Disputed-in-part.** HighMark does not dispute that the Defendants' HOP files contain the text "vectorcam." However, HighMark disputes that Defendants provided HOP files prior to 2012. |
| 104 | Between December 30, 2014 and January 1, 2019, Casablanca often | **Undisputed.** |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
| | does not generate HOP files for days at a time, especially over weekends. | |
| 105 | Casablanca licensed the Prodim software, including vectorcam to generate HOP files, for a one-time fee. | **Undisputed.** |
| 106 | Casablanca can generate infinite HOP files using the vectorcam software linked to their CNC machines for no additional cost. | **Undisputed.** |
| 107 | The second cause of action for trade secret misappropriation alleges that the Entity Defendants misappropriated trade secret materials related to One-Cut$^{TM}$ by improperly copying, accessing and/or removing them from Plaintiffs premises and/or systems, and or/by improperly using, transferring and/or disclosing them in breach of a duty to maintain the secrecy and confidential thereof. | **Undisputed.** |
| 108 | The fifth cause of action for unfair | **Undisputed.** |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
| | competition alleges that the Entity Defendants unfairly competed with Plaintiff by allegedly misappropriating and using Plaintiffs trade secret and/or confidential information. | |
| 109 | The fifth cause of action also alleges that Four Seasons breached a contract with Plaintiff. | **Undisputed.** |
| 110 | Winter did not take, use, or disclose trade secret or confidential belonging to Plaintiff. | **Disputed.** Winter took proprietary HighMark source code with him to the Defendants after he terminated his HighMark employment. Huisjen Decl., Ex. 9 at 12:8-13:28. |
| 111 | Plaintiffs Chief Technology Officer, Joseph Fallon ("Plaintiffs CTO"), admitted that he has no evidence Winter took, disclosed, or used trade secret or confidential information belonging to Plaintiff m any manner. | **Disputed.** Highmark does not dispute that Fallon testified that he had no personal knowledge that Winter disclosed trade secret or confidential information in his possession to third parties.  However, Highmark disputes that Winter never possessed and disclosed any of Highmark's confidential information.  Krzeminski Decl., Ex. 16 at 66:17-68:19, 102:21-104:11, 132:16-134:5; *id.* |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
| | | Ex. 7 at 89:1-91:1, 93:1-16, 94:25-96:4; *id.* Ex. 12 at 52:1-53:17, 62:2-19. |
| 112 | Winter informed Dairl and Glenn Johnson in July of 2015 that he did not want to bring over any dealers or assets from HighMark or do anything to the detriment of the company. | **Disputed.** The Johnsons specifically requested that Winter bring HighMark assets to the Corporate Defendants. Krzeminski Decl., Ex. 24. |
| 113 | Winter wanted to be ethical in all areas and wanted nothing to do with HighMark's technology. | **Disputed.** HighMark disputes that Winter wanted to act ethically. Defendants, in their own statement of facts, have already admitted that Winter selfishly and unethically took advantage of a corporate opportunity instead of offering it to HighMark, where he served as a director. |
| 114 | After his resignation, Winter returned materials that consisted of an Apple laptop, an external electronic storage device and the materials in his office. | **Disputed-in-part.** HighMark does not dispute that Winter returned an Apple Laptop, and *an* external electronic storage device. HighMark disputes that the return of the device occurred within the time frame set by the Employee Non-Disclosure Assignment and Non-Solicitation |

-30-

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
|  |  | Agreement Winter entered into with HighMark. Winter failed to return the materials until a week to a week and a half after when he was supposed to. *See infra* Fact. No. 25; Krzeminski Decl., Ex. -43. Furthermore, when the laptop computer was returned it had been wiped preventing analysis as to what had been done to it prior to its return. Krzeminski Decl., Ex. 49. |
| 115 | Right after the end of his employment, Winter received an email alert that information including his phone number, email address and home address had been changed on his personal Wells Fargo bank account. | **Undisputed.** |
| 116 | Winter went to the bank and was informed that his account information was changed to include what he believed to be Richard Matulia's email address along with other HighMark email addresses, HighMark phone numbers and the physical address | **Undisputed.** |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
| | for HighMark. | |
| 117 | Winter also believes that his personal Face book page was accessed and changed by HighMark. | **Undisputed.** |
| 118 | Plaintiff did not inform Winter it was accessing these accounts, even after he objected to what he perceived to be Plaintiff hacking into his personal accounts. | **Disputed.** HighMark disputes that Winter was not informed. As a former employee of HighMark, he was on notice that information he made available to his company via logged-in accounts on a company-issued device may be mistaken for company accounts, and thus have their information changed upon his departure. |
| 119 | Katherine Gabales, an employee of Plaintiff in July 2015, admits to accessing a Wells Fargo bank account and a Facebook account and changing the credentials to Plaintiff and not informing Winter she was doing so. | **Undisputed.** |
| 120 | Winter was advised by Wells Fargo officials m its fraud department to wipe the hard drive of the Apple computer. | **Disputed.** Defendants have presented no evidence that Wells Fargo gave this advice to Winter. Regardless, Winter taking such advice would be illogical and |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
| | | unreasonable behavior by a technically savvy software executive. It was clear from HighMark's contact information being listed on the account that it was HighMark who had changed the account information. It would be obvious to someone in Winter's position that such action was likely a mistake. Instead of simply calling HighMark to have the issue corrected, Winter took the drastic step of wiping the hard drive. |
| 121 | Winter did not want to do so, but ultimately did wipe the hard drive of the Apple laptop. | **Disputed**. HighMark disputes Winter did not want to wipe the hard drive. It was clear from HighMark's contact information being listed on the account that it was HighMark who changed the account information. It would be obvious to Winter that such action was likely a mistake. Instead of simply calling HighMark to have the issue corrected, Winter took the drastic step of wiping the hard drive. This suggests Winter acted on his own volition. |
| 122 | Before wiping the hard drive of the Apple laptop, Winter backed | **Disputed.** HighMark disputes that any HighMark files were backed up to an |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
|  | up any HighMark files to an external hard drive. | external hard drive. Winter wiped the laptop's hard drive prior to returning it. Therefore, no forensic analysis as to what files were or were not backed up was possible. Krzeminski Decl., Ex. 49. |
| 123 | It is admitted that the external electronic storage device provided by Winter contained HighMark files and there is no suspicion that files were missing. | **Disputed.** HighMark disputes that there is no suspicion that files were missing. The laptop's hard drive was wiped, and therefore no analysis as to what files were or were not missing could be completed. Krzeminski Decl., Ex. 49. |
| 124 | Prior to Winter's resignation, Plaintiff had not been compensating Winter in accordance with his employment agreements, such that Winter was forced to bring a claim before the California Labor Commissioner, which resulted m the Labor Commissioner issuing an A ward in favor of Winter in the amount of $219,587.23. | **Disputed-in-part**. Winter was compensated properly as an employee of HighMark throughout his employment tenure. Matulia Decl. at ¶ 9.  Winter was awarded $219, 587.23 before the California Labor Commission. |
| 125 | Winter did not provide Defendants any source code, passwords, or other information pertaining to | **Disputed.** Winter brought the Defendants HighMark source code for processing doors, which may have |

-34-

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
|  | CadCode. | contained CadCode access and integration written into it. Krzeminski Decl., Ex. 16 at 155:5-156:16. |
| 126 | Winter did not provide Glenn Johnson with any confidential or trade secret information belonging to Plaintiff. | **Disputed.** Winter brought the Defendants HighMark source code for processing doors, which may have contained CadCode access and integration written into it. Krzeminski Decl., Ex. 16 at 155:5-156:16. |
| 127 | Winter did not provide Dairl Johnson with any confidential or trade secret information belonging to Plaintiff. | **Disputed.** Winter brought the Defendants HighMark source code for processing doors, which may have contained CadCode access and integration written into it. Krzeminski Decl., Ex. 16 at 155:5-156:16. |
| 128 | Plaintiff's Chief Technology Officer admitted he was aware no facts suggesting that Defendants improperly came to possess any confidential information relating to One-Cut$^{TM}$. | **Disputed-in-part.** |
| 129 | Plaintiff's Chief Technology Officer admitted that he has no evidence to suggest that Dave Winter ever looked at the "key" | **Disputed-in-part.** HighMark does not dispute that Fallon testified he lacked personal knowledge that Winter ever looked at the "key".  However, |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
|  | for the CadCode Software. | HighMark disputes that Winter neither possessed nor looked at any of Highmark's confidential information, including the "key." Fallon testified that Winter possessed a file containing the "key" that would allow access to Highmark CadCode servers. Krzeminski Decl., Ex. 16 at 155:5-156:16. |
| 130 | Plaintiff's Chief Technology Officer admitted that he was aware of no facts indicating Winter transmitted any trade secrets to Defendants. | **Disputed.** Highmark does not dispute that Fallon testified that he had no personal knowledge that Winter disclosed trade secret or confidential information in his possession.  However, Highmark disputes that Winter never possessed and transmitted any of Highmark's confidential information. Krzeminski Decl., Ex. 16 at 155:5-156:16. |
| 131 | Plaintiff's Chief Technology Officer admitted that he was aware of no facts indicating Winter shared any trade secrets, including source code, belonging to Highmark with One Day, or any other person or entity. | **Disputed.** HighMark does not dispute that Fallon testified he lacked personal knowledge that Winter disclosed trade secret or confidential information in Winter's possession to third parties.  However, HighMark disputes that Winter never possessed and thus |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|-----|------|-----------------------------------|
| | | never disclosed any of Highmark's confidential information.  Krzeminski Decl., Ex. 16 at 66:17-68:19, 102:21-104:11, 132:16-134:5; *id.* Ex. 7 at 89:1-91:1, 93:1-16, 94:25-96:4; *id.* Ex. 12 at 52:1-53:17, 62:2-19. |
| 132 | Plaintiff's Chief Technology Officer admitted that he was aware of no facts indicating Winter used Highmark' s trade secret or confidential information with third parties. | **Disputed.** HighMark does not dispute that Fallon testified he lacked personal knowledge that Winter disclosed trade secret or confidential information in Winter's possession to third parties.  However, HighMark disputes the implication that Winter never possessed and thus never disclosed any of HighMark's confidential information. Krzeminski Decl., Ex. 16 at 155:5-156:16. |
| 133 | Plaintiff's Chief Technology Officer admitted that he was aware of no facts indicating that Defendants came into possession of Highmark's trade secrets through any means whatsoever. | **Disputed.** HighMark does not dispute that Fallon testified he lacked personal knowledge that Winter disclosed trade secret or confidential information in Winter's possession to Defendants.  However, HighMark disputes that Winter never possessed and |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
| | | thus never disclosed any of Highmark's confidential information to the Defendants. Krzeminski Decl., Ex. 16 at 155:5-156:16. |
| 134 | Winter returned the backup hard drive Fallon gave him for safe keeping. | **Disputed.** HighMark disputes that Winter returned the backup hard drive Fallon gave him for safe keeping. Krzeminski Decl., Ex. 14 at 39:20-42:6, 64:25-65:17; *id.* Ex. 48. |
| 135 | | |
| 136 | Four Seasons was incorporated on or around July 15, 2004. | **Undisputed.** |
| 137 | Four Seasons has not conducted business since 2011. | **Undisputed** that the Corporate Defendants may not have conducted business using Four Seasons name since 2011. |
| 138 | Between 2012 and the present, Four Season never accessed the CadCode Software to generate HOP files. | **Undisputed** that the Corporate Defendants did not specifically use the Four Seasons entity within its single entity structure to access CadCode to generate HOP files. |
| 139 | Dairl Johnson shut down Four Seasons m favor of Defendant Casablanca Design Centers, Inc. ("Casablanca") because he | **Disputed** that Four Seasons was "shut down," as it remains a formal corporation registered in the State of California. Krzeminski Decl., Ex. 33. |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
| | intended to operate Casablanca as part of a national chain. | |
| 140 | Dairl Johnson incorporated Casablanca in November 2010. | **Undisputed.** |
| 141 | Four Seasons did not sublicense Plaintiff's software. | **Undisputed** that Four Seasons was not permitted to sublicense or otherwise share Plaintiff's software as per the terms of the Master Agreement. Krzeminski Decl., Ex. 44 at § 6.1. |
| 142 | One Day Doors and Closets, Inc. ("One Day Doors") was incorporated on or around April 18,2012. | **Undisputed.** |
| 143 | One Day Doors was incorporated with the intention of it operating as part of a nationwide dealership program. | **Undisputed** that this was a possible intention of One Day Doors. |
| 144 | One Day Doors never manufactured doors, had employees, or generated revenue. | **Undisputed** that One Day Doors was another non-functional company within Corporate Defendants' single entity structure. |
| 145 | One Day Doors never used any software, Prodim or One-Cut™, to produce doors. | **Undisputed** that a non-functional entity has no use for software. |
| 146 | One Day Doors never accessed the | **Undisputed** that a non-functional entity |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
| | CadCode Software to generate HOP files. | has no use for software. |
| 147 | One Day Enterprises, LLC ("One Day Enterprises") is a Delaware LLC formed on October 27, 2016 and registered in California on or around January 6, 2017. | **Undisputed.** |
| 148 | One Day Enterprises has operated from its facility in Rocklin, California since 2017. | **Undisputed.** |
| 149 | One Day Enterprises is a distinct entity. | **Disputed** that One Day Enterprises is an entity distinct from the other Corporate Defendants for the purposes of liability. One Day Enterprises does business as One Day Doors and Closets. Krzeminski Decl., Ex. 13 at 170:5-11 G. *id*. Ex 17 at 36:1-8. |
| 150 | One Day Enterprises has used Prodim software, including vectorcam, to manufacture doors since its commenced operations in 2017. | **Disputed-in-part.** One Day Enterprises is not distinct from other Corporate Defendants, and Defendants used HighMark source code as part of its operations in addition to and/or in lieu of Prodim software**.** Huisjen Decl., Ex. 9 at 8:18-12:7. |
| 151 | One Day Enterprises never | **Disputed.** One Day Enterprises acting as |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
|  | accessed the CadCode Software to generate HOP files. | part of the single-entity Defendants accessed CadCode Software to generate HOP files. Huisjen Decl., Ex. 9 at 8:18-12:7. |
| 152 | Interior Door and Closet Company is not an independent entity, but merely a dba of Defendant Casablanca Design Centers, Inc. | **Undisputed.** |

## II. <u>CONCLUSIONS OF LAW</u>
### <u>Summary Judgment</u>

1.     Summary judgment is appropriate when, drawing all justifiable inferences in the non-movant's favor, there exists "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts are those that may affect the outcome of the case.  *Id.* at 248.  An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

2.     The moving party bears the burden of establishing the absence of a genuine issue of material fact.  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323, 106 S.Ct. 2548 (1986).

3.     "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.  In such a case, the moving party has the initial burden of establishing the absence of a genuine

-41-

issue of fact on each issue material to its case."  *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted).

4.    "A moving party without the ultimate burden of persuasion at trial—usually, but not always, a defendant—has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment."  *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."  *Id*.  The moving party may discharge its initial burden by  "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  *Celotex*, 477 U.S. 317, 325 (1986).  The nonmoving party may avoid summary judgment by "designat[ing] specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (internal quotation omitted).  "In order to carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact."  *Nissan Fire*, 210 F.3d at 1102.

**<u>Applicable Statutes of Limitations</u>**

5.    A cause of action for trade secret misappropriation under the California Uniform Trade Secrets Act ("CUTSA") is timely if it is filed "within three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered."  Cal. Civ. Code § 3426.6.

6.    A cause of action for trade secret misappropriation under the Defend Trade Secrets Act ("DTSA") is timely if it is filed within "3 years after the date on which the misappropriation with respect to which the action would relate is

/ / /

-42-

discovered or by the exercise of reasonable diligence should have been discovered." 18 U.S.C. § 1836.

7.     A cause of action for breach of contract is timely if filed within four years of accrual. *See* Cal. Civ. Proc. Code § 337(1).

8.     A cause of action for unfair competition is timely if filed within four years of accrual. *See* Cal. Bus. & Prof. Code § 17208.

### The Discovery Rule

9.     Under California's discovery rule, a cause of action accrues at the time when the plaintiff "either (1) actually discovered his injury and its negligent cause or (2) could have discovered injury and cause through the exercise of reasonable diligence." *April Enters., Inc. v. KTTV*, 147 Cal. App. 3d 805, 826 (Ct. App. 1983) (internal quotation marks omitted).

10.     In California, the discovery rule has been applied to numerous different causes of action in circumstances where "[t]he injury or the act causing the injury, or both, have been difficult for the plaintiff to detect." *April Enters.*, 147 Cal. App. 3d at 831 (applying discovery rule to breach of contract claim); *Broberg v. Guardian Life Ins. Co. of Am.*, 171 Cal. App. 4th 912, 920-21 (Cal. App. 2009) (applying the discovery rule to unfair competition claim).

### Constructive Notice

11.     Under the discovery rule, "[a] plaintiff is held to her actual knowledge as well as knowledge that could reasonably be discovered through investigation of sources open to her." *Jolly v. Eli Lilly & Co.* 44 Cal. 3d 1103, 1109-1113 (1988) (internal quotes omitted). Accordingly, a plaintiff discovers a cause of action when "the plaintiff has actual or constructive notice of the facts giving rise to the claim." *Alamar Biosciences Inc. v. Difco Labs. Inc.*, 40 U.S.P.Q2d 1437, 1438 (E.D. 1996); *see also E-Fab, Inc. v. Accts., Inc. Servs.*, 153 Cal. App. 4th 1308, 1318-19 (Cal. App. 2007) ("Notice may be actual or constructive. Actual notice is express information of a fact, while constructive

notice is that which is imputed by law.") (internal quotation marks and citations omitted).

12. "A person with actual notice of circumstances sufficient to put a prudent man upon inquiry is deemed to have constructive notice of all facts that a reasonable inquiry would disclose." *E-Fab*, 153 Cal. App. 4th at 1319; *see also Hobart v. Hobart Estate Co*., 159 P.2d 958, 972-973 (1945) ("[A]s the means of knowledge are equivalent to knowledge, if it appears that the plaintiff had notice or information of circumstances which would put him on an inquiry which, if followed, would lead to knowledge . . . he will be deemed to have had actual knowledge of these facts."). Accordingly, "'[w]hen there is reason to suspect that a trade secret has been misappropriated, and a reasonable investigation would produce facts sufficient to confirm this suspicion (and justify bringing suit*)*, the limitations period begins, even though the plaintiff has not conducted such an investigation.'" *Gabriel Techs. Corp. v. Qualcomm Inc.*, 857 F. Supp. 2d 997, 1003 (S.D. Cal. 2012) (quoting *Alamar*, 40 U.S.P.Q2d at 1438).

13. Generally, it is a question of fact "whether a party has notice of circumstances sufficient to put a prudent man upon inquiry as to a particular fact," and "whether by prosecuting such inquiry, he might have learned such fact[.]" *Hobart*, 159 P.2d 958, 960 (internal quotation marks omitted).

14. "Summary judgment is not appropriate unless only one reasonable inference can be drawn from undisputed facts." *Cleveland v. Internet Specialties W., Inc*., 171 Cal. App. 4th 24, 33 (2009).

### Inquiry Notice

15. "'Circumstances that are dubious or equivocal'" are not sufficient to trigger a duty to investigate. *Cleveland*, 171 Cal. App. 4th at 33 (quoting *Sime v. Malouf*, 95 Cal. App. 2d 82, 107, 212 P.2d 946 (1949)). "'The rule imputes notice only of those facts that are naturally and reasonably connected with the fact known, and of which the known fact or facts can be said to furnish a clue. It

does not impute notice of every conceivable fact and circumstance however remote which might come to light by exhausting all possible means of knowledge.'" *Id.* "The circumstances must be such that further inquiry is not merely suggested, but becomes an imperative duty, and failure to make it constitutes a negligent omission." *Id.*

16.   "For purposes of accrual of the limitations period, inquiry notice is triggered by suspicion." *E-Fab*, 153 Cal. App. 4th at 1319.

17.   For suspicion to give rise to a duty to investigate, the plaintiff's suspicion must be tied to the factual basis for the specific cause of action at issue. *See Fox v. Ethicon Endo–Surgery, Inc.,* 35 Cal. 4th 797, 807 (2005) ("A plaintiff has reason to discover a cause of action when he or she has reason at least to suspect a factual basis for its elements."); *id.* at 806 ("'Under the discovery rule, suspicion of one or more of the elements of a cause of action, coupled with knowledge of any remaining elements, will generally trigger the statute of limitations period.'").

18.   "[T]he 'discovery' of facts that put a plaintiff on 'inquiry notice' does not automatically begin the running of the limitations period." *Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010) (rejecting the argument that inquiry notice triggers the limitations period when accrual under the statute was based on the time that plaintiff *discovered*, or reasonably should have discovered, the facts constituting the cause of action).

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: January 28, 2020          By: *Thomas P. Krzeminski*
                                              Michael K. Friedland
                                              Thomas P. Krzeminski

                                              Attorneys for Plaintiff,
                                              HIGHMARK DIGITAL, INC.