Michael Friedland (State Bar No. 157,217)
michael.friedland@knobbe.com
Thomas P. Krzeminski (State Bar No. 213,714)
2tpk@knobbe.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, 14th Floor
Irvine, CA 92614
Phone: (949) 760-0404
Facsimile: (949) 760-9502

Attorneys for Plaintiff,
HIGHMARK DIGITAL, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| HIGHMARK DIGITAL, INC., a California corporation,<br><br>     Plaintiff,<br><br>  v.<br><br>CASABLANCA DESIGN CENTERS, INC., a California corporation; FOUR SEASONS WINDOWS, INC., a California corporation; INTERIOR DOOR & CLOSET COMPANY, an unincorporated California company; ONE DAY DOORS AND CLOSETS, INC., a California corporation; DAVID WINTER, an individual; and ONE DAY ENTERPRISES, LLC, a Delaware company,<br><br>     Defendants. | CASE NO. 2:18-cv-06105-SJO-AS<br><br>**STATEMENT OF GENUINE DISPUTES IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT**<br><br>**Hon. S. James Otero**<br>**Magistrate Judge Alka Sagar**<br><br>**Date: January 27, 2020**<br>**Time: 10:00 a.m.**<br>**Judge: S. James Otero**<br>**Location: Courtroom 10C**<br><br>**Discovery Cutoff: 9/30/2019**<br>**Pre-Trial Conference: 6/1/2020**<br>**Trial Date: 6/9/2020** |

Plaintiff HighMark Digital, Inc. ("HighMark") submits this Statement of Genuine Disputes, pursuant to Local Rule 56-2, in opposition to Defendant David Winter's ("Winter") (D.I. 147) Motion for Summary Judgment or Partial Summary Judgment.

The alleged facts that HighMark does not affirmatively dispute below should be deemed undisputed solely for the purposes of responding to Defendants' present motion. HighMark reserves the right to contest the truth of these facts later in these proceedings and for any purpose other than opposing Defendants' present Motion for Summary Judgment or Partial Summary Judgment.

## I. <u>STATEMENT OF GENUINE DISPUTES</u>

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
| 1 | Defendant Dave Winter ("Winter") and his father-in-law, Michael McElroy ("McElroy"), founded Plaintiff in 2007. | **Undisputed.** |
| 2 | Winter was a high ranking executive at HighMark upon his departure from the company in July of 2015 with his position being President and Chief Development Officer. | **Undisputed.** |
| 3 | Prior to his departure his relationship with HighMark had become strained. | **Disputed-in-part.** HighMark does not dispute that the relationship was strained. HighMark disputes that HighMark was the sole cause of that strain. Winter had been unengaged with the company prior |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|-----|------|-----------------------------------|
|  |  | to his departure and was failing to fulfill his roles and President and Chief Development Officer. Krzeminski Decl., Ex. 63. |
| 4 | McElroy was not actively involved in the business and a new Chief Executive Officer, Richard Matulia ("Matulia"), had been hired. | **Undisputed.** HighMark does not dispute that a new CEO, Richard Matulia, had been hired as of November 2014. Krzeminski Decl., Ex. 14 at 9:21-23. |
| 5 | Winter was not being compensated by HighMark as agreed to between the parties, ("and he came across communications which he perceived as Matulia making disparaging remarks about him while improperly taking credit for his efforts. | **Disputed.** Winter was compensated fairly as an employee of HighMark throughout his employment tenure. Matulia Decl. at ¶ 9. |
| 6 | Winter became disenchanted with the business practices of HighMark, which he believed included the non-payment of vendors. | **Undisputed.** HighMark does not dispute that Winter felt disenchanted with the business practices of HighMark. |
| 7 | Winter perceived that due to the Evidence: efforts of Matulia, the | **Undisputed.** HighMark does not dispute that Winter perceived the Board of |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
|  | HighMark — Board of Directors view of him could not be changed. | Directors view of him could not be changed. |
| 8 | All of these factors led Mr. Winter to the conclusion that he would need to seek alternative employment. | **Undisputed.** HighMark does not dispute that these factors contributed to Winter seeking alternative employment. However, these factors fail to show Winter did not take confidential and trade secret information with him. |
| 9 | In June of 2015, Winter connected via a telephone call with Dairl and Glenn Johnson regarding the potential of future employment. | **Disputed-in-part.** HighMark does not dispute that Winter connected with Dairl and Glenn Johnsons via a telephone call. Highmark disputes the implication that it was only one call. Krzeminski Decl., Ex. 54. |
| 10 | The parties entered into a nondisclosure agreement that Winter viewed as important to protect his family. | **Disputed-in-part**. HighMark does not dispute that Winter entered into a nondisclosure agreement with Dairl and Glenn Johnson, nor does HighMark dispute that Winter felt such an agreement was important to protect his family. HighMark does dispute that the mere presence of an agreement means Winter abided by it. Contrarily, given pre-existing agreements codifying Winter's |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
|  |  | obligations to HighMark, a secondary contract seems redundant and more like a facial attempt to cover up tracks of wrongdoing. Krzeminski Decl., Ex. 43. |
| 11 | Dave Winter and Dairl and Glenn Johnson discussed broad business plans. | **Undisputed**. |
| 12 | Winter flew to Southern California to meet with Dairl and Glenn. | **Undisputed.** |
| 13 | The parties worked toward a letter of intent. | **Undisputed.** |
| 14 | Winter resigned from his employment with HighMark on July 16, 2015 and his last day of employment at HighMark was on July 17, 2015. | **Undisputed.** |
| 15 | Winter flew to Southern California for a business meeting with Dairl and Glenn Johnson on July 22, 2015. | **Undisputed.** |
| 16 | Winter began his employment with Casablanca in August of 2015. | **Disputed.** Winter was assisting in the formation and building of Casablanca prior to August 2015. Krzeminski Decl., Exs. 24, 25, 26, and 54. |
| 17 | While at Highmark, Winter | **Disputed.** Winter began conversations to |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
| | devoted his best efforts to the interests of the business, never had other employment and never engaged in conduct that was in direct conflict with HighMark's interests that would cause a material and substantial disruption to it. | set up a competing company prior to his departure, while still serving as a director of HighMark. This conduct was a clear violation of his fiduciary duties, as he usurped a corporate opportunity that could have been pursued by HighMark and sought to set up a direct competitor to HighMark. *See supra* Fact No. 11, 12, 13. |
| 18 | Winter never accessed, took or disclosed any trade secret or confidential information of Plaintiff. | **Disputed.** Winter had access to trade secret and confidential information. Krzeminski Decl., Ex. 16 at 66:17-68:19, 102:21-104:11, 132:16-134:5; *id*. Ex. 7 at 89:1-91:1, 93:1-16, 94:25-96:4. Furthermore, when he returned his computer to HighMark it was wiped of all files, preventing HighMark from determining whether he removed confidential information from it. Krzeminski Decl., Ex. 49. Additionally, a later-discovered discrepancy in the number of HOP files processed by CadCode for HighMark's account and the number of HOP files processed by HighMark arose. This indicated |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
|  |  | CadCode's servers were accessed by someone else using HighMark's CadCode key. Krzeminski Decl., Ex. 23; *id.* Ex. 16 at 153:20-154:23. |
| 19 | Winter has never used CadCode since leaving his employment with HighMark. | **Disputed.** Winter had access to the source code which contained integration for accessing CadCode servers. Krzeminski Decl., Ex. 16 at 66:17-68:19, 102:21-104:11, 132:16-134:5, 155:5-156:16; *id.* Ex. 7 at 89:1-91:1, 93:1-16, 94:25-96:4.  After Winter's departure from HighMark, a discrepancy in the number of HOP files processed by CadCode for HighMark's account and the number of HOP files processed by HighMark arose. This indicated CadCode's servers were accessed by someone else using HighMark's CadCode key. Krzeminski Decl., Ex. 23; *id.* Ex. 16 at 153:20-154:23. |
| 20 | Plaintiff's Chief Technology Officer, Joseph Fallon ("Plaintiff's CTO"), admitted that he has no evidence Winter took, disclosed, or used trade secret or confidential | **Disputed.** HighMark does not dispute that Fallon testified he had no personal knowledge that Winter disclosed trade secret or confidential information in his possession.  However, HighMark |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
|  | information belonging to Plaintiff in any manner. | disputes that Winter never possessed any of Highmark's confidential information.  Fallon testified that Winter possessed a file containing a "key" that would allow access to HighMark property. Krzeminski Decl., Ex. 16 at 155:5-156:16. |
| 21 | Winter informed his future employers in July of 2015 that he did not want to bring over any dealers or assets from HighMark or do anything to the detriment of the company. | **Disputed-in-part.** HighMark does not dispute that Winter told his future employers that he did not want to bring over any dealers or assets from HighMark or do anything to the detriment of the company. HighMark does dispute that Winter meant what he said. Contrarily, given pre-existing agreements codifying Winter's obligations to HighMark, a secondary statement seems redundant and more like a facial attempt to cover up tracks of wrongdoing. Krzeminski Decl., Ex. 43. |
| 22 | Winter wanted to be ethical in all areas and wanted nothing to do with HighMark's technology. | **Disputed.** HighMark disputes that Winter wanted to act ethically. Defendants, in their own statement of facts, admitted that Winter unethically |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
|  |  | breached fiduciary duties when he took advantage of a corporate opportunity, instead of offering it to HighMark (where he served as a director). *See* supra Facts Nos. 11, 12, 13. |
| 23 | After his resignation, Winter returned materials that consisted of an Apple laptop, an external electronic storage device and the materials in his office. | **Disputed-in-part.** HighMark does not dispute that Winter returned an Apple Laptop, and *an* external electronic storage device. HighMark disputes that the return of the devices occurred within the time frame set by the Employee Non-Disclosure Assignment and Non-Solicitation Agreement Winter entered into with HighMark. Winter failed to return the materials for a week to a week and a half after he was supposed to. *See infra* Fact. No. 25; Krzeminski Decl., 43. Furthermore, Winter wiped the laptop's hard drive, making forensic analysis of the laptop nearly impossible. Krzeminski Decl., Ex. 49. |
| 24 | Winter returned the Apple laptop and the external electronic storage device to Richard Matulia at a | **Undisputed.** |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
| | Starbucks. | |
| 25 | Winter returned the Apple laptop Evidence: and the external storage device approximately a week to a week and a half after his employment at HighMark ceased. | **Undisputed.** |
| 26 | Winter intended to return the Apple laptop upon his resignation. | **Disputed.** HighMark disputes that Winter intended return the Apple laptop in a timely fashion upon resignation. If this was his intent, he could have easily returned the laptop during his conversation with Joe Fallon, HighMark's Chief Technology Officer. Instead, he chose to wait. |
| 27 | Right after the end of his employment, Winter received an email alert that account information for his personal Wells Fargo bank account had been changed, including the changing of Winter and his wife's personal password and the removal of Winter and his wife's name and contact information. | **Undisputed.** |
| 28 | HighMark banked with US Bank | **Undisputed.** HighMark does not dispute |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
|  | at the time. | that as of July 16, 2015 it banked with U.S. Bank. |
| 29 | Winter went to the bank and was informed that his account information was changed to include Matulia's email address along with other HighMark email addresses, HighMark phone numbers and the physical address for HighMark. | **Undisputed.** |
| 30 | Winter believes that his personal Facebook page was accessed and account settings including the changing of his password and the removal of his personal email account were made by HighMark. | **Undisputed.** |
| 31 | Winter believes that HighMark hacked into his Wells Fargo bank account and personal Facebook account. | **Disputed-in-part.** HighMark does not dispute that it accessed and changed account information. HighMark does dispute that Winter believed he was "hacked" by HighMark.  Instead, it is clear from the testimony of Katherine Gabales that Winter's credentials and account information were changed mistakenly in accordance with routine |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
| | | business process for employee departures. *See infra* facts No. 33, 34, 36, 37, 38, 39, 40, 41. |
| 32 | Winter was not informed by HighMark that changes were going to be made to the Wells Fargo bank account and the Facebook account prior to when such changes were made. Winter did not consent to HighMark making changes to the Wells Fargo bank account and the Facebook page. | **Undisputed.** |
| 33 | In July of 2015 Katherine Gabales was an employee of HighMark. | **Undisputed.** |
| 34 | A job duty of Gabales was to change credentials once employees stopped working there. | **Undisputed.** |
| 35 | Gabales believed there was a sloppy process where information with usernames and passwords would be stored in a handwritten or some electronic format at HighMark. | **Undisputed.** |
| 36 | Gabales was instructed to change | **Undisputed.** |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
|  | credentials for Winter after he left HighMark. |  |
| 37 | After the resignation of Winter, Gabales accessed a Wells Fargo bank account and switched the credentials to reflect HighMark. | **Undisputed.** |
| 38 | Gabales did not communicate with Winter that changes were going to be made to the Wells Fargo account. | **Undisputed.** |
| 39 | After the resignation of Winter, Gabales accessed a Facebook account and switched the credentials to reflect Highmark. | **Undisputed.** |
| 40 | Gabales did not communicate with Winter that changes were made to the Facebook account. | **Undisputed.** |
| 41 | Gabales assumed that the accounts where credentials were changed were HighMark accounts and were not personal accounts of Winter. | **Undisputed.** |
| 42 | Winter was advised by Wells Fargo officials in its fraud department to wipe the hard drive of the Apple computer. | **Disputed.** Defendants have presented no evidence that Wells Fargo gave this advice to Winter. Regardless, Winter taking such advice would be illogical and |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
| | | unreasonable behavior by a technically savvy software executive. It was clear from HighMark's contact information being listed on the account that it was HighMark who had changed the account information. It would be obvious to someone in Winter's position that such action was likely a mistake. Instead of simply calling HighMark to have the issue corrected, Winter took the drastic step of wiping the hard drive. |
| 43 | Winter, did not want to do so, but ultimately did wipe the hard drive of the Apple laptop. | **Disputed**. HighMark disputes Winter did not want to wipe the hard drive. It was clear from HighMark's contact information being listed on the account that it was HighMark who changed the account information. It would be obvious to Winter that such action was likely a mistake. Instead of simply calling HighMark to have the issue corrected, Winter took the drastic step of wiping the hard drive. This suggests Winter acted on his own volition. |
| 44 | Before wiping the hard drive of the Apple laptop, Winter backed | **Disputed.** HighMark disputes that any HighMark files were backed up to an |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
|  | up any HighMark files to an external hard drive. | external hard drive. Winter wiped the laptop's hard drive prior to returning it. Therefore, no forensic analysis as to what files were or were not backed up was possible. Krzeminski Decl., Ex. 49. |
| 45 | Winter never intentionally deleted any HighMark data or information from any HighMark issued laptop or hard drive. | **Disputed.** HighMark disputes that Winter never intentionally deleted any HighMark data or information from any HighMark issued laptop or hard drive for the reasons stated above. Krzeminski Decl., Ex. 49. *See supra* Fact No. 43. |
| 46 | The external electronic storage device provided by Winter contained HighMark files and there is no suspicion that files were missing. | **Disputed.** HighMark disputes that there is no suspicion that files were missing. Winter wiped the laptop's hard drive, and therefore no analysis as to what files were or were not missing could be completed. Krzeminski Decl., Ex. 49. |
| 47 |  |  |
| 48 | From August of 2015 to December of 2016 Winter was an employee of Casablanca Design Centers, Inc. | **Undisputed.** |
| 49 |  |  |
| 50 |  |  |
| 51 | In or around October 2011, | **Undisputed.** |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
| | Casablanca entered into an agreement with Prodim to license Prodim software to convert Proliner measurement data into cutting instructions written in HOP. | |
| 52 | Prodim offered a non-expiring license to its software for a one-time fee. | **Undisputed.** |
| 53 | Prodim completed installation of its software in November 2011. | **Disputed.** HighMark disputes the characterization of the software as Prodim's own software. Rather, the software was reverse engineered utilizing a HighMark HOP file and is therefore HighMark's software. *See* D.I. 56, "HighMark Second Amended Complaint." |
| 54 | In 2013, Casablanca paid to upgrade the Prodim software it licenses. | **Disputed.** HighMark disputes the characterization of the software as Prodim's software. Rather, the software was reverse engineered utilizing a HighMark HOP file and is therefore HighMark's software. *See* D.I. 56, "HighMark Second Amended Complaint." |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
| 55 | Casablanca has manufactured doors using Prodim software since November 2011. | **Disputed.** HighMark disputes that the software used to manufacture doors is Prodim's. Rather, the software was reverse engineered utilizing a HighMark HOP file and is therefore HighMark's software. *See* D.I. 56, "HighMark Second Amended Complaint." |
| 56 | Prodim uses computer aided manufacturing software provided by the third-party company vectorcam to translate Proliner XML files into cutting instructions for Casablanca's Holz-Her CNC machine written in HOP. | **Disputed-in-part.** HighMark disputes that the Prodim CAM-software component was always provided by vectorcam. |
| 57 | Software installed on the Prodim Proliner generates an XML file containing door measurement data. | **Undisputed.** |
| 58 | Since November 2011, Casablanca has generated HOP files via the Prodim provided vectorcam software. | **Disputed.** HighMark disputes that the software used to manufacture doors is Prodim's. Rather, the software was reverse engineered utilizing a HighMark HOP file and is therefore HighMark's software. *See* D.I. 56, "HighMark Second Amended Complaint." |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|-----|------|-----------------------------------|
| 59 | Vectorcam is installed locally at Casablanca and One Day Enterprises' Torrance and Rocklin, California facility, respectively; Defendants do not access any type of off-site server to generate HOP files. | **Undisputed.** |
| 60 | Each HOP file stored on Defendants' CNC machine from November 2011 to the present bears the name "vectorcam" in its text. | **Disputed-in-part.** HighMark does not dispute that all HOP files produced by Defendants contain the text "vectorcam." Defendants, however, have produced no HOP files with a date prior to January 2012. |
| 61 | On March 16, 2017, Plaintiff sent e-mail correspondence to CadCode stating that Plaintiff's "server issues" had not been resolved and requesting that CadCode make the issue a high priority "so we can get back up and running." | **Undisputed.** |
| 62 | Casablanca generated HOP files March 13, 14, 15, 16, and 17, 2016. | **Undisputed.** |
| 63 | Between December 30, 2014 and | **Undisputed** that businesses have ebbs |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
| | January 1, 2019, Casablanca frequently did not generate HOP files for days at' a time, especially over weekends. | and flows in order processing volume based on demand and other factors. |
| 64 | Casablanca can generate infinite HOP files using the vectorcam software linked to their CNC machines for no additional cost. | **Undisputed** |
| 65 | From January of 2017 to the present Winter has been an employee of One Day Enterprises, LLC. | **Undisputed.** |
| 66 | One Day Enterprises has used Prodim software, including vectorcam, to manufacture doors since its commenced operations in 2017. | **Disputed-in-part.** One Day Enterprises is not distinct from other Corporate Defendants, and Defendants used HighMark source code as part of its operations in addition to and/or in lieu of Prodim software**.** Huisjen Decl., Ex. 9 at 8:18-12:7. |
| 67 | One Day Enterprises never accessed the CadCode Software to generate HOP files. | **Disputed.** One Day Enterprises acting as part of the single-entity Defendants accessed CadCode Software to generate HOP files. Huisjen Decl., Ex. 9 at 8:18-12:7. |
| 68 | Winter did not provide Defendants | **Disputed.** Winter brought the |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|-----|------|-----------------------------------|
| | with confidential or trade secret information pertaining to CadCode. | Defendants HighMark source code which had CadCode access and integration written into it for processing doors. Huisjen Decl., Ex. 9 at 12:8-13:28**.** |
| 69 | Winter did not provide Dairl Johnson with any confidential or trade secret information belonging to Plaintiff. | **Disputed.** Winter brought the Defendants HighMark source code which had CadCode access and integration written into it for processing doors. Huisjen Decl., Ex. 9 at 12:8-13:28**.** |
| 70 | Plaintiff's Chief Technology Officer admitted that he has no evidence Winter ever looked at the "key" for the CadCode Software. | **Disputed-in-part**. Highmark does not dispute that Fallon testified he lacked firsthand knowledge that Winter ever looked at the "key".  However, Highmark disputes that Winter never possessed nor looked at any of Highmark's confidential information, including the "key."  In fact, Fallon testified that Winter possessed a file containing the "key" that would allow access to Highmark CadCode servers. Krzeminski Decl., Ex. 16 at 155:5-156:16. |
| 71 | On December 2, 2016, Plaintiff's | **Undisputed.** |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
|  | Chief Technology Officer sent e-mail correspondence stating that door files were being generated because for a given door, Plaintiff regenerates HOP file 3-4 times. |  |
| 72 | CadCode responded that Plaintiffs Chief Technology Officer's statements are "consistent with the logs, so I think that question has been answered." | **Undisputed** that CadCode's response was premised on the assumption that only HighMark possessed its own "key" ID. |
| 73 | Plaintiff wrote to CadCode to ask if there had been "any cadcode conversions coming from more than 1 IP address in regards to our specific account." | **Undisputed** |
| 74 | CadCode responded that they "just verified that all of the authorization requests have come from the same computer ID." | **Undisputed** that CadCode had no way of knowing the Defendants were using their solution if Defendants were using HighMark's "key" ID. |
| 75 | On January 4, 2017, CadCode wrote to Plaintiff stating that: "For the record, we don't have any evidence that Dave and/or his current company are using the CadCode solution." | **Undisputed** that CadCode had no way of knowing the Defendants were using their solution if Defendants were using HighMark's "key" ID. |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|-----|------|-----------------------------------|
| 76 | Winter returned the backup external hard drive Fallon gave him for safe keeping. | **Disputed.** HighMark disputes that Winter returned the backup hard drive Fallon gave him for safe keeping. Krzeminski Decl., Ex. 14 at 39:20-42:6, 64:25-65:17; *id*. Ex. 48. |
| 77 | The second cause of action for trade secret misappropriation alleges that David Winter misappropriated trade secret materials related to One-Cut™ by improperly copying, accessing and/or removing them from Plaintiff's premises and/or systems, and or/by improperly using, transferring and/or disclosing them in breach of a duty to maintain the secrecy and confidential thereof. | **Undisputed.** |
| 78 | The sixth cause of action for breach of fiduciary of duty incorporates paragraph 1 through 95 of the Complaint which principally concern the allegation that that David Winter misappropriated trade secret | **Undisputed.** |

| NO. | FACT | GENUINE DISPUTES OF MATERIAL FACT |
|---|---|---|
| | materials related to One-Cut™ by improperly copying, accessing and/or removing them from Plaintiff's premises and/or systems, and or/by improperly using, transferring and/or disclosing them in breach of a duty to maintain the secrecy and confidential thereof. | |
| 79 | The fifth cause of action for unfair competition alleges that David Winter unfairly competed with Plaintiff by allegedly misappropriating trade secret or confidential information and allegedly violating the Computer Fraud Data Access and Fraud Act. | **Undisputed.** |
| 80 | The fifth cause of action also alleges that David Winter breached a contract with Plaintiff. | **Undisputed.** |

## II.  CONCLUSIONS OF LAW

### Summary Judgment

1.      Summary judgment is appropriate when, drawing all justifiable inferences in the non-movant's favor, there exists "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

1  Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Material

2  facts are those that may affect the outcome of the case.  *Id.* at 248.  An issue is

3  genuine "if the evidence is such that a reasonable jury could return a verdict for the

4  nonmoving party."  *Id.*

5       2.    The moving party bears the burden of establishing the absence of a

6  genuine issue of material fact.  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477

7  U.S. 317, 322-323 (1986).

8       3.    "When the party moving for summary judgment would bear the

9  burden of proof at trial, it must come forward with evidence which would entitle it

10  to a directed verdict if the evidence went uncontroverted at trial.  In such a case, the

11  moving party has the initial burden of establishing the absence of a genuine issue of

12  fact on each issue material to its case."  *C.A.R. Transp. Brokerage Co. v. Darden*

13  *Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted).

14       4.    "A moving party without the ultimate burden of persuasion at trial—

15  usually, but not always, a defendant—has both the initial burden of production and

16  the ultimate burden of persuasion on a motion for summary judgment."  *Nissan Fire*

17  *& Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  "In

18  order to carry its burden of production, the moving party must either produce

19  evidence negating an essential element of the nonmoving party's claim or defense

20  or show that the nonmoving party does not have enough evidence of an essential

21  element to carry its ultimate burden of persuasion at trial."  *Id.*  The moving party

22  may discharge its initial burden by  "'showing'—that is, pointing out to the district

23  court—that there is an absence of evidence to support the nonmoving party's

24  case."  *Celotex*, 477 U.S. 317, 325 (1986).  The nonmoving party may avoid

25  summary judgment by "designat[ing] specific facts showing that there is a genuine

26  issue for trial."  *Id.* at 324 (internal quotation omitted).  "In order to carry its ultimate

27  burden of persuasion on the motion, the moving party must persuade the court that

28  there is no genuine issue of material fact."  *Nissan Fire*, 210 F.3d at 1102.

**Applicable Statutes of Limitations**

5.     A cause of action for trade secret misappropriation under the California Uniform Trade Secrets Act ("CUTSA") is timely if it is filed "within three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered."  Cal. Civ. Code § 3426.6.

6.     A cause of action for trade secret misappropriation under the Defend Trade Secrets Act ("DTSA") is timely if it is filed within "3 years after the date on which the misappropriation with respect to which the action would relate is discovered or by the exercise of reasonable diligence should have been discovered."  18 U.S.C. § 1836.

7.     A cause of action for breach of contract is timely if filed within four years of accrual.  *See* Cal. Civ. Proc. Code § 337(1).

8.     A cause of action for unfair competition is timely if filed within four years of accrual.  *See* Cal. Bus. & Prof. Code § 17208.

**The Discovery Rule**

9.     Under California's discovery rule, a cause of action accrues at the time when the plaintiff "either (1) actually discovered his injury and its negligent cause or (2) could have discovered injury and cause through the exercise of reasonable diligence."  *April Enters., Inc. v. KTTV*, 147 Cal. App. 3d 805, 826 (Cal. App. 1983) (internal quotation marks omitted).

10.    In California, the discovery rule has been applied to numerous different causes of action in circumstances where "[t]he injury or the act causing the injury, or both, have been difficult for the plaintiff to detect."  *April Enters.*, 147 Cal. App. 3d at 831 (applying discovery rule to breach of contract claim); *Broberg v. Guardian Life Ins. Co. of Am.*, 171 Cal. App. 4th 912, 920-21 (Cal. App. 2009) (applying the discovery rule to unfair competition claim).

/ / /

/ / /

**Constructive Notice**

11.     Under the discovery rule, "[a] plaintiff is held to her actual knowledge as well as knowledge that could reasonably be discovered through investigation of sources open to her." *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1109-1113 (1988) (internal quotes omitted).  Accordingly, a plaintiff discovers a cause of action when "the plaintiff has actual or constructive notice of the facts giving rise to the claim." *Alamar Biosciences Inc. v. Difco Labs. Inc.*, 40 U.S.P.Q2d 1437, 1438 (E.D. 1996); *see also E-Fab, Inc. v. Accts., Inc. Servs.*, 153 Cal. App. 4th 1308, 1318-19 (Cal. App. 2007) ("Notice may be actual or constructive.  Actual notice is express information of a fact, while constructive notice is that which is imputed by law.") (internal quotation marks and citations omitted).

12.     "A person with actual notice of circumstances sufficient to put a prudent man upon inquiry is deemed to have constructive notice of all facts that a reasonable inquiry would disclose." *E-Fab*, 153 Cal. App. 4th at 1319; *see also Hobart v. Hobart Estate Co.*, 159 P.2d 958, 972-973 (1945) ("[A]s the means of knowledge are equivalent to knowledge, if it appears that the plaintiff had notice or information of circumstances which would put him on an inquiry which, if followed, would lead to knowledge . . . he will be deemed to have had actual knowledge of these facts.").  Accordingly, "'[w]hen there is reason to suspect that a trade secret has been misappropriated, and a reasonable investigation would produce facts sufficient to confirm this suspicion (and justify bringing suit*)*, the limitations period begins, even though the plaintiff has not conducted such an investigation.'"  *Gabriel Techs. Corp. v. Qualcomm Inc.*, 857 F. Supp. 2d 997, 1003 (S.D. Cal. 2012) (quoting *Alamar*, 40 U.S.P.Q2d at 1438).

13.     Generally, it is a question of fact "whether a party has notice of circumstances sufficient to put a prudent man upon inquiry as to a particular fact," and "whether by prosecuting such inquiry, he might have learned such fact[.]" *Hobart*, 159 P.2d 958, 960 (internal quotation marks omitted).

14.   "Summary judgment is not appropriate unless only one reasonable inference can be drawn from undisputed facts."  *Cleveland v. Internet Specialties W., Inc*., 171 Cal. App. 4th 24, 33 (Cal. App. 2009).

**<u>Inquiry Notice</u>**

15.   "'Circumstances that are dubious or equivocal'" are not sufficient to trigger a duty to investigate.  *Cleveland*, 171 Cal. App. 4th at 33 (quoting *Sime v. Malouf*, 95 Cal. App. 2d 82, 107, 212 P.2d 946 (1949)).  "'The rule imputes notice only of those facts that are naturally and reasonably connected with the fact known, and of which the known fact or facts can be said to furnish a clue.  It does not impute notice of every conceivable fact and circumstance however remote which might come to light by exhausting all possible means of knowledge.'"  *Id*.  "The circumstances must be such that further inquiry is not merely suggested, but becomes an imperative duty, and failure to make it constitutes a negligent omission."  *Id*.

16.   "For purposes of accrual of the limitations period, inquiry notice is triggered by suspicion."  *E-Fab*, 153 Cal. App. 4th at 1319.

17.   For suspicion to give rise to a duty to investigate, the plaintiff's suspicion must be tied to the factual basis for the specific cause of action at issue.  *See Fox v. Ethicon Endo–Surgery, Inc.,* 35 Cal. 4th 797, 807 (2005) ("A plaintiff has reason to discover a cause of action when he or she has reason at least to suspect a factual basis for its elements."); *id*. at 806 ("'Under the discovery rule, suspicion of one or more of the elements of a cause of action, coupled with knowledge of any remaining elements, will generally trigger the statute of limitations period.'").

18.   "[T]he 'discovery' of facts that put a plaintiff on 'inquiry notice' does not automatically begin the running of the limitations period."  *Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010) (rejecting the argument that inquiry notice triggers the limitations period when accrual under the statute was based on the time

/ / /

that plaintiff *discovered*, or reasonably should have discovered, the facts constituting the cause of action).

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: January 28, 2020     By: *Thomas P. Krzeminski*
                                   Michael K. Friedland
                                   Thomas P. Krzeminski

                                   Attorneys for Plaintiff,
                                   HIGHMARK DIGITAL, INC.