**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

CASE NO.:  **CV 18-06105 SJO (JPR)**          DATE:     **March 26, 2020**

TITLE:     **HighMark Digital, Inc. v. Casablanca Design Centers, Inc. et al.**

========================================================================
**PRESENT:  THE HONORABLE S. JAMES OTERO, UNITED STATES DISTRICT JUDGE**

Victor Paul Cruz                           Not Present
Courtroom Clerk                            Court Reporter

**COUNSEL PRESENT FOR PLAINTIFF(S):**      **COUNSEL PRESENT FOR DEFENDANT(S):**

Not Present                                Not Present

========================================================================
**PROCEEDINGS (in chambers): ORDER GRANTING-IN-PART AND DENYING-IN-PART CORPORATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** [ECF No. 146]**; ORDER GRANTING-IN-PART AND DENYING-IN-PART DEFENDANT WINTER'S MOTION FOR SUMMARY JUDGMENT** [ECF No. 147]**; ORDER DENYING PLAINTIFF HIGHMARK'S MOTION FOR SUMMARY JUDGMENT** [ECF No. 148]**; ORDER GRANTING-IN-PART AND DENYING-IN-PART CORPORATE DEFENDANTS' AND DEFENDANT WINTER'S MOTION TO EXCLUDE EXPERT TESTIMONY OF DEREK HUISJEN** [ECF No. 152].

This matter is before the Court on the following four motions: (1) Defendants' Casablanca Design Centers, Inc., Four Seasons Windows, Inc., Interior Door and Closet Company ("IDCC"), One Day Doors and Closets, Inc., One Day Enterprises, LLC (collectively "Corporate Defendants") Motion for Summary Judgment ("Corporate Defendants' MSJ") (ECF No. 146); (2) Defendant David Winter's ("Winter") Motion for Summary Judgment ("Winter's MSJ") (ECF No. 147); (3) Plaintiff HighMark Digital, Inc.'s ("HighMark") Motion for Summary Judgment ("HighMark's MSJ") (ECF No. 148); (4) Corporate Defendants' and Winter's (collectively, "Defendants") Motion to Exclude Expert Testimony of Derek Huisjen ("Motion to Exclude") (ECF No. 152).  The Court found these matters suitable for disposition without oral argument and vacated the hearing set for February 18, 2020. *See* Fed. R. Civ. P. 78(b).

For the reasons stated below, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** Corporate Defendants' MSJ, **GRANTS-IN-PART** and **DENIES-IN-PART** Winter's MSJ, **DENIES** HighMark's MSJ, and **GRANTS-IN-PART** and **DENIES-IN-PART** Corporate Defendants' and Defendant Winter's Motion to Exclude.

I.     <u>INTRODUCTION</u>

HighMark and Corporate Defendants are rivals in the replacement interior door industry.  They each possess technology that converts measurement data of interior door frames into instructions for a machine to efficiently cut an interior door to fit the frame.  This dispute arises from HighMark's allegations that David Winter, a former HighMark employee who left HighMark and joined the

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

CASE NO.:   **CV 18-06105 SJO (JPR)**          DATE:       **March 26, 2020**

Corporate Defendants, took HighMark's trade secrets with him and disclosed them to the Corporate Defendants.  The central question is whether the Corporate Defendants reverse-engineered HighMark's technology.

II.   FACTUAL AND PROCEDURAL BACKGROUND[1]

    A.   Factual Background

        1.   The Parties

The instant action alleges that the Defendants improperly misappropriated confidential information and trade secrets possessed by HighMark, which is a company that provides door replacement services.  (Second Amended Complaint ("SAC") ¶ 2, ECF No. 56.)  Plaintiff HighMark's trade secret and confidential information relate to HighMark's proprietary "One-Cut" software system, which allows for quickly measuring and installing custom-fitted and pre-painted replacement doors for homes and business.  (*Id.*)  HighMark introduced its One-Cut system in 2008, and the One-Cut system won the Window and Door Crystal Achievement Award for "Most Innovative Product." (SAC ¶ 21.)

Defendant David Winter was employed by HighMark from March 1, 2007 to July 16, 2015.  (SAC ¶ 22.)  Winter began as HighMark's Chief Financial Officer, and on the last day of his employment, he was the company's President.  (SAC ¶ 26.)  In his role as President at HighMark, Winter provided strategic leadership by working with its Board of Directors and other management to establish and pursue goals, strategies and policies.  (SAC ¶ 27.)

Dairl Johnson owns and operates Casablanca, Four Seasons, One Day Doors and Closets, Inc., One Day Enterprises, LLC, and Interior Door and Closet Company.  (*See* SAC ¶ 30.)  Similar to HighMark, these companies provide door replacement services.  (SAC ¶ 54.)  Four Seasons has not conducted business since 2011, although it was never dissolved and remains an active business entity.   (Statement of Genuine Disputes to Entity Defendants' Disputed Facts ("HighMark's Facts CD's MSJ"), Fact Nos. 136-37, ECF No. 166.)  One Day Doors and Closets, Inc. was incorporated on April 18, 2012 with the intention that it operate as part of a nationwide dealership program.  (*Id.* Fact Nos. 142-43.)  One Day Enterprises, LLC was formed on October 27, 2016 and operates its facility in Rocklin, California.  (*Id.* Fact No. 147-48.)  Interior Door and Closet Company is not an independent entity, but is doing business as Defendant Casablanca,

---

[1]  Unless stated below, the following facts are not in dispute.  The court has reviewed the parties evidentiary objections. To the extent that objected-to evidence is included in this order, the Court **OVERRULES** the objection.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

CASE NO.:  <u>CV 18-06105 SJO (JPR)</u>        DATE:    <u>March 26, 2020</u>

Inc. (*Id.* Fact No. 152.) Dairl's son, Glenn Johnson, is a part-owner of IDCC, Four Seasons, and Casablanca. (*See, e.g., id.* Fact Nos. 81, 88, 89.)

2.    <u>The Master Agreement Between HighMark and Four Seasons</u>

In December 2008, Four Seasons and HighMark entered into a Master Agreement in which Four Seasons licensed HighMark's One-Cut door software. (HighMark's Facts CD's MSJ, Fact No. 1.) According to its terms, the Master Agreement lasted from December 12, 2008 to December 31, 2010 and could be renewed for an additional two-year term. (*Id.* Fact Nos. 2-3.) Although Four Seasons and HighMark did not sign a written extension to the Master Agreement, the parties continued to perform under the agreement beyond December 31, 2010; Four Seasons continued to use HighMark's One-Cut software until November 2011. (*Id.* Fact Nos. 4, 5.)

The Master Agreement contains a provision titled "Obligations on Termination," and the parties dispute whether the provision required Four Seasons to return or destroy the Licensed Applications, Documentation, or Confidential Information upon the termination of the agreement, or whether discontinuing the use of One-Cut fulfilled Four Seasons' obligations. (HighMark's Facts CD's MSJ, Fact Nos. 23-24.) The parties also signed a Confidentiality Agreement, and the parties dispute whether the Confidential Information in § 1 of that agreement cover HighMark's HOP files and source code. (Defendants' Statement of Genuine Disputes in Opposition to HighMark's Statement of Uncontroverted Facts and Conclusions of Law ("D's Facts HighMark's MSJ"), Fact Nos. 46-47, ECF No. 163-1.)

In early 2012, HighMark was aware that Four Seasons stopped using One-Cut software in favor of Prodim's software, which competed with HighMark's One-Cut. (HighMark's Facts CD's MSJ, Fact No. 7.) The parties dispute whether HighMark was simply angry about Four Seasons' decision to stop using One-Cut, or whether HighMark suspected Four Seasons was improperly using One-Cut in violation of the Master Agreement. (*Id.* Fact Nos. 7-17.)

3.    <u>Technology at Issue</u>

HighMark's One-Cut technology takes measurement data of existing door frames and converts that data into instructions for a machine to precisely cut wood doors. The first step in the process requires measuring the existing door frame. (HighMark's Facts CD's MSJ, Fact No. 27.) To capture the measurements of existing door frames, Four Seasons used the "Proliner," which is an electronic device manufactured by Prodim. (*Id.* Fact No. 28.) HighMark contracted with MetaWorks LLC to develop software for HighMark to convert Proliner measurement data into eXtensible markup language ("XML") output. (*Id.* Fact No. 30.) To translate XML files into files written in HOP, HighMark also worked with CadCode. (*Id.* Fact No. 31.) A HOP file is a set of instructions to a CNC Holz-Her machine that the CNC machine uses to cut doors. (*Id.* Fact

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:**  <u>CV 18-06105 SJO (JPR)</u>        **DATE:**        <u>March 26, 2020</u>

33-34.)  HighMark stores its source code in a cloud-based repository.  (*Id.* Fact No. 46.)  In short, HighMark's One-Cut technology takes measurement data and converts the data into a HOP file that a CNC machine uses to cut wood doors.

In December 2010, nearing the end of the Master Agreement between Four Seasons and HighMark, HighMark increased the per file fee it charged Four Seasons, which prompted Four Seasons to look elsewhere for another service provider.  (*Id.* Fact No. 37.)  Instead of continuing operating Four Seasons, the Johnsons incorporated Casablanca and continued conducting their business under that entity's name.  (*Id.* Fact No. 139.)  In October 2011, Casablanca entered into an agreement with Prodim to license software that would convert Proliner measurement data into HOP for Casablanca's CNC machines.   (*Id.* Fact No. 38.)  Prodim offered its software to Casablanca for a one-time fee, and Prodim completed the installation of its software in November 2011.   (*Id.* Fact No. 39-40.)  Prodim's software, which is provided by third-party vectorcam, translates Proliner XML files into HOP files.  (*Id.* Fact No. 43.)

The parties dispute whether Prodim independently possessed software to convert measurement data into HOP prior to Casablanca licensing Prodim's software, or whether Defendants worked with Prodim to develop such software.  (*Id.* Fact No. 57.)  HighMark maintains that Defendants sent HighMark's HOP file to Prodim to reverse-engineer HighMark's software, but Defendants vigorously dispute HighMark's position.  (*Id.* Fact Nos. 52-55.)

### 4.   <u>Winter's Employment Agreement and Departure from HighMark</u>

Winter's employment with HighMark began in March 2007.  (Defendants' Statement of Genuine Disputes in Opposition to HighMark's Statement of Uncontroverted Facts and Conclusions of Law ("D's Facts HighMark's MSJ"), Fact No. 16, ECF No. 163-1.)  Winter signed an Employee Nondisclosure, Assignment and Non-Solicitation Agreement ("Employee Agreement").  (*Id.* Fact No. 17.)  In the Employee Agreement § 3, Winter agreed he would "not disclose any Proprietary Information to anyone outside [HighMark]," and in § 12, Winter agreed that the agreement would "survive [his] employment."   (Declaration of Thomas P. Krzeminski ISO HighMark's MSJ ("Krzeminski Decl.") Ex. 43, ECF No. 153.)  The agreement defines Proprietary Information as "any information that is confidential or proprietary, technical or non-technical information of [HighMark], including for example and without limitation, information related to . . . processes, methods, systems, designs, computer programs, source documentation, trade secrets, formulas, development or experimental work . . . and any other nonpublic information that has commercial value." (*Id.*)  The Employee Agreement § 10 required Winter to "return all materials . . . containing or disclosing any Proprietary Information (including copies thereof), as well as any . . . computers, . . .or similar items or devices that [HighMark] has provided to [Winter]."  (*Id.*)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**CASE NO.:**  <u>CV 18-06105 SJO (JPR)</u>          **DATE:**          <u>March 26, 2020</u>

Winter had access to HighMark's source code that was maintained on a cloud-based repository. (D's Facts HighMark's MSJ, Fact Nos. 21-25.)  Winter also had access to a backup external hard drive that contained a copy of HighMark's source code, and took that hard drive home on at least one occasion.  (*Id.* Fact Nos. 23-28.)  HighMark also gave Winter a laptop to use during his employment.  (*Id.* Fact No. 30.)

Winter began exploring employment with the Johnsons while he was still a HighMark employee. (*Id.* Fact No. 34.)  Winter resigned from HighMark on July 16, 2015.  (*Id.* Fact No. 18.)  After resigning, Winter retained his laptop for approximately seven to ten days, and he wiped the computer's hard drive prior to returning it to HighMark.  (*Id.* Fact Nos. 31-32.)  Seven to ten days after Winter's resignation, he returned the laptop and an external hard drive to HighMark.  (*Id.* Fact No. 33).  Before wiping the laptop's hard drive, Winter backed up HighMark files to an external hard drive and returned the hard drive to HighMark.  (*Id.* Fact No. 32)  HighMark points out that wiping the computer precludes HighMark from verifying whether Winter backed up all of the files to the external hard drive that he returned.  (Statement of Genuine Issues to David Winter's Disputed Material Facts ("HighMark's Facts Winter's MSJ"), Fact No. 44, ECF No. 167.)  Shortly after discussions began, Winter began working for the Johnsons.

5.     <u>Relevant Evidentiary Disputes</u>

During discovery, Defendants produced a September 2011 email from Mike MacGilvray, a Casablanca employee, sent to Marc Pustjens, a Prodim employee.  (D's Facts HighMark's MSJ, Fact No. 51.)  MacGilvray states "here is that file from our server in a HOPS file just so you can see [t]he conversion . . . ."  (*Id.*)  After a non-substantive response from Pustjens, MacGilvray added that "Dairl and Gleen [sic] are trying to keep this quiet so we don't get cut off with [w]hat were [sic] using right now . . . ."  (*Id.* Fact No. 52.)  The parties dispute whether the HOP file attached in MacGilvray was a HighMark HOP file, or a Prodim file.

As discussed above, HighMark's One-Cut software relies on accessing CadCode servers to convert the XML file into a HOP file readable by a CNC machine.  HighMark points to data from the CadCode servers to support its claim of misappropriation.  On February 5, 2016, CadCode shut down its servers due to HighMark's late payment.  (D's Facts HighMark's MSJ, Fact No. 119.)  This process prevented anyone using the One-Cut software or source code from generating HOP files, which rely on the CadCode XML to HOP conversion.  HighMark highlights that the Corporate Defendants failed to produce any HOP files in this litigation between February 5, 2016 and February 8, 2016, despite the fact that Defendants produced tens of thousands of HOP files.  (*Id.* Fact No. 120.)  According to HighMark, this shows that the Corporate Defendants were using HighMark's source code and accessing CadCode servers.  HighMark also points to a discrepancy between the number of doors processed by CadCode and the number of doors submitted for processing by HighMark.  (*Id.* Fact No. 124.)

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:** <u>CV 18-06105 SJO (JPR)</u>          **DATE:**     <u>March 26, 2020</u>

Corporate Defendants respond that Casablanca continued to generate HOP files when HighMark, on March 16, 2016, told CadCode that there remained unresolved "server issues." (HighMark's Facts Winter's MSJ, Fact No. 61.) Corporate Defendants note that Casablanca produced HOP files ranging from March 13, 2016 to March 17, 2016, undermining HighMark's argument that Corporate Defendants' software depended on accessing CadCode. (*Id.* Fact No. 62.) And Corporate Defendants respond that the undisputed evidence establishes that the CadCode discrepancy is due to HighMark's employees who would create multiple HOP files for each door. (*Id.* Fact No. 71.) Corporate Defendants raise an email from CadCode to HighMark stating that all of the authorization requests to access CadCode came from the same computer ID, indicating that none of the Corporate Defendants accessed CadCode. (*Id.* Fact No. 74.) CadCode also stated that they had no evidence that the Johnsons were using CadCode. (*Id.* Fact No. 75.)

B.   <u>Procedural Background</u>

HighMark filed its first complaint on July 13, 2018 asserting six causes of action. (*See* Compl., ECF No. 1.) That same day, HighMark filed its First Amended Complaint. (*See* First Am. Compl., ECF No. 9.) The parties stipulated to allow HighMark to amend the First Amended Complaint (*see* Stip. to Am., ECF No. 34), and the Court granted the parties stipulation, (Ord. Granting Stip., ECF No. 38.) HighMark moved to amend the operative complaint, (Mot. to Am. Compl., ECF No. 47), and the Court granted HighMark leave to file its SAC, (Ord. Granting Pl.'s Mot. For Leave to File SAC, ECF No. 54). HighMark filed its SAC on March 21, 2019. (*See generally* SAC.)

The first two causes of action in the SAC allege trade secret misappropriation under the Defend Trade Secrets Act ("DTSA") (18 U.S.C. § 1836 *et seq.*) and the California Uniform Trade Secrets Act ("CUTSA") (Cal. Civ. Code § 3426 *et seq.*) against all Defendants. (SAC ¶¶ 64-76.) In the third cause of action, HighMark alleges a violation of California's Comprehensive Computer Data Access and Fraud Act (California Penal Code § 502 *et seq.*) for Winter's alleged unauthorized and intentional taking and/or using from HighMark's confidential information from HighMark's computer and electronic storage devices. (SAC ¶¶ 77-81.) HighMark asserts its fourth cause of action for breach of contract against Winter for breaching his Employment Agreement and against Four Seasons for breaching the Master Agreement. (SAC ¶¶ 82-90.) The fifth cause of action for unfair competition (Cal. Bus. & Prof. Code § 17200 *et seq.*) is against all Defendants, and HighMark alleges its sixth cause of action for breach of fiduciary duty against Winter. (SAC ¶¶ 91-99.)

Defendants filed their answer to the SAC on April 10, 2019, and, on the same day, filed a counterclaim against HighMark and its CEO, Richard Matulia. (Answer to Am. Compl., ECF No. 65; First Counterclaim, ECF No. 66.)

The parties then stipulated to stay the case pending settlement discussions, and the Court granted the stipulation. (Stip. to Stay Case, ECF No. 71; Ord. Granting Joint Stip., ECF No. 78.) Following

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:**  <u>CV 18-06105 SJO (JPR)</u>          **DATE:**      <u>March 26, 2020</u>

unsuccessful settlement talks, the parties stipulated to terminate the stay, and the Court granted the stipulation. (Stip. to Discovery, ECF No. 80; Ord. Granting Joint Stip., ECF No. 81.) HighMark and Matulia then moved to dismiss the counterclaims. (Mot. to Dismiss, ECF No. 83.) Defendants filed a Notice of Non-Opposition to HighMark's motion, and the Court granted the motion to dismiss. (Notice of Non-Opposition, ECF No. 83; Ord. Granting Mot. to Dismiss, ECF No. 85.)

On June 3, 2019, the Court ordered the parties to file their motions for summary judgment by December 20, 2019. (Ord. Granting Joint Stip., ECF No. 81.) On December 11, 2019, the Court ordered the five Corporate Defendants to submit one motion for summary judgment brief limited to 25 pages, Defendant Winter to submit a motion for summary judgment brief limited to 20 pages, and HighMark to submit its summary judgment brief limited to 30 pages. (*See* Min. in Chambers, ECF No. 141.)

The parties complied and filed their briefs prior to the December 20, 2019 deadline. (*See* ECF Nos. 146-48.) The Court granted the parties' request to file certain documents under seal. (*See* ECF Nos. 149, 150.) In addition to their motions for summary judgment, Corporate Defendants and Winter both filed a motion to exclude the expert testimony of Plaintiff's technical expert Derek Huisjen. (*See* Motion to Exclude Expert Testimony of Plaintiff's Technical Expert Witness Derek Huisjen ("Motion to Exclude"), ECF No. 152.)

On January 28, 2020, HighMark filed its opposition to Corporate Defendants' MSJ and Winter's MSJ ("HighMark's Opp'n"), and HighMark also filed an opposition to Defendants' Motion to Exclude. (*See* ECF Nos. 164, 168.) That same day, Corporate Defendants and Winter filed a joint opposition to HighMark's MSJ ("D's Opp'n"). (*See* ECF No. 163.)

On February 4, 2020, the parties filed their reply briefs to their motions for summary judgment, and Defendants filed a reply to their Motion to Exclude. (*See* ECF Nos. 174, 176-78.)

III.   <u>LEGAL STANDARDS</u>

    A.   <u>Standards for Summary Judgement</u>

Federal Rule of Civil Procedure 56(a) mandates that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**CASE NO.:** <u>CV 18-06105 SJO (JPR)</u>          **DATE:**     <u>March 26, 2020</u>

verdict if the evidence went uncontroverted at trial.  In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal quotation marks and citations omitted).  In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party does not need to produce any evidence or prove the absence of a genuine issue of material fact.  *See Celotex*, 477 U.S. at 325.  Rather, the moving party's initial burden "may be discharged by 'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." *Id.* "Summary judgment for a defendant is appropriate when the plaintiff 'fails to make a showing sufficient to establish the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial.'" *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805-06 (1999) (quoting *Celotex*, 477 U.S. at 322).

Once the moving party meets its initial burden, the "party asserting that a fact cannot be or is genuinely disputed must support the assertion."  Fed. R. Civ. P. 56(c)(1).  "The mere existence of a scintilla of evidence in support of the [nonmoving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("[O]pponent must do more than simply show that there is some metaphysical doubt as to the material facts.").  Further, "[o]nly disputes over facts that might affect the outcome of the suit . . . will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Liberty Lobby*, 477 U.S. at 248.  At the summary judgment stage, a court does not make credibility determinations or weigh conflicting evidence.  *See id.* at 249.  A court must draw all inferences in a light most favorable to the nonmoving party.  *Matsushita*, 475 U.S. at 587.  "When the parties file cross-motions for summary judgment, [the court] review[s] each separately, giving the non-movant for each motion the benefit of all reasonable inferences." *Flores v. City of San Gabriel*, 824 F.3d 890, 897 (9th Cir. 2016).

   B.   <u>Standards for Expert Testimony</u>

Under Federal Rule of Evidence 702:

   A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**CASE NO.:** <u>CV 18-06105 SJO (JPR)</u>        **DATE:**        <u>March 26, 2020</u>

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Before admitting expert testimony, the trial court must act as a gate-keeper and make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 592-93 (1993).

"In determining whether expert testimony is admissible under Rule 702, the district court must keep in mind [the rule's] broad parameters of reliability, relevancy, and assistance to the trier of fact." *Sementilli v. Trinidad Corp.*, 155 F.3d 1130, 1134 (9th Cir. 1998) (internal quotation marks omitted); *see also Jinro Am. Inc. v. Secure Invests., Inc.*, 266 F.3d 993, 1004 (9th Cir. 2001) ("Rule 702 is applied consistent with the 'liberal thrust' of the Federal Rules and their general approach of relaxing the traditional barriers to opinion testimony" (internal quotation marks omitted)). The party offering an expert witness bears the burden of establishing that Rule 702 is satisfied. *See Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 542-43 (C.D. Cal. 2012).

IV.    <u>ANALYSIS OF MOTION TO EXCLUDE EXPERT REPORT</u>[2]

The Court begins by analyzing the Defendants' Motion to Exclude the Expert Opinion of HighMark's Expert Derek Huisjen to determine whether the Court may rely on information in Mr. Huisjen's expert report when analyzing the parties' motions for summary judgment. Mr. Huisjen has over 25 years of software engineering experience and received a Bachelor of Science degree in Computer Science from Calvin College in 1995. (Declaration of Martin Jensen ISO Motion to Exclude Expert Testimony, Ex. A ("Huisjen Report") at 2, ECF No. 152-2.) Since graduating, he

---

[2] To the extent that the motions focus on the same issues, the analysis in each section will address all parties' arguments on that issue regardless of whether the assertion is made in a motion, opposition, or reply.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:   CV 18-06105 SJO (JPR)         DATE:         March 26, 2020**

has practiced software engineering. (*Id.*)  From 2008 to 2013, Mr. Huisjen served as HighMark's Chief Technical Officer, which required him to read and write g-code for Holz-Her CNC machines. (*Id.*)

Mr. Huisjen reaches three conclusions in his expert report: (1) HighMark's conversion software and the HOP files are trade secrets; (2) Corporate Defendants' software used for cutting doors was likely reverse-engineered from HighMark's HOP files; and (3) Winter took and misused HighMark's information.  (Huisjen Report 3-4.)   The Court will first review the relevant legal standards, then it will address the arguments Defendants raise in challenging Mr. Huisjen's expert report.

A.     Inadmissible Legal Conclusions

Defendants first argue that Mr. Huisjen's expert report contains the inadmissible legal conclusion that HighMark's source code and HOP files constitute trade secrets.  (Motion to Exclude 5.)  It is well-established that expert testimony regarding legal conclusions is inadmissible.  *Aguilar v. Int'l Longshoremen's Union Local #10*, 966 F.2d 443, 447 (9th Cir. 1992).   However, the law is unsettled on whether an expert is permitted to conclude that certain technology constitutes a trade secret.

Defendants cite *Bausch & Lomb, Inc. v. Alcon Labs., Inc.*, 79 F. Supp. 2d 252, 259 (W.D.N.Y. 2000), where the court held that testimony regarding what constitutes a "trade secret" and "misappropriation" of a trade secret under New York law was "clearly inadmissible" because it is not the expert's role to instruct the jury on the applicable law.  However, *Bausch* is not entirely on point because that case, and another case Defendants cite,[3] involved excluding testimony from an attorney offered to testify about legal issues.  *See id.*  Defendants also rely on *Patriarch, Inc. v. Dynomite Distribution, Inc.*, No. CV06-4960CAS(RCX), 2007 WL 4800400, at *3 (C.D. Cal. Feb. 14, 2007), where the court excluded expert testimony that was disclosed late.  The court added, in dicta, that the experts would be prohibited from testifying "regarding legal conclusions, such as whether plaintiff's customer and supplier lists were trade secrets, such testimony invades the province of the jury."  *Id.*

As predicted, HighMark's cases challenge those of Defendants.  In *OTR Wheel Engineering, Inc. v. W. Worldwide Services, Inc.*, No. CV-14-085-LRS, 2016 WL 3626383, at *3 (E.D. Wash. Jan. 20, 2016), the court held that an expert could testify that the plaintiff's trade secrets were not

_____

[3]  *Cargill, Inc. v. Sears Petroleum & Transp. Corp.*, 334 F. Supp. 2d 197, 250 (N.D.N.Y. 2004).

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**CASE NO.:  CV 18-06105 SJO (JPR)**          **DATE:**          **March 26, 2020**

misappropriated.  *OTR Wheel* is arguably distinguishable because the issue there was whether the expert could testify to the ultimate issue of misappropriation, not whether the technology constituted a trade secret.  In addition, *OTR Wheel* is not binding precedent as it is an unpublished decision from a different district court.  HighMark also cites *Space Data Corp. v. Alphabet Inc.*, No. 16-CV-03260-BLF, 2019 WL 2603285, at *4 (N.D. Cal. June 25, 2019), but that case concerned the scope of the expert's testimony given his expertise as an economist rather than a technical expert; the case did not address whether an expert with the proper background may opine whether certain information is a trade secret.

These cases inform this Court's holding that an expert may not testify that certain technology constitutes a trade secret.  Although it is an unreported decision from a court in a different circuit, the Court finds the analysis in *CDA of America Inc. v. Midland Life Ins. Co.*, No. 01-CV-837, 2006 WL 5349266, at *5 (S.D. Ohio Mar. 27, 2006), parallel and persuasive.  There, the plaintiff sought to exclude expert testimony on whether the insurance conservation program at issue constituted a trade secret.  *Id.*  In finding that the expert had significant experience in insurance conservation, the court permitted the expert's testimony.  *Id.*  However, the court prevented the expert from testifying on "the issue of whether or not CDA's insurance conservation program constituted a 'trade secret,' as that would, as a matter of law, encroach upon the province of the jury in breach of Federal Rule of Evidence 704."  *Id.*

As applied here, Mr. Huisjen may not present the legal conclusion that HighMark's source code and HOP files constitute trade secrets.  However, the Court's holding is narrow; Mr. Huisjen may still provide opinions for which he possesses the technical background, including the value of HighMark's conversion software and its HOP files, as this testimony is relevant to the trier of fact's trade secret determination.   Mr. Huisjen may further testify to how the conversion software functions, the information contained in a HOP file, the reason HOP files and HighMark's source code are valuable, and the steps HighMark took to keep the information secret.  (Huisjen Report 6-8.)  A case cited by HighMark further reinforces the conclusion that experts may testify to the factors underlying whether technology constitutes a trade secret.  *See GSI Tech., Inc. v. United Memories, Inc.*, No. 5:13-CV-01081-PSG, 2015 WL 12942201, at *4 (N.D. Cal. Oct. 14, 2015) (permitting testimony on whether the technology at issue possessed independent economic value and whether the party undertook reasonable efforts to maintain the technology's secrecy).

As such, the Court **GRANTS** Defendants' Motion to Exclude to the extent Mr. Huisjen seeks to opine that HighMark's HOP files and source code are trade secrets.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:**  <u>CV 18-06105 SJO (JPR)</u>          **DATE:**     <u>March 26, 2020</u>

      B.   <u>Conclusion That Corporate Defendants Accessed CadCode</u>

Next, Defendants request that the Court strike Mr. Huisjen's conclusion that Corporate Defendants accessed CadCode's server. (Motion to Exclude 6-12.) A cursory review of Mr. Huisjen's opinion demonstrates that it must be excluded because it does not require application of Mr. Huisjen's expertise in software engineering.

Mr. Huisjen derives this opinion from "further background information" provided by HighMark's counsel. (Huisjen Report 12.) The further background information includes the fact that Winter served as HighMark's president for many years and had access to HighMark's source code, Winter left HighMark with his laptop and returned it "wiped," and Winter joined the Johnsons' businesses after leaving HighMark. (*Id.*) The background information also includes the Corporate Defendants' lack of HOP files from February 5, 2016 to February 8, 2016, when CadCode prevented HighMark from accessing its servers. (*Id.*) Further, Mr. Huisjen points to the discrepancy between the number of doors processed by CadCode and the number of doors submitted by HighMark. (*Id.*) Mr. Huisjen concludes that based on this evidence, "Winter took and the [Corporate] Defendant[s] used code, passwords, or other information from HighMark to access CadCode after he resigned from HighMark." (Expert Report 13.)

This conclusion is inadmissible under Rule 702(a) because it does not depend on Mr. Huisjen's expertise in software engineering. Fed. R. Evid. 702(a); *Daubert*, 509 U.S. at 591-92 ("Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."). Mr. Huisjen's expert report shows that his conclusion is an uncritical regurgitation of HighMark's claims; Mr. Huisjen recounts the information provided to him by his attorneys, then he reaches the conclusion that Corporate Defendants accessed CadCode without adding any of his own independent analysis. Mr. Huisjen did not conduct a forensic review of Corporate Defendants' computer systems, and he is not explaining the technical details of how Corporate Defendants accessed CadCode. Mr. Huisjen bases his conclusion on the fact that there is a discrepancy between HighMark's actual quantity of processed doors and HOP files, his unsupported assertion that it is "unusual" to wipe a hard drive, and Corporate Defendants' lack of HOP files when CadCode servers were inaccessible to HighMark. This analysis does not require a software engineer's expertise; instead, these facts are circumstantial evidence that a jury can weigh in deciding whether Corporate Defendants accessed CadCode's servers.

Accordingly, the Court **GRANTS** Defendants' Motion to Exclude Mr. Huisjen's opinion that Corporate Defendants accessed CadCode's servers.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:** <u>CV 18-06105 SJO (JPR)</u>          **DATE:**    <u>March 26, 2020</u>

C.    <u>Conclusion that Defendants Reverse-Engineered HighMark's One-Cut</u>

Defendants also seek to exclude Mr. Huisjen's opinion that the Defendants worked with Prodim to reverse-engineer HighMark's One-Cut.  (Motion to Exclude 12-17.)  Contrary to Defendants' arguments, Mr. Huisjen's opinion is proper under Rule 702.

Mr. Huisjen compares samples of HighMark's HOP files with samples of Corporate Defendants' HOP files, and he highlights six structural similarities between the two types of files.  For example, Mr. Huisjen notes that both HighMark's and Corporate Defendants' HOP files have a unique, nonfunctional comment value ";WZGV=7123ME001."  (Huisjen Report 8-9.)  Mr. Huisjen states that there is no reason for both HOP files to contain the exact same nonfunctional comment value, which leads Mr. Huisjen to conclude that Corporate Defendants worked with Prodim to reverse-engineer HighMark's software.  (Huisjen Report 9.)  Also, Mr. Huisjen analyzes another "out-of-place" comment in Corporate Defendants' HOP file, as well as the multiple identical tool numbers and same general ordering of the cuts.  (Huisjen Report 9-11.)  Mr. Huisjen concludes that it is "impossible that these sets of programs would have so many similarities without some level of code duplication occurring."  (Huisjen Report 12.)

Defendants challenge Mr. Huisjen's conclusion by first arguing that Mr. Huisjen's opinion is based on information supplied to him by his attorneys, including the allegation that Corporate Defendants sent HighMark's HOP file to Prodim to reverse-engineer.  (Motion to Exclude 13.)  Defendants argue that there is no evidence that MacGilvray sent HighMark's HOP file to Prodim, as MacGilvray testified repeatedly that the file he sent to Prodim was a Prodim HOP file, not a HighMark HOP file.  (*See* Motion to Exclude 13.)  Also, Defendants rebut the similarities Mr. Huisjen draws between the two HOP files by arguing that the unique comment lines Mr. Huisjen identifies are seen in HOP files from August 2006 that are publically available on the internet. (Motion to Exclude 15.)  Defendants also challenge Mr. Huisjen's analysis of the other "out-of-place" comment, as well as his vagueness regarding what precisely Mr. Huisjen alleges was reverse-engineered.  (Motion to Exclude 17.)

Defendants' attacks are best saved for cross-examination, as they address the weight of Mr. Huisjen's testimony rather than its admissibility.  The Court's inquiry is not to determine whether Mr. Huisjen's opinion is correct, but rather whether it satisfies the requirements of Rule 702, which it does.  Mr. Huisjen applies his expertise in software engineering and his years of experience working directly with g-code and HighMark's HOP files to analyze the files' contents and opine that the two files contain similarities that would be impossible without reverse-engineering.  This conclusion is helpful to the trier of fact because, left to its own devices, an average jury would unlikely be unable to compare the two HOP files and recognize whether certain comments are "out-of-place," or suggest reverse-engineering.  It is precisely the jury's function to determine factual disputes such as whether the publically available HOP file from August 2006 rebuts Mr.

MINUTES FORM 11
CIVIL GEN

___ : ___
Initials of Preparer _____

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

CASE NO.:   <u>CV 18-06105 SJO (JPR)</u>          DATE:      <u>March 26, 2020</u>

Huisjen's analysis, so these arguments cannot serve as a basis for excluding Mr. Huisjen's testimony.

The Court **DENIES** Defendants' Motion to Exclude Mr. Huisjen's opinion that Defendants reverse-engineered One-Cut.

      D.    <u>Principles and Methods Reliably Applied</u>

Finally, Defendants argue that Mr. Huisjen's report reflects no underlying principles or methods and is comprised "almost exclusively" of information given to him by HighMark's attorneys. (Motion to Exclude 18.)  Defendants assert that Mr. Huisjen's conclusions are contradicted by HighMark's Chief Technology Officer who stated that one could not recreate the functionality of CadCode using a HOP file, and that Mr. Huisjen was never able to fully understand HOP files. (Motion to Exclude 18.)

The Court rejects Defendants' first argument.  Mr. Huisjen has established his expertise in software engineering based on his credentials and 25 years of practical experience, which required him to read and write g-code for Holz-Her CNC machines.  Mr. Huisjen has applied principles acquired from his experience analyzing HOP files to opine on whether a particular line of code is functional or nonfunctional, as well as similarities between HighMark's and Corporate Defendants' HOP files that only a software engineer would recognize.  These are examples of Mr. Huisjen reliably applying his expertise to the hotly-disputed facts of this case, making his testimony valuable for the fact finder.

Defendants' other arguments do not justify exclusion of Mr. Huisjen's expert report.  In contrast to HighMark's Chief Technology Officer's comments, it appears that Mr. Huisjen has demonstrated a keen understanding of the various lines of code in a HOP file, and he has drawn parallels between HighMark's and Corporate Defendants' files that support a finding of reverse-engineering.

The Court **DENIES** Defendants' Motion to Exclude Mr. Huisjen's opinions on the basis that his report lacks reliable application of software engineering principles.

V.    <u>ANALYSIS OF HIGHMARK'S CLAIMS AGAINST CORPORATE DEFENDANTS</u>

      A.    <u>Relationship Between Corporate Defendants</u>

A threshold question is whether the Corporate Defendants should be deemed as a single entity for purposes of this litigation.  In California, the trial court is entrusted with the decision of whether to disregard the corporate form.  *See Stark v. Coker*, 20 Cal. 2d 839, 846 (1942) ("The conditions under which the corporate entity may be disregarded, or the corporation be regarded as the alter

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

CASE NO.:  <u>CV 18-06105 SJO (JPR)</u>          DATE:      <u>March 26, 2020</u>

ego of the stockholders, necessarily vary according to the circumstances in each case inasmuch as the doctrine is essentially an equitable one and for that reason is particularly within the province of the trial court.")

HighMark argues that Casablanca, Four Seasons, and Interior Door and Closet Company (IDCC) operate as the same company.  For example, all three entities are owned by Dairl and Glenn Johnson.  (D's Facts HighMark's MSJ, Fact Nos. 81, 88-89.)  Towards the end of 2011, the Johnsons converted Four Seasons to Casablanca with the intention of operating a national chain. (Krzeminski Decl., Ex. 13 at 100:13-101:13.)  When the plan to operate a national chain failed, the Johnsons continued to operate the business with the name Casablanca.  (*Id.*)  Dairl Johnson testified that Four Seasons and Casablanca share the same employees and business address. (*Id.* at 104:3-9.)  Also, it is undisputed that IDCC is an entity doing business as Casablanca.  (*Id.* Fact No. 86.)

However, the evidence does not suggest that Four Seasons should be treated as a single entity along with Casablanca and IDCC.  Four Seasons ceased doing business when the Johnsons incorporated Casablanca and started doing business under that name.  While HighMark claims that it is "undisputed" that IDCC does business on behalf of both Casablanca and Four Seasons, HighMark's citations betray its claim.  HighMark's first citation to Exhibit 58 is meaningless as HighMark did not attach an Exhibit 58 in its supporting documents, and HighMark's second citation to the Joint Rule 26(f) Report (*see* ECF No. 40) merely states that the three entities are California corporations.

The fact that IDCC does business as Casablanca indicates that IDCC acts on behalf of Casablanca.  *See Pinkerton's, Inc. v. Superior Court*, 49 Cal. App. 4th 1342, 1349 (1996) ("The designation 'd/b/a' means 'doing business as' but is merely descriptive of the person or corporation who does business under some other name. Doing business under another name does not create an entity distinct from the person operating the business.").  Therefore, the Court will treat Casablanca and IDCC as a single entity, but will not group Four Seasons with Casablanca and IDCC.

The Court agrees with the Corporate Defendants that IDCC is not a proper defendant in this litigation because it is not an independent legal entity.  While its acts can be imputed to Casablanca because IDCC does business on Casablanca's behalf, the fact that IDCC is not a legal entity means that litigation must proceed only against Casablanca.  *Pinkerton's*, 49 Cal. App. 4th at 1349 ("But while a corporation may be sued by its fictitious business name, once its true name is discovered, all further proceedings should be in the corporate name.").

Separately, One Day Doors & Closets was incorporated on April 12, 2012.  (HighMark's Facts CD's MSJ, Fact No. 142.)  It is undisputed that One Day Doors & Closets never manufactured

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

CASE NO.:  **CV 18-06105 SJO (JPR)**          DATE:          **March 26, 2020**

doors, never had employees, did not generate any revenue, and never used any software to produce doors.  (*Id.* Fact No. 144-46.)  One Day Enterprises was formed as a Delaware corporation on October 27, 2016 and registered in California on January 6, 2017. (*Id.* Fact No. 147.)  One Day Enterprises does business as One Day Doors & Closets. (*Id.* Fact No. 149.)  One Day Enterprises has used Prodim software, including vectorcam, to manufacture doors since 2017.  (*Id.* Fact No. 150.)

The Court agrees with HighMark's position that these two defendants are inextricably linked, because One Day Enterprises does business as One Day Doors & Closets. *See Pinkerton's*, 49 Cal. App. 4th at 1349. Therefore, One Day Enterprises' acts, such as using Prodim's software and producing doors, can be imputed to One Day Doors & Closets.  As such, it would be inappropriate to dismiss both parties, because as the analysis below shows, a reasonable jury could find the Defendants liable for the allegations in HighMark's complaint.

Therefore, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** Corporate Defendants' MSJ. The Court concludes that IDCC must be dismissed because it is not a proper party, and that the Corporate Defendants are not one entity for purposes of this litigation.

     B.     Statute of Limitations

Corporate Defendants' first attack on HighMark's suit claims that HighMark filed its lawsuit beyond the statute of limitations.  HighMark's causes of action began in 2011 when Four Seasons allegedly breached the Master Agreement by disclosing HighMark's confidential information, including HighMark's HOP file.  HighMark argues that it learned of Four Seasons' allegedly improper disclosure only when the email was produced in January 2019 in this litigation.  The question is whether HighMark knew or should have known of its claim in 2011, or whether the discovery rule applies to delay the accrual of the cause of action.

As the below analysis shows, there is a genuine issue of material fact regarding whether HighMark knew or should have known of its claims in 2011. Therefore, the Court **DENIES** Corporate Defendants' MSJ given the material, disputed factual questions underlying when HighMark learned of its claims.

          1.     Statute of Limitations Legal Standard

Corporate Defendants argue that the statute of limitations has run on each of the four claims asserted against them.  The parties do not dispute, and the law is clear on, the applicable statutes of limitations for the four claims.  The statute of limitations in California for a breach of contract claim is four years.   Cal. Civ. Proc. Code § 337.   HighMark's California and federal misappropriation of trade secrets causes of action both have a statute of limitations of three years.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**CASE NO.:**  <u>CV 18-06105 SJO (JPR)</u>          **DATE:**       <u>March 26, 2020</u>

Cal. Civ. Code § 3426.6; 18 U.S.C. § 1836(d).  Finally, HighMark's unfair competition claim has a statute of limitations of four years.  Cal. Bus. & Prof. Code § 17208.  The statute of limitations for all of HighMark's claims are four years or less.  Because Plaintiff filed its lawsuit on July 13, 2018, claims that accrued before July 13, 2014 are time-barred.

"Generally speaking, a cause of action accrues at 'the time when the cause of action is complete with all of its elements.'"  *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 806 (2005) (quoting *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 397 (1999)).  However, under the "discovery rule," the accrual is postponed until the plaintiff discovers, or has reason to discover, the cause of action.  *Fox*, 35 Cal. 4th at 807.  "A plaintiff has reason to discover a cause of action when he or she 'has reason at least to suspect a factual basis for its elements.'"  *Id.* (quoting *Norgart*, 21 Cal. 4th at 398).  California's discovery rule applies to breach of contract and unfair competition claims.  *April Enterprises, Inc. v. KTTV*, 147 Cal. App. 3d 805, 832 (1983); *Broberg v. The Guardian Life Ins. Co. of Am.*, 171 Cal. App. 4th 912, 920 (2009).

"[W]hen there is reason to suspect that a trade secret has been misappropriated, and a reasonable investigation would produce facts sufficient to confirm this suspicion (and justify bringing suit), the limitations period begins, even though the plaintiff has not conducted such an investigation."  *Gabriel Techs. Corp. v. Qualcomm Inc.*, 857 F. Supp. 2d 997, 1003 (S.D. Cal. 2012) (quoting *Alamar Biosciences Inc. v. Difco Labs. Inc.*, No. CIV-S-94-1856 DFL PA, 1996 WL 648286, at *3 (E.D. Cal. Feb. 27, 1996)).

To invoke the discovery rule and delay the accrual of a cause of action, the plaintiff must "show (1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence."  *See Fox*, 35 Cal. 4th at 808 (quoting *McKelvey v. Boeing North American, Inc.*, 74 Cal. App. 4th 151, 160 (1999)).

"[When] the facts are susceptible to more than one legitimate inference, the issue of when the statute of limitations began to run is a question of fact for the jury, and summary judgment is not proper."  *Dias v. Nationwide Life Ins. Co.*, 700 F. Supp. 2d 1204, 1224 (E.D. Cal. 2010).

> 2.    <u>Statute of Limitations Analysis on HighMark's California and Federal Misappropriation Claims</u>

Corporate Defendants argue that HighMark knew or should have known of the alleged misappropriation claims no later than 2012.  (Corporate Defendants' MSJ 13-17.)  Corporate Defendants highlight that HighMark knew Four Seasons stopped using One-Cut in favor of Prodim's competing software.  (*See* HighMark's Facts CD's MSJ, Fact No. 6-22.)  HighMark's president, McElroy was "mad" and "upset," distrusted Dairl and Glenn Johnson and questioned the legitimacy of their business dealings.  (*Id.* Fact Nos. 8-13.)  McElroy was concerned about

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:**   <u>CV 18-06105 SJO (JPR)</u>            **DATE:**        <u>March 26, 2020</u>

potential "infringement" and the Johnsons using information that they were not permitted to have. (*Id.* Fact No. 14.)  McElroy testified that there may be "a need for protection." (*Id.* Fact No. 20.) Corporate Defendants note that HighMark contemplated litigation against Dairl and Glenn Johnson in or around 2012.  (*Id.* Fact No. 21.)

HighMark persuasively responds that this evidence merely points to general distrust of the Johnsons and frustration with their decision to stop using HighMark's software, rather than suspicion of the factual basis of the claims asserted in this case.  (HighMark's Opp'n 5-6.) HighMark responds that McElroy was "mad" and "upset" not at the Johnsons using HighMark's technology improperly or breach of the Master Agreement, but rather the Johnsons' decision to cease doing business with HighMark.  (*Id.* at 7.)  HighMark disputes that it was aware of any specific information that would have informed it that Four Seasons misappropriated its technology or breached the parties' contract.  (*Id.* at 5-7.)

Corporate Defendants failed to counter with Winter's testimony when he explained the basis for HighMark's concern in late 2011 was Four Seasons' decision to switch service providers.  Winter testified that he and McElroy considered their options when they learned that Four Seasons stopped using One-Cut in order to "save the account" with the Johnsons.  (HighMark's Opp'n 7.) When asked whether Winter or McElroy had any concerns that Four Seasons was improperly using HighMark's technology, Winter answered "No."  (*Id.*)  Upon a closer review of Corporate Defendants' citations, none suggests that HighMark was aware of or suspected Four Seasons improperly used its confidential information; rather, the citations paint a picture of a business worried about losing its customer and exploring options to address the evolving relationship.

Viewing the evidence in the light most favorable to HighMark, the evidence supports the inference that HighMark did not know or have reason to know that Four Seasons misappropriated HighMark's trade secrets.

3.    <u>Statute of Limitations Analysis on Breach of Contract Claim</u>

In contrast to the statute of limitations for HighMark's misappropriation claims that turns on disputed factual issues, the Court can resolve the statute of limitations defense to HighMark's breach of contract claim.  "Interpretation of a written instrument becomes solely a judicial function only when it is based on the words of the instrument alone, when there is no conflict in the extrinsic evidence, or when a determination was made based on incompetent evidence." *City of Hope Nat'l Med. Ctr. v. Genentech, Inc.*, 43 Cal. 4th 375, 395 (2008).  The Court may interpret the relevant provisions of the Master Agreement because the parties do not dispute the underlying facts:  the Master Agreement ended on December 31, 2010, the parties continued performing beyond that date, HighMark did not request Four Seasons return or destroy any confidential

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

CASE NO.:   **CV 18-06105 SJO (JPR)**          DATE:          **March 26, 2020**

information, and Four Seasons never voluntarily did so.  (HighMark's Facts CD's MSJ, Fact Nos. 2-5, 23-25.)

Corporate Defendants argue that Four Seasons' continued use of One-Cut past the December 31, 2010 termination of the Master Agreement put HighMark on inquiry notice back in 2011 that Four Seasons breached the Master Agreement.  (Corporate Defendants' MSJ 13-14.)  Corporate Defendants also argue that under § 9.3 of the Master Agreement, titled "Obligations on Termination," Four Seasons was required to return or destroy all "Licensed Applications," "Documentation," or "Confidential Information."  (HighMark's Facts CD's MSJ, Fact No. 23.)  Section 4 of the "Confidentiality Agreement" attached as Exhibit E to the Master Agreement states that upon HighMark's request, Four Seasons must return all written materials containing the confidential information or destroy all such written materials and certify to HighMark that such destruction has occurred.  (*Id.* Fact Nos. 23-24.)  Because Four Seasons failed to return or destroy this information and continued using One-Cut past December 31, 2010, HighMark was allegedly on inquiry notice in early 2011.

HighMark argues that the parties consented to extend the Master Agreement through mutual performance.  (HighMark's Opp'n 8.)  Four Seasons continued to use One-Cut and HighMark continued to convert Four Seasons' door measurements into HOP files.  (*Id.*)  Because the two consented to the extended performance under the Master Agreement, Four Seasons did not breach the contract.  (*Id.*)  HighMark also argues that Four Seasons' obligation to return or destroy the confidential information did not arise at the end of the Master Agreement's term, because Four Seasons continued using One-Cut into 2011.  (*Id.* 8-9.)  Regarding Four Seasons' obligations upon termination, HighMark interprets § 9.3 of the Master Agreement differently; HighMark argues that the provision gave Four Seasons the option to "discontinue its use" of One-Cut as an alternative to returning or destroying the application and associated files.  (*Id.* at 9.)  Because Four Seasons stopped using One-Cut in 2011, Four Seasons satisfied its obligations under the Master Agreement.  HighMark also argues that Four Seasons' obligations under the Confidentiality Agreement were only triggered "[u]pon owner's written request," and because HighMark never demanded Four Seasons return or destroy HighMark's Confidential Information, Four Seasons' failure to return the information was not a breach of the agreement.  (*Id.*)

The Court agrees with HighMark's position that Four Seasons did not breach the Master Agreement by the parties' continued mutual performance beyond the term of the December 31, 2010 termination date.  Instead, the parties impliedly agreed to extend the contract; Four Seasons continued to use One-Cut, HighMark billed Four Seasons, and Four Seasons paid the invoices.  California law recognizes the type of contract extension the parties undertook here. *See McKeon v. Giusto*, 44 Cal. 2d 152, 164 (1955) (where the parties continue to perform beyond the agreement's termination, "a renewal of the original contract will be implied in the absence of a contractual provision to the contrary or an affirmative showing that the parties did not so intend").

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:**   <u>CV 18-06105 SJO (JPR)</u>          **DATE:**          <u>March 26, 2020</u>

Turning to interpreting the contractual provisions at issue, the Court agrees with HighMark's reading of the relevant clauses, and concludes that the clauses did not place HighMark on inquiry notice in 2011 that Four Seasons had breached the Master Agreement. Section 9.3 of the Master Agreement, titled "Obligations on Termination," states that upon termination of the Master Agreement, "Licensee shall discontinue its use of such application(s) return or destroy any copies of the Licensed Applications and/or Documentation and any Confidential Information it may possess." (Krzeminski Decl., Ex. 44.)  The Court agrees with HighMark's interpretation that Four Seasons could have discontinued its use of HighMark's product as an alternative to returning or destroying the confidential information.  Also, Four Seasons could have fulfilled its obligation under this provision by destroying (as opposed to returning) the confidential information.  Because Four Seasons could have fulfilled its obligation under that provision by destroying the confidential information and not notifying HighMark, the provision did not create an obligation whose breach would have placed HighMark on inquiry notice.   Finally, the Court agrees with HighMark's interpretation of § 4 of the Confidentiality Agreement, as obligations under that provision arose only upon HighMark's request.   Because HighMark never requested Four Seasons return or destroy confidential information, Four Seasons did not breach the agreement.

Accordingly, the Court concludes that the statute of limitations on HighMark's breach of contract claim did not begin running in 2011.

4.      <u>Accrual of HighMark's Causes of Action</u>

To rely on the discovery rule to delay the accrual of the causes of action, HighMark must show (1) the time and manner in which HighMark discovered the basis for its claims, and (2) that HighMark was unable to discover the basis for its claims earlier despite reasonable diligence.  *See Fox*, 35 Cal. 4th at 808.  In California, the "discovery rule may be applied to [contract] breaches which can be, and are, committed in secret and, moreover, where the harm flowing from those breaches will not be reasonably discoverable by plaintiffs until a future time."  *Apr. Enters., Inc. v. KTTV*, 147 Cal. App. 3d 805, 831-32 (Ct. App. 1983).  "[Whether] the plaintiff exercised reasonable diligence is a question of fact for the court or jury to decide."  *Id.* at 833 (quoting *Enfield v. Hunt*, 91 Cal. App. 3d 417, 419 (1979)).

HighMark explains that it received MacGilvray's email to Prodim only in January of 2019. (HighMark's Opp'n 3-4, 10.)  Also, HighMark argues that it was unable to discover the basis of its claims earlier.  HighMark cites the email exchange between MacGilvray and Prodim that expressly requests Prodim "keep this quiet so we don't get cut off [w]ith what were [sic] using right now." (*Id.* at 11.)  Prodim responds "ofcourse [sic] we will keep u confidential!"  (*Id.*)  This email evidences an attempt to conceal Four Seasons' work with Prodim from HighMark, as Dairl Johnson testified that the comment "[p]robably referred to HighMark."  (*Id.*)  HighMark has provided sufficient evidence that it would have been unable to discover its claims earlier despite

MINUTES FORM 11
CIVIL GEN                                Page 20 of   31                    Initials of Preparer _____

__ : __

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:**  <u>CV 18-06105 SJO (JPR)</u>          **DATE:**     <u>March 26, 2020</u>

reasonable diligence given Four Seasons' efforts to conceal its communications with Prodim from HighMark.  Viewing the facts in the light most favorable to HighMark, a reasonable jury could find that HighMark was unable to discover its claims prior to January 2019 because MacGilvray hid his communications with Prodim from HighMark.

The Court **DENIES** Corporate Defendants' MSJ based on the statute of limitations defense.  The Court's holding above precludes Defendants from asserting their statute of limitations defense against HighMark's breach of contract claim.  However, the jury must decide the disputed questions of whether HighMark knew of its trade secret misappropriation claims in 2011 and when HighMark's misappropriation claims accrued.

C.     <u>HighMark's Breach of Contract Claim Against Corporate Defendants</u>

To prevail on a claim of breach of contract, a plaintiff must prove (1) the existence of a contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damages.  *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1367 (2010).  The parties do not dispute that the parties were bound by the Master Agreement and Confidentiality Agreement.  The dispute here centers on whether Four Seasons breached its obligations under the agreements.

HighMark asserts that Four Seasons breached its obligations under § 2.4 of the Master Agreement by disclosing HighMark's HOP file to Prodim in September 2011.  (HighMark's MSJ 14.)  HighMark also alleges that Four Seasons' disclosure of HighMark's HOP file to Prodim violates § 2 of the parties' Confidentiality Agreement.  (HighMark's MSJ 14.)  In addition, HighMark argues that Four Seasons violated the Master Agreement by licensing from Prodim software that Four Seasons knew was reverse-engineered from HighMark's HOP file.  (HighMark MSJ 15.)

The Confidentiality Agreement protects from disclosure HighMark's HOP files and source code. It defines "Confidential Information" as follows:

> <u>Confidential Information</u>. For purposes of this Agreement "Confidential Information" means any type of information or material disclosed by HighMark or its authorized representatives to the Recipient, and related to HighMark's current, future and proposed business, system, strategy, concepts, processes, methodology , activities, tools, products, services, suppliers, partners, and customers, and includes, without limitation, information, know-how and data concerning development, **design details and specifications**, **source code**, engineering, customer lists, business forecasts, sales, and marketing plans and **any other similar information or data** which is disclosed by HighMark.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:** <u>CV 18-06105 SJO (JPR)</u>　　　　**DATE:**　　<u>March 26, 2020</u>

(Krzeminski Decl., Ex. 44, Confidentiality Agreement, HMDI.0000108 (emphasis added).)  The Confidentiality Agreement also prohibits Four Seasons from "developing competitive products or businesses."  (*Id.*)  Four Seasons was only permitted to disclose the Confidential Information to its own employees or consultants on a "need to know" basis.  (*Id.*)  On its face, the Confidentiality Agreement prohibits Four Seasons from disclosing HighMark's HOP files and source code.

The Master Agreement also protects HighMark's HOP files from disclosure.  Section 1.6 defines "Files" to include files "created by a Licensed Application based on Measurement Data containing a digital footprint for a single, individual door opening."  (Krzeminski Decl., Ex. 44 § 1.6.)  The Master Agreement then prohibits Four Seasons from distributing, transferring or allowing any third party from accessing or using the "Files."  (Krzeminski Decl., Ex. 44 § 2.4.)  A simple reading of the Master Agreement and Confidentiality Agreement undermines Corporate Defendants' position that HighMark's HOP files were not protected under these contracts.

Having concluded that HighMark's HOP files and source code were protected from disclosure, the Court concludes that HighMark's breach of contract claim must proceed to the jury because there is a genuinely disputed material fact of whether the HOP file that MacGilvray sent to Prodim was HighMark's HOP file.  The parties agree that MacGilvray sent an email to Prodim employee Pustjens with a HOP file so that Prodim "could see the conversion . . . ."  (D's Facts HighMark's MSJ, Fact No. 51.)  It is also undisputed that MacGilvray requested Pustjens "keep this quiet so we don't get cut off with [w]hat were [sic] using right now . . . ."  (*Id.* Fact No. 52.)

A reasonable jury interpreting this evidence could conclude that at the time of MacGilvray's email, Four Seasons was using HighMark's One-Cut software, and the HOP file on Four Seasons' server (that MacGilvray sent to Prodim) was a HighMark HOP file.  This is supported by the expert report of Mr. Huisjen, who concludes that the similarities between HighMark's and Corporate Defendants' HOP files proves that Corporate Defendants used a HighMark HOP file to reverse-engineer HighMark's technology.

A jury may just as reasonably conclude that the HOP file MacGilvray sent to Prodim was not a HighMark HOP file.  Corporate Defendants point to Winter's consistent position that the HOP file did not belong to HighMark.  (D's Opp'n 15.)  Corporate Defendants also highlight the fact that McElroy testified that Prodim was instrumental in developing One-Cut, which explains the similarities in HighMark's and Corporate Defendants' HOP files.  (*Id.* at 15-16.)

Whether Four Seasons sent HighMark's HOP file to Prodim is the crux of HighMark's breach of contract claim, and that is a factual determination that a jury could resolve in either HighMark's or Corporate Defendants' favor.

_____ : _____

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

| | |
|---|---|
| Priority | ____ |
| Send | ____ |
| Enter | ____ |
| Closed | ____ |
| JS-5/JS-6 | ____ |
| Scan Only | ____ |

**CASE NO.:** <u>CV 18-06105 SJO (JPR)</u>          **DATE:** <u>March 26, 2020</u>

The Court **DENIES** Corporate Defendants' MSJ on HighMark's breach of contract claim, and **DENIES** HighMark's MSJ on its breach of contract claim.

      D.    <u>HighMark's Misappropriation of Trade Secrets Claims Under DTSA and CUTSA Against Corporate Defendants</u>

The parties also move for summary judgment on HighMark's DTSA and CUTSA misappropriation claims. To prevail on a DTSA or CUTSA claim, a plaintiff must prove: (1) ownership of a trade secret; (2) the defendant misappropriated the trade secret; and (3) damages caused by the defendant's actions. *WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 845 (N.D. Cal. 2019); *Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 220 (2010) *disapproved of on other grounds by Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310 (2011). The DTSA and CUTSA both define "misappropriation" as the improper "acquisition," "disclosure," or "use" of a trade secret. 18 U.S.C. §§ 1839(5)(A)-(B); *Silvaco*, 184 Cal. App. 4th at 222.

      1.    <u>HighMark's Trade Secrets</u>

The parties dispute whether HighMark possesses a trade secret. A plaintiff first "must identify the trade secrets and carry the burden of showing that they exist." *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164-65 (9th Cir. 1998). The plaintiff "should describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons ... skilled in the trade." *Imax Corp.*, 152 F.3d at 1164-65 (internal citation omitted). In addition to the requirement that the information be sufficiently particular, courts apply a two-part test to determine whether the information at issue constitutes a trade secret: (1) the information is valuable because it is unknown to others, and (2) the owner made reasonable efforts to keep the information secret. 18 U.S.C. § 1839(3); *see Imax Corp.*, 152 F.3d at 1164; *see Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443, 1454 (2002). DTSA defines "trade secret" as "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes." 18 U.S.C. § 1839(3).

Courts generally leave to the jury the determination of whether information constitutes a trade secret. *Moss, Adams & Co. v. Shilling*, 179 Cal. App. 3d 124, 128 (1986) ("Ordinarily whether information is a trade secret constitutes a question of fact."); *Masimo Corp. v. Sotera Wireless, Inc. (In re Sotera Wireless, Inc.)*, 591 B.R. 453, 458 (S.D. Cal. 2018) ("The issue of whether information constitutes a trade secret is a question of fact.").

In 2007, McElroy and Winter worked on developing a system to automate the process of measuring and cutting replacement doors. (D's Facts HighMark's MSJ, Fact Nos. 6-8.) HighMark

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

CASE NO.:   **CV 18-06105 SJO (JPR)**          DATE:          **March 26, 2020**

used the Prodim Proliner to create the measurement data and worked with MetaWorks to develop software to convert the Prodim Proliner data into MetaWorks XML data for CadCode. (*Id.* Fact Nos. 94-95.) HighMark then worked with CadCode to convert the XML data into HOP files for CNC machines. (*See id.* Fact Nos. 100, 103.) HighMark claims its trade secrets include both the source code and the cutting instructions (HOP file) for the CNC machine. (HighMark's MSJ 2.) HighMark points to the Master Agreement and Winter's 2007 Employee Agreement to support its position that it owns the proprietary One-Cut system and associated software and hardware. (HighMark's MSJ 18.)

In addition, HighMark relies on the expert report of Mr. Huisjen in arguing that HighMark's HOP files and source code are trade secrets. Mr. Huisjen states that HighMark's conversion software converts 3D measurements of a door into cutting instructions for a Holz-Her CNC machine. (Huisjen Report 6.) He states that this valuable process, which required significant investment, eliminates the need to take the measurements by hand, is more efficient, and contains complicated algorithms and mathematical conversions. (Huisjen Report 7.) Mr. Huisjen also states that HighMark's HOP files are valuable because they indicate cuts to be made to each side of the door so that it will fit an old door frame, and they contain information about the exact tools to use and in which order. (*Id.*) Mr. Huisjen notes that the company derived independent economic value from licensing HOP files, as demonstrated by Four Seasons' desire to license the product. (*Id.*) Mr. Huisjen also reviews HighMark's efforts to maintain the secrecy of the source code and HOP files. (Huisjen Report 8.)

HighMark further argues that it took reasonable efforts to maintain the secrecy of its source code by, for example, placing restrictions on use and access to the source code and ensuring that the source code and HOP files were not distributed to third parties. (HighMark's MSJ 19-20.) In focusing on its HOP files, HighMark argues that the HOP files are trade secrets because they convey valuable information about the conversion process reflected in HighMark's source code. (HighMark's Opp'n 15-16.) A jury analyzing this evidence could conclude that HighMark's source code and HOP files are trade secrets.

Corporate Defendants do not appear to challenge HighMark's claim that its source code that it developed with MetaWorks is a trade secret. However, Corporate Defendants challenge HighMark's claim that its HOP files are trade secrets. Corporate Defendants argue that HOP files are publically available and were in use even before HighMark existed. (HighMark's Facts CD's MSJ, Fact Nos. 72-89.) According to both McElroy and Winter, neither consider the HOP file itself proprietary. (*Id.* Fact Nos. 83-85.) The Corporate Defendants note that HOP files are used with CNC machines all over the world and cannot be considered trade secrets. In Corporate Defendants' view, the fact that CadCode and HighMark did not enter into a written confidentiality or trade secret agreement undermines HighMark's claim that the source code is a trade secret. (*Id.* Fact Nos. 86-89.) Corporate Defendants dispute that HighMark's source code or HOP files

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:**  <u>CV 18-06105 SJO (JPR)</u>          **DATE:**     <u>March 26, 2020</u>

constitute trade secrets, arguing that the software that generates HOP files is owned by CadCode. (*Id.* Fact Nos. 79-80.)   Similarly, reasonable minds can conclude that this evidence refutes HighMark's claim that its source code and HOP file are trade secrets.

While it appears undisputed that HighMark's source code is a trade secret, the parties' competing narratives establish a genuine issue of material fact regarding whether HighMark's HOP files constitute trade secrets.   Given the factual basis supporting each theory, the Court cannot conclude that no reasonable juror could find for the nonmovant; the decision of whether HighMark's HOP files are trade secrets must be decided by the jury.

> 2.   <u>Misappropriation of HighMark's Trade Secrets</u>

Even assuming HighMark can establish that both its source code and HOP files are trade secrets, there remains a genuine issue of material fact regarding whether the Defendants misappropriated HighMark's trade secrets.   As set forth more fully in Part V.C. above, a jury could reasonably conclude either that the HOP file MacGilvray sent to Prodim was a HighMark HOP file, or that it was not.  *See supra* Part V.C.  That factual question will determine whether Defendants are liable for misappropriating HighMark's trade secrets.

In sum, the analysis above demonstrates that there are genuine issues of material fact regarding whether HighMark's source code and HOP files are both trade secrets, and whether the Corporate Defendants misappropriated those trade secrets.   Therefore, the Court **DENIES** Corporate Defendants' MSJ on HighMark's misappropriation claims, and **DENIES** HighMark's MSJ on its misappropriation claims.

> E.   <u>Whether the Alleged Misappropriation Predates the DTSA</u>

Corporate Defendants argue that HighMark's DTSA claim against Four Seasons is barred because the DTSA only applies to trade secret misappropriation that occurs after the enactment of the DTSA on May 11, 2016.  *Veronica Foods Co. v. Ecklin*, No. 16-CV-07223-JCS, 2017 WL 2806706, at *13 (N.D. Cal. June 29, 2017) ("[T]he DTSA applies only to 'any misappropriation of a trade secret ... for which any act occurs on or after [May 11, 2016,] the date of the enactment of [the] Act.'") (quoting Defend Trade Secrets Act of 2016, Pub. L. No. 114-153, 130 Stat. 376, 381-82 (May 11, 2016)).  However, the DTSA applies to misappropriation before May 11, 2016 if the defendant's misappropriation continued after the date of the act's enactment.  *Veronica Foods*, 2017 WL 2806706, at *13.

The parties do not dispute that the Four Seasons legal entity has not conducted business since 2011.  (*See* HighMark's Opp'n 18; HighMark's Facts CD's MSJ, Fact No. 137.)  Above, the Court concluded that Four Seasons is not liable for the acts of Casablanca and IDCC, as neither act on

MINUTES FORM 11
CIVIL GEN
___ : ___
Initials of Preparer _____

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

CASE NO.:  <u>CV 18-06105 SJO (JPR)</u>          DATE:          <u>March 26, 2020</u>

behalf of Four Seasons.  *See supra* Part V.A.  As such, HighMark has not provided any evidence of misappropriation after May 11, 2016 that can be attributed to Four Seasons.  Thus, Four Seasons cannot be held liable for violating the DTSA.

Therefore, the Court **GRANTS** Corporate Defendants' MSJ on HighMark's DTSA claim.

F.    <u>HighMark's Unfair Competition Claim Under § 17200</u>

Corporate Defendants argue that HighMark's unfair competition claim is preempted by the CUTSA.  (Corporate Defendants' MSJ 23.)  The CUTSA "provides the exclusive civil remedy for conduct falling within its terms and supersedes other civil remedies based upon misappropriation of a trade secret."  *Waymo LLC v. Uber Techs., Inc.*, 256 F. Supp. 3d 1059, 1062 (N.D. Cal. 2017).  The CUTSA preempts all state law claims based on the same nucleus of facts as a plaintiff's trade secret misappropriation claim.  *Prostar Wireless Grp., LLC v. Domino's Pizza, Inc.*, 360 F. Supp. 3d 994, 1006 (N.D. Cal. 2018).  To avoid preemption, the plaintiff must "allege wrongdoing that is materially distinct from the wrongdoing alleged in a CUTSA claim."  *Id.* (quoting *SunPower Corp. v. SolarCity Corp.*, 2012 WL 6160472, at *9 (N.D. Cal. Dec. 11, 2012)).  The central question is whether HighMark's trade secret and unfair competition claims are based on the same set of facts.

In its complaint, HighMark supports its unfair competition claim by alleging that Corporate Defendants "misappropriat[ed] and us[ed] HighMark's trade secret and/or confidential information in violation of United States law." (SAC ¶ 92.)  HighMark's own allegations inextricably tie its trade secret misappropriation and unfair competition claims, so CUTSA preempts HighMark's unfair competition claim.

HighMark acknowledges that its unfair competition claim is likely preempted by CUTSA. (HighMark's Opp'n 21.)  To save its claim, HighMark requests that the Court defer dismissing its unfair competition claim until after the determination has been made that HighMark possesses a trade secret.  Courts have grappled with whether CUTSA preempts a cause of action based on disclosure of information even when the information does not constitute a "trade secret."  The Court agrees with the decision in *Mattel, Inc. v. MGA Entm't, Inc.*, 782 F. Supp. 2d 911, 985-87 (C.D. Cal. 2011), where, after a thorough analysis of cases addressing the issue, the court concluded "that UTSA supersedes claims based on the misappropriation of confidential information, whether or not that information meets the statutory definition of a trade secret." This ruling aligns with the California decisions that have addressed the issue, and "the majority of district courts that have considered [this issue] have held that CUTSA supersedes claims based on the misappropriation of information that does not satisfy the definition of trade secret under CUTSA."  *Zomm, LLC v. Apple Inc.*, 391 F. Supp. 3d 946, 954 (N.D. Cal. 2019).

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:** <u>CV 18-06105 SJO (JPR)</u>        **DATE:**        <u>March 26, 2020</u>

In addition to being preempted, HighMark's unfair competition claim under § 17200 must be dismissed because HighMark has an adequate remedy at law. A claim under § 17200 is a claim for equitable relief. *See Munning v. Gap, Inc.*, 238 F. Supp. 3d 1195, 1204 (N.D. Cal. 2017). And to pursue an equitable remedy, the plaintiff must lack an adequate remedy at law. HighMark fails to address this issue, likely because it recognizes that its trade secret misappropriation claim, which allows for monetary damages, is an adequate legal remedy. Courts in this circuit have routinely dismissed unfair competition claims where the plaintiff has an adequate legal remedy. *See Munning*, 238 F. Supp. 3d at 1204 (collecting cases). Therefore, it is appropriate to grant summary judgment on plaintiff's unfair competition claim given HighMark's other viable legal remedies.

The Court **GRANTS** summary judgment on HighMark's unfair competition claim because it is preempted by the CUTSA and HighMark maintains an adequate legal remedy.

VI.     <u>ANALYSIS OF HIGHMARK'S CLAIMS AGAINST WINTER</u>

    A.     <u>HighMark's Breach of Contract Claim Against Winter</u>

The parties do not dispute that the Employee Agreement is a valid, binding contract. The dispute focuses on whether Winter breached the agreement. HighMark asserts three alleged breaches of the Employee Agreement to support its breach of contact claim.

HighMark first argues that Winter breached the Employee Agreement by engaging in negotiations with the Johnsons while Winter was still employed at HighMark. (HighMark's MSJ 16.) The Employee Agreement states that Winter will "not engage in other employment or in any conduct in direct conflict with [HighMark's] interests." (Krzeminski Decl., Ex. 43, § 1.) It is unclear whether merely entering prospective employment negotiations directly conflicts with HighMark's interests, particularly given that the relationship between HighMark and Winter was severely strained at the time of Winter's departure. (*See* HighMark's Facts Winter's MSJ, Fact Nos. 1-8.) Therefore, whether Winter's decision to seek employment with the Johnsons violates § 1 of the Employee Agreement is a question of fact proper for the jury.

Second, HighMark argues that Winter breached the contract by disclosing HighMark's source code to Casablanca when he left HighMark to work for Casablanca in August 2015. (HighMark's MSJ 16-17.) HighMark argues that Winter's retention of the laptop and external hard drive and returning the laptop "wiped" of its data indicates that Winter gave the source code to Casablanca and tried to cover his tracks. Also, HighMark points to the discrepancy between CadCode requests and doors that HighMark processed, indicating that the Corporate Defendants were using HighMark's source code and therefore CadCode's servers. HighMark argues that this evidence shows that Winter disclosed HighMark's source code to the Corporate Defendants.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:**  <u>CV 18-06105 SJO (JPR)</u>        **DATE:**        <u>March 26, 2020</u>

Winter responds that he was required to wipe the hard drive because the Wells Fargo fraud department advised him to do so after there was a breach of his personal bank account. (HighMark's Facts Winter's MSJ, Fact No. 42.)  Winter discovered that Katherine Gabales, a HighMark employee, accessed his personal bank account and changed the email address on the account to a HighMark email address. (*Id.* Fact Nos. 33-41.)  Also, Winter rebuts HighMark's argument that the Corporate Defendants accessed CadCode by noting that CadCode confirmed that only one computer accessed the CadCode servers, and the multiple HOP files resulted from HighMark's own employees generating multiple HOP files for a single door.

With vastly different storylines each supported by evidence, nearly no fact remains undisputed. A reasonable jury could reject Winter's explanation of his reason for wiping the laptop and hard drive.  When one's bank account has been accessed and the email address changed, typically that does not give rise to wiping the entirety of a laptop's contents, which makes this behavior arguably suspicious.  However, in contrast, a jury could conclude that the Corporate Defendants never accessed CadCode, as CadCode itself stated that all authorization requests to the CadCode server came from one computer.  This would support the conclusion that the Corporate Defendants were not using HighMark's source code, so Winter did not disclose the HighMark source code to the Corporate Defendants.  Given these competing viewpoints supported by disputed evidence, these factual issues must be reserved for a jury's determination.

Third, HighMark claims that Winter breached the Employee Agreement by retaining his computer and the external hard drive for over a week after his employment with HighMark had ended.  (*Id.*)  Section 10 of the Employee Agreement states "when my employment with [HighMark] is over, I will return all materials . . . containing or disclosing any Proprietary Information . . . ." (Krzeminski Decl., Ex. 43, § 10.)  The parties do not dispute that Winter retained his computer and external hard drive for seven to ten days after he resigned from HighMark.  (D's Facts HighMark's MSJ, Fact No. 31.)  The question remains whether Winter's retention of the company computer and external hard drive for seven to ten days after his employment constitutes a breach of § 10 of the Employee Agreement, even though the agreement does not provide a time frame in which Winter was required to return the items.

Although not addressed by the parties, it appears that California Civil Code § 1657 governs the issue here.  It states, "If no time is specified for the performance of an act required to be performed, a reasonable time is allowed. If the act is in its nature capable of being done instantly--as, for example, if it consists in the payment of money only--it must be performed immediately upon the thing to be done being exactly ascertained." Cal. Civ. Code § 1657.  So if returning one's laptop and computer can be "done instantly," Winter violated the Employee Agreement by retaining the devices.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority   _____
Send       _____
Enter      _____
Closed     _____
JS-5/JS-6  _____
Scan Only  _____

CASE NO.:   <u>CV 18-06105 SJO (JPR)</u>          DATE:      <u>March 26, 2020</u>

Nearly all published decisions from California state courts citing the "capable of being done instantly" clause of § 1657 apply that clause to the payment of money.  *See, e.g.*, *Dennis v. Overholtzer*, 178 Cal. App. 2d 766, 775 (1960).  There is only one published California case applying § 1657 to a different context, that of assigning a contract.  *See Archer v. Miller*, 73 Cal. App. 678, 686 (Dist. Ct. App. 1925).  Clearly, California courts have been reluctant to require immediate performance of non-payment obligations where the contractual provision is silent on the deadline for performance.  Taking its cue from California state courts, the Court holds that Winter was required to return the computer and external hard drive to HighMark within a reasonable time under § 1657.

"What constitutes such a reasonable time ordinarily presents a question of fact, dependent upon the circumstances of the case."  *Kotler v. PacifiCare of Cal.*, 126 Cal. App. 4th 950, 956 (2005).  As such, a jury must decide if seven to ten days is a reasonable time for Winter to return his electronic devices, or whether a week of retaining those devices is unreasonable and violates § 10 of the Employee Agreement.

Because HighMark's breach of contract claims against Winter depend on genuinely disputed factual issues, this claim must be decided by a jury.  The Court **DENIES** Winter's MSJ on HighMark's breach of contact claim, and **DENIES** HighMark's MSJ on that claim as well.

   B.   <u>HighMark's Misappropriation of Trade Secrets Claims Under DTSA and CUTSA Against Winter</u>

HighMark alleges that Winter misappropriated HighMark's trade secrets and is liable under CUTSA and DTSA. (HighMark's MSJ 23.)  As the Court's analysis above shows, there are genuine issues of material fact regarding whether HighMark's source code and HOP files are trade secrets.  *See supra* Part V.D.1.  Even assuming HighMark could establish that it possessed trade secrets, this Court's analysis in the previous section demonstrates that there are genuine issues of material facts regarding whether Winter misappropriated HighMark's trade secrets.  *See supra* Part VI.A.  A jury could conclude that Winter misappropriated HighMark's trade secrets when he retained the company's laptop and external hard drive seven to ten business days after he resigned and returned the laptop wiped of its data.  A reasonable jury could also credit Winter's explanation that Wells Fargo instructed him to wipe his laptop, he backed up and returned all of HighMark's files, and there is no direct proof that he misappropriated HighMark's source code or HOP files.

The Court **DENIES** HighMark's MSJ and Corporate Defendants' MSJ on HighMark's misappropriation claim.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

| | |
|---|---|
| Priority | _____ |
| Send | _____ |
| Enter | _____ |
| Closed | _____ |
| JS-5/JS-6 | _____ |
| Scan Only | _____ |

CASE NO.:   **CV 18-06105 SJO (JPR)**          DATE:          **March 26, 2020**

C.     HighMark's Claim Under California Penal Code § 502

A person violates California Penal Code § 502(c)(2) if he or she "[k]nowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network." Cal. Penal Code § 502(c)(2). HighMark argues that Winter knowingly accessed HighMark's One-Cut source code repository on the laptop given to him by HighMark. (HighMark MSJ 28.) HighMark claims that Winter knowingly retained the computer data and external hard drive beyond the term of his employment, and he used the source code by divulging the code to the Corporate Defendants, as shown by their access to the CadCode server. (HighMark MSJ 28-29.)

Winter responds that he never took HighMark's source code or disclosed HighMark's source code to Corporate Defendants. (D's Opp'n 30-31.) Also, Winter highlights CadCode's correspondence with HighMark indicating that CadCode had no evidence that Corporate Defendants accessed its servers. (*Id.* at 9.)

The facts do not conclusively establish whether Winter disclosed HighMark's source code to the Corporate Defendants after leaving HighMark. Disputed evidence raises a triable issue of fact to be decided by a jury.

Also, HighMark asserts a claim under California Penal Code § 502(c)(4). An individual violates that statute when he or she "[k]nowingly accesses and without permission adds, alters, damages, deletes, or destroys any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network." Cal. Penal Code § 502(c)(4). HighMark argues that by wiping his computer, Winter destroyed HighMark's data on the devices he eventually returned to HighMark. (HighMark's Facts Winter's MSJ, Fact No. 44.) HighMark engaged a third-party forensics team that concluded that Winter wiped and deleted data off of his devices. (Krzeminski Decl., Ex. 49.) Winter argues that he backed up all HighMark files from his laptop to the external hard drive that he returned to HighMark about a week after he terminated his employment. (D's Opp'n 31.)

Because Winter wiped the laptop before returning it, one cannot determine what files were on the computer that may or may not have been transferred to the external hard drive. For this reason, HighMark disputes the fact that Winter backed up all files on his HighMark computer and returned them to the company. (HighMark's Facts Winter's MSJ, Fact No. 44.) A jury must decide the factual question of whether Winter backed up and returned all of his HighMark files upon leaving the company.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

| | |
|---|---|
| Priority | _____ |
| Send | _____ |
| Enter | _____ |
| Closed | _____ |
| JS-5/JS-6 | _____ |
| Scan Only | _____ |

**CASE NO.:**  <u>CV 18-06105 SJO (JPR)</u>        **DATE:**        <u>March 26, 2020</u>

The Court **DENIES** HighMark's MSJ on its claim against Winter for violating California Penal Code § 502, and **DENIES** Corporate Defendants' MSJ on that same claim.

### D.        Preemption of HighMark's Breach of Fiduciary Duty and Unfair Competition Claims

Winter argues that CUTSA preempts HighMark's breach of fiduciary duties and unfair competition claims. (Winter's MSJ 16-17.) As discussed above, common law claims that rely on the same set of essential facts as trade secret misappropriation claims are preempted by CUTSA. *Prostar Wireless*, 360 F. Supp. 3d at 1006. HighMark's claims are preempted because HighMark's breach of fiduciary duty claim and unfair competition claims are based on the same essential facts as his trade secret misappropriation claims.

HighMark's breach of fiduciary duty claim is premised on Winter's access to confidential information and the alleged disclosure of that information to Corporate Defendants. (HighMark's MSJ 26.) HighMark also alleges that Winter usurped a corporate opportunity by joining the Johnsons' companies and competing with HighMark to expand into the market for interior door replacement services. (*Id.* at 27.) Because HighMark's corporate opportunity claim is inextricably tied to its trade secret misappropriation claim, the two share the same nucleus of facts. Therefore, HighMark's breach of fiduciary duty claim is preempted by CUTSA.

The analysis of HighMark's unfair competition claim against Winter is substantially similar to that of HighMark's unfair competition claim against Corporate Defendants; HighMark acknowledges that its unfair competition claim is likely preempted by CUTSA, but requests the Court defer dismissing the unfair competition claim until after a decision on whether HighMark possesses a trade secret. (HighMark's Opp'n 27.) As discussed above, the Court holds that the CUTSA preempts all claims based on misappropriation of confidential information, even if the information does not constitute a trade secret. *See supra* Part V.F.; *see also Mattel*, 782 F. Supp. 2d 987. Thus, CUTSA preempts HighMark's unfair competition claim.

Therefore, the Court **GRANTS** Winter's MSJ on HighMark's breach of fiduciary duty and breach of contract claims.

## VII.    RULING

For the foregoing reasons, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** Corporate Defendants' MSJ, **GRANTS-IN-PART** and **DENIES-IN-PART** Winter's MSJ, **DENIES** HighMark's MSJ, and **GRANTS-IN-PART** and **DENIES-IN-PART** Corporate Defendants' and Defendant Winter's Motion to Exclude.

IT IS SO ORDERED.